# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ERNEST GIBSON, Minor, by his guardian ad litem, SUSAN M. GRAMLING, )<br><br>Plaintiff, )<br><br>vs. )<br><br>AMERICAN CYANAMID COMPANY, et al., )<br><br>Defendants. ) | **Case No. 07-CV-0864** |

**MEMORANDUM IN SUPPORT OF DEFENDANT ATLANTIC RICHFIELD COMPANY'S MOTION PURSUANT TO FED R. CIV. P. 56 FOR SUMMARY JUDGMENT ON CONSTITUTIONAL GROUNDS**

**PRELIMINARY STATEMENT**

Defendant Atlantic Richfield Company ("Atlantic Richfield") seeks summary judgment dismissing Plaintiff's claims on the ground that they rely upon a novel rule of Wisconsin law that violates the Takings Clause and the Due Process Clause of the United States Constitution.[1]

Plaintiff sues former manufacturers of white lead carbonate pigments or their alleged corporate successors under a novel theory of liability created by the Wisconsin Supreme Court — the "risk contribution" rule. Under this rule, when someone in Wisconsin is injured by a product and the manufacturer of the product is unknown, Wisconsin may require anyone who

---

[1] This motion is being filed simultaneously in three other cases filed by Plaintiff's counsel on behalf of other plaintiffs: *Burton v. Am. Cyanamid*, No. 07-CV-0303, *Owens v. Am. Cyanamid*, No. 07-CV-0441, and *Stokes v. Am. Cyanamid*, No. 07-CV-0865. Other than the description of the complaints' allegations concerning the individual plaintiffs, the motions are identical.

made the same type of product to pay for the injury. A manufacturer can escape the reach of the risk contribution rule only if it can prove that its product could not reasonably have been the actual product that caused the injury. The Wisconsin Supreme Court created the rule in a conscious, deliberate departure from traditional common-law rules of tort liability and causation, in order to facilitate recovery by particular types of tort claimants whose claims would fail under those traditional rules. Wisconsin created this rule in *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), *cert. denied*, 469 U.S. 826 (1984), a case involving the drug diethylstilbestrol ("DES"). *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523, held that the rule could also be applied in cases involving white lead carbonate pigments.

Under decisions of the United States Supreme Court rendered since *Collins*, the risk contribution rule violates Atlantic Richfield's constitutional rights. In the words of one of those decisions, the rule "imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 528 (1998). The potential retroactive liability is particularly unfair and arbitrary in this case because Atlantic Richfield did not itself manufacture white lead carbonate. It is a defendant here only because of mergers that occurred long after its alleged predecessors left the white lead carbonate business but before Wisconsin created the risk contribution rule. The parties to those mergers could have chosen not to consummate them had they known that such mergers could ensnare them in the potential liability Wisconsin now threatens to impose.

The risk contribution rule violates due process for an additional reason. The United States Supreme Court has held, in a series of cases decided since *Collins*, that a state violates a defendant's due process rights when it exacts punitive damages based on harm caused to persons other than the plaintiff. Wisconsin's risk contribution rule is limited to compensatory damages, but it has been adopted in part for a purpose traditionally understood to justify punitive damages: "deterring wrongful conduct that causes harm." The Supreme Court has not yet expressly held that a state may not constitutionally exact compensatory damages from a defendant without proof that the defendant's conduct harmed the plaintiff. But the reasoning of the Court's punitive damages cases compels the conclusion that a state may not do so. These cases have applied the principle that a state's "abrogation of a well-established common law protection against arbitrary deprivations of property raises a presumption that its procedures violate the Due Process Clause." *Honda Motor Co. v. Oberg,* 512 U.S. 415, 430 (1994). Wisconsin's risk contribution rule eliminates the fundamental requirement of the common law of torts that the plaintiff must prove that the defendant's conduct caused the plaintiff's harm.

## STATEMENT OF FACTS

**Plaintiff's Allegations of Injury
and Wrongful Conduct**

In 1997, Plaintiff's family moved into a residence located at 2904 West Wisconsin Avenue in Milwaukee. Compl. ¶ 13. Plaintiff was a small child at the time. He alleges that he sustained an injury caused by ingestion of paint containing white lead carbonate pigment at that residence. Compl. ¶¶ 32-36. He further alleges that white lead carbonate was a defective and unreasonably dangerous product. Compl. ¶ 15. He seeks recovery from eight "Industry

-3-

Defendants," alleging that they or their corporate predecessors tortiously made and sold white lead carbonate pigment, and that they are liable for his alleged injuries on theories of negligence and strict products liability. Compl. ¶¶ 4-12, 15-49. Plaintiff's ability to recover depends entirely upon the validity of the risk contribution rule. He is unable to identify the specific manufacturer of the white lead carbonate he allegedly ingested. Compl. ¶ 18.

**Atlantic Richfield's Alleged Liability**

Plaintiff does not allege that Atlantic Richfield itself manufactured, produced, or sold lead pigment or lead paint. Atlantic Richfield is exposed to potential liability in this action as a result of two mergers between parent and subsidiary corporations. The first such merger involved International Smelting and Refining Company ("IS&R"), which manufactured white lead carbonate at a plant in East Chicago, Indiana from 1936 until 1946, when it sold the plant. Affidavit of Bruce R. Kelly ("Kelly Aff.") ¶ 10 & Exs. 2-4; *Thomas* Stip. ¶¶ 3-6.[2] During that time, IS&R its sold white lead carbonate under the "Anaconda" brand name to both paint manufacturers and manufacturers of ceramics and other non-paint products. Kelly Aff. ¶ 11; *Thomas* Stip. ¶¶ 4-5. IS&R was a wholly-owned subsidiary of the Anaconda Copper Mining Company (later renamed The Anaconda Company), a publicly traded mining and metals company. Kelly Aff. ¶ 12 & Ex 5; *Thomas* Stip. ¶ 2. In 1973, long after IS&R left the white

---

[2] In the trial of the *Thomas* case, following its remand from the Wisconsin Supreme Court, the attorneys representing Plaintiff agreed to stipulate to certain basic facts concerning Atlantic Richfield and its alleged predecessors. A copy of that stipulation ("*Thomas* Stip.") is attached as Kelly Aff. Ex. 1. Atlantic Richfield assumes that the facts to which Plaintiff's attorneys stipulated in *Thomas* also would be undisputed here. However, because the *Thomas* stipulation does not formally bind the present Plaintiff, the documents establishing the stipulated facts relied upon here have been provided as exhibits to the Kelly Affidavit.

-4-

lead carbonate business, The Anaconda Company merged IS&R into itself.  Kelly Aff. ¶ 13 &

Ex 6; *Thomas* Stip. ¶ 7.  Several years later, Atlantic Richfield acquired 100% of the shares of

The Anaconda Company.  Kelly Aff. ¶ 14 & Ex. 7; *Thomas* Stip. ¶ 9.  Atlantic Richfield

operated The Anaconda Company as a wholly-owned subsidiary until 1981, when it merged The

Anaconda Company into itself.  Kelly Aff. ¶ 15 & Ex. 8; *Thomas* Stip. ¶ 10.  Plaintiff contends,

and Atlantic Richfield does not dispute, that as a result of these transactions Atlantic Richfield

has succeeded to any liability IS&R, if it still existed, now would have based on its operation of

the East Chicago plant from 1936 to 1946.[3]  Compl. ¶¶ 10, 12; Kelly Aff. ¶ 9; *Thomas* Stip. ¶ 11.

The available documents suggest that little or no white lead carbonate produced by IS&R

found its way into paint applied to houses in Wisconsin.  A now-deceased IS&R employee

testified in another case that ceramics manufacturers were the major customers for its white lead

carbonate pigment.  Kelly Aff. ¶ 19 & Ex. 9.  IS&R never owned or operated any sales office or

other physical facility in Wisconsin and was never authorized to do business in Wisconsin.

Kelly Aff. ¶¶ 20-21 & Ex. 10.  Experts retained by Plaintiff's attorneys in *Thomas* commissioned

a survey of back issues of Milwaukee newspapers from 1900 through 1972 to identify companies

advertising lead pigment or any form of paint, whether or not it contained lead.  Kelly Aff. ¶ 23

---

[3]     Plaintiff's complaint alleges that Atlantic Richfield also succeeded to the liabilities of Anaconda Lead Products
Company ("ALPC"), which operated the East Chicago plant from 1920 to 1936.  Compl. ¶ 10; Kelly Aff. ¶¶ 27, 30
& Exs. 2, 16.  In 1936 ALPC was dissolved, and its assets and properties, including the East Chicago plant, were
transferred to IS&R, its sole shareholder.  Kelly Aff. ¶¶ 28-29 & Ex. 2.  In both the *Thomas* and *Rhode Island* cases,
the trial courts ruled that Atlantic Richfield did not succeed to the liabilities of ALPC.  *See* Kelly Aff. ¶¶ 31-32 &
Exs. 17-18.  This Court need not consider the ALPC successorship issue to decide the present motion.  The
constitutional issues it raises would be present whether Atlantic Richfield succeeded only to the liabilities of IS&R
or, as Plaintiff contends, to the liabilities of both IS&R and ALPC.

& Exs. 12-13; *Thomas* Stip. ¶ 13.  That survey found no advertisements promoting Anaconda brand pigment or mentioning IS&R.  Kelly Aff. ¶ 24 & Exs. 13-14; *Thomas* Stip. ¶ 14.

In the *Thomas* case, the plaintiff moved for summary judgment on the issue of whether Atlantic Richfield could assert the exculpation defense under the risk contribution rule.  The plaintiff argued that no disputed issue of fact existed as to whether Atlantic Richfield's alleged predecessors produced or marketed white lead carbonate during the relevant time period or in the relevant geographic market.  Atlantic Richfield opposed the motion, arguing that either (a) Atlantic Richfield should be granted summary judgment, because, based on the record, its alleged predecessors could not reasonably have marketed or sold the white lead carbonate that allegedly injured plaintiff, or (b) the court should deny plaintiff's motion, because the record at best presented a fact issue for the jury.  Atlantic Richfield presented the only two categories of documents suggesting any possible business relations with respect to white lead carbonate between its alleged predecessors and entities located in Wisconsin:  (1) a single blank form for use in consignment agreements under Wisconsin law and (2) nineteen documents that appeared to be the internal accounting records of Atlantic Richfield's alleged predecessors, some of which showed amounts owed to or by various entities purportedly located in Wisconsin.  Atlantic Richfield explained why these documents did not provide a non-speculative basis for concluding that its alleged predecessors could have marketed or sold the white lead carbonate that allegedly injured the plaintiff.  The trial court ruled that the issue of whether Atlantic Richfield's alleged predecessors reasonably could have contributed to the plaintiff's injury was a fact issue for the jury.  Kelly Aff. ¶¶ 25-26 & Ex. 11.  At trial, this issue was raised by a question on the jury

verdict form, but the jury never reached that question.  Kelly Aff. ¶ 26 & Ex. 15.  Here, the Court

need not decide this issue to determine that Atlantic Richfield is entitled to summary judgment

on the ground that the risk contribution rule is unconstitutional.

**Wisconsin's Risk Contribution Rule**

      **A.**    **The Creation of the Risk Contribution Rule in *Collins***

      The plaintiff in *Collins* was exposed *in utero* to DES when her mother took the drug to

prevent miscarriage.  She later developed a rare form of cancer associated with maternal

ingestion of DES.  She sued several pharmaceutical companies that produced or marketed DES.

The defendants moved for summary judgment on the ground that the plaintiff could not identify

which defendant, if any, produced or marketed the DES the plaintiff's mother took.  The trial

court granted the motion, concluding that adoption of any of the plaintiff's theories of liability

designed to avoid the problem of identification "would necessitate a radical departure from

current law."  *Collins*, 116 Wis. 2d at 176, N.W.2d at 42.

      The Wisconsin Supreme Court reversed.  The court fashioned a new "risk-contribution"

rule that had not existed at common law, stating "we have formulated a method of recovery for

plaintiffs in DES cases in Wisconsin."  *Id.* at 191, 342 N.W.2d at 49.  The court held that the

plaintiff's case should be tried under this rule.  The salient point about *Collins* is that the risk

contribution rule it created departed fundamentally from the traditions of the common law and,

hence, could not reasonably have been anticipated by product manufacturers before it was

announced.  *Collins* says as much:

> We are faced with a choice of either fashioning a method of
> recovery for the DES case which will deviate from traditional
> notions of tort law, or permitting possibly negligent defendants to
> escape liability to an innocent, injured plaintiff. In the interests of
> justice and fundamental fairness, we choose to follow the former
> alternative.

*Id.* at 181, 342 N.W.2d at 45.

Collins provides that a former manufacturer of DES may be held liable in a product liability action for an injury caused by DES that it did not produce. *Collins* further provides that a DES plaintiff relying on the newly created rule need not prove, or even allege, "any facts related to the time or geographic distribution of the subject DES." *Id.* at 194, 342 N.W.2d at 50. The court placed the burden on the defendant to exculpate itself by proving, based on the time and place of its own marketing and sales of DES, that there was no reasonable possibility that it could have been the actual supplier of the DES the plaintiff's mother ingested. *Id.* at 197-98, 342 N.W.2d at 52.

The Wisconsin Supreme Court understood that this rule might impose liability on companies that in fact could not have been the supplier of the actual injury-causing product but had not retained the records to prove it. The sale of DES for use in preventing miscarriages had been banned in 1971, thirteen years before *Collins* was decided; the actual sale of the DES ingested by the plaintiff's mother in *Collins* had occurred in 1957. The court acknowledged that, because of the passage of time, it would often be difficult for a manufacturer to prove exculpation under the standard *Collins* imposed, because "many drug companies may not have kept or may not be able to locate pertinent records as to when, where, and what type of DES they produced or marketed." *Id.* at 181, 342 N.W.2d at 44. Nevertheless, the court stated that "if

relevant records do not exist, we believe that the equities of DES cases favor placing the consequences on the defendants." *Id.* at 198, 342 N.W.2d at 52. Thus, the court intended that if a particular manufacturer of DES in, say, Missouri sold its entire output in Missouri but failed to retain records proving that fact, that DES maker could be held liable for harm caused by DES sold (necessarily by someone else) in Wisconsin.

The Wisconsin Supreme Court stated that its new rule would not permit recovery of punitive damages. The court reasoned that punitive damages are "designed to punish a wrongdoer and to serve as a deterrent" and should not be recoverable where a plaintiff cannot prove that a particular defendant was the actual wrongdoer who caused the plaintiff's injury. *Id.* at 201, 342 N.W.2d at 54. According to the court, "[W]here punishment is to be exacted, it must be certain that the wrongdoer being punished because of his conduct actually caused the plaintiff's injuries." *Id.* at 201-02, 342 N.W.2d at 54.

### B.   The *Thomas* Decision Extending the Risk Contribution Rule To White Lead Carbonate Pigment Cases

*Collins* stated that the newly created risk contribution rule might be applied to other products presenting factually similar circumstances. *Id.* at 191, 342 N.W.2d at 49. *Thomas*, taking the record in the light most favorable to the plaintiff as the non-moving party, held that white lead carbonate pigments sufficiently resemble DES to warrant application of the risk contribution rule.

Like Plaintiff in this action, the plaintiff in *Thomas* claimed that he became lead poisoned by ingesting white lead carbonate pigment contained in paint at homes he lived in as a child. Also like Plaintiff, the plaintiff in *Thomas* was unable to identify the producer of the white lead carbonate pigment he allegedly ingested.

The plaintiff in *Thomas* alleged that former pigment manufacturers were liable on theories of strict liability and negligence. The Circuit Court granted summary judgment dismissing plaintiff's claims based on the absence of proof of causation. The Wisconsin Court of Appeals affirmed. 2004 WI App. 131, 275 Wis. 2d 377, 685 N.W.2d 791. The Court of Appeals held, among other things, that because the plaintiff had a remedy against his landlords for their negligence in failing to abate lead paint hazards in his prior residences, there was no reason to extend the risk contribution rule to his case. *Id.*, ¶ 7, 275 Wis. 2d 377, ¶ 7, 685 N.W.2d 791, ¶ 7.

The Wisconsin Supreme Court reversed. The majority concluded that the claim in *Thomas* sufficiently resembled the claim in *Collins* to warrant the extension of the risk contribution rule. The majority identified the elements that the plaintiff would need to prove at trial, making clear that he would not have to prove that a particular defendant made the lead pigment he ingested. Regarding plaintiff's negligence claim, the majority stated that "[b]ecause [the plaintiff] [could not] prove the specific type of white lead carbonate he ingested, he need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the houses' existence." 2005 WI 129, ¶ 161, 285 Wis. 2d 236, ¶ 161, 701 N.W.2d 523, ¶ 161. With respect to the strict products liability claim,

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 10 of 38   Document 75

the majority stated that plaintiff need only prove that "the pigment manufacturer engaged in the business of producing or marketing white lead carbonate." *Id.*, ¶ 162, 285 Wis. 2d 236, ¶ 162, 701 N.W.2d 523, ¶ 162.  The majority further stated:

> Once [the plaintiff] makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located.  However, if relevant records do not exist that can substantiate either defense, "we believe that the equities of [white lead carbonate] cases favor placing the consequences on the [pigment manufacturers]."

*Id.*, ¶ 163, 285 Wis. 2d 236, ¶ 163, 701 N.W.2d 523, ¶ 163 (quoting *Collins*, 116 Wis. 2d at 198, N.W.2d at 42).

*Thomas* acknowledged that it was fashioning a new rule because it perceived a public policy problem that traditional rules of law would not solve.  The court stated, "[t]he problem of lead poisoning from white lead carbonate is real; it is widespread; and it is a public health catastrophe that is poised to linger for quite some time." *Id.*, ¶ 133, 285 Wis. 2d 236, ¶ 133, 701 N.W.2d 523, ¶ 133.

Two justices dissented.  Each wrote a separate dissent that was joined by the other.  In his dissent, Justice Wilcox stated that the court's decision announced a form of collective liability, unconnected to any actual responsibility for the claimed harm, in what amounted "to little more than this court dictating social policy to achieve a desired result." *Id.*, ¶ 180, 285 Wis. 2d 236, ¶ 180, 701 N.W.2d 523, ¶ 180 (Wilcox, J., dissenting).

After *Thomas* was remanded to the Circuit Court, Atlantic Richfield moved for summary judgment on the grounds that application of the risk contribution rule violated Atlantic Richfield's rights under the Due Process Clause and the Takings Clause. The Circuit Court acknowledged that this motion raised "very substantial constitutional questions," but denied the motion as premature, without prejudice to its renewal after trial. Kelly Aff. ¶ 22 & Ex. 11.

The *Thomas* case was tried before a jury, which returned a verdict finding that the plaintiff had failed to prove he had been injured as a result of the ingestion of white lead carbonate pigment. Kelly Aff. ¶ 26 & Ex. 15. The jury did not reach the other questions on its special verdict form concerning the potential liability of individual defendants or their exculpation under the risk contribution rule. Kelly Aff. ¶ 26 & Ex. 15.

## ARGUMENT

## I. HOLDING ATLANTIC RICHFIELD LIABLE UNDER THE RISK CONTRIBUTION RULE WOULD VIOLATE CONSTITUTIONAL PROHIBITIONS ON RETROACTIVE LAWMAKING

Retroactive laws have long been disfavored. Since this country's founding, courts have recognized that it is unfair for the government to create new rules imposing new consequences on prior conduct. The Supreme Court has stated:

> [The] presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and

-12-

> universal human appeal."  In a free, dynamic society, creativity in
> both commercial and artistic endeavors is fostered by a rule of law
> that gives people confidence about the legal consequences of their
> actions.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-66 (1994) (internal citation omitted).

The Supreme Court considered the unconstitutional effect of retroactive lawmaking in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).  *Eastern Enterprises* bears close scrutiny because it involved a situation similar to that in the present case.  In both cases, the government perceived a present-day problem that it chose to ameliorate by forcing a narrowly defined group of persons to bear a newly-created liability for their prior conduct based on a standard of liability utterly unknown and unanticipated at the time the conduct occurred.

Although the Justices in *Eastern Enterprises* could not agree on the proper constitutional "lens" through which to view the case — *i.e.*, the Takings Clause or the Due Process Clause — the decision "nonetheless stands for a clear principle:  that a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not be constitutionally imposed."  *Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 378 (Fed. Cl. 1999); s*ee also Williams v. United Parcel Serv., Inc.*, 527 F.3d 1135, 1142-43 (10th Cir. 2008) (citing *Eastern Enterprises* in rejecting interpretation of state drug testing statute that would retroactively impose liability on employer under state law for lack of compliance with *federal* drug testing statute).

**A.    Application of the Risk Contribution Rule to Atlantic Richfield in This Case Would Violate the Takings Clause**

In *Eastern Enterprises,* the plaintiff asserted a constitutional challenge under the Takings Clause[4] to the application of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701-9722 (1994 ed. and Supp. II) (the "Coal Act").  The Coal Act was a political solution to the problem presented by the inadequacy of existing trust funds to finance lifetime health benefits for coal miners who had been led to expect them.

In 1946, following a nationwide coal strike, President Truman directed the Secretary of the Interior to take possession of all bituminous coal mines and to negotiate "appropriate changes in the terms and conditions of employment" for miners represented by the United Mine Workers of America ("UMW").  524 U.S. at 505.  The Secretary negotiated such an agreement.  It created benefit funds, financed by royalties on coal produced and by payroll deductions, that compensated miners and their dependents and survivors for medical expenses.

In 1947, the mines returned to private control, and the UMW and several coal operators negotiated the National Bituminous Coal Wage Agreement ("NBCWA") of 1947.  This established a 1947 UMW Welfare and Retirement Fund, which was to use the proceeds of a royalty on coal production to provide pension and medical benefits to miners and their

_____

[4]    The Takings Clause of the Fifth Amendment, applicable to the States under the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V; *see Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536 (2005).  It precludes the government from forcing "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

-14-

dependents. In 1950, the industry and the UMW negotiated a new multiemployer trust, the 1950 UMW Welfare and Retirement ("W&R") Fund, to be funded by payment of a "several and not joint" royalty on coal production. The 1950 fund was not a defined benefit fund and specifically provided that it was not to create a vested interest in the fund in any beneficiary. The trustees adjusted the level of benefits provided to match the level of royalty receipts.

In 1974, the Employee Retirement Income Security Act introduced specific funding and vesting requirements for pension plans. In response, the UMW and the multiemployer bargaining agent entered into a new agreement that created four new trusts, financed by royalties on coal production and premiums based on hours worked by miners, to replace the 1950 W&R Fund. Two of the new trusts provided pension and medical benefits to miners who had retired before January 1976. The new agreements in effect vested retiree medical benefits, but did not alter employers' obligations to contribute only a fixed amount of royalties, nor did they extend employers' liability beyond the life of the agreement. The increase in benefits, combined with other factors such as declining coal production and increased numbers of retirees, resulted in financial problems for the benefit plans. In response to those problems, a new NBCWA was negotiated in 1978 that included a "guarantee" clause obligating signatory operators to make sufficient contributions to maintain benefits. Problems continued, however, as employers exited the business or continued with nonunion employees and thereby withdrew from the agreement. This process generated a class of "orphan retirees" who had been promised lifetime health benefits that could not readily be financed by a royalty on the limited revenues of the remaining operators subject to the agreement.

To address the problem of the "orphan retirees," Congress passed the Coal Act that
*Eastern Enterprises* ultimately found unconstitutional.  The Coal Act merged the 1950 and 1974
Benefit Plans into a new multiemployer plan, to be financed by annual premiums assessed
against "signatory coal operators," defined as coal operators that signed any NBCWA or any
other agreement requiring contributions to the 1950 or 1974 Benefit Plans.  A signatory operator
would be liable for the premiums as long as it continued in any business activity, whether or not
in the coal industry.

The plaintiff in the case, Eastern Enterprises, had been organized in 1929 and conducted
coal mining operations thereafter.  It was a signatory to each NBCWA executed between 1947
and 1963.  Eastern was subject to assessment of premiums under the Coal Act, even though it
had long since exited the coal industry and had never agreed to assume the cost of lifetime health
care for any retirees other than by making its specified contributions to the defined-contribution
plans.  The Commissioner of Social Security, charged with the responsibility of assessing
premiums under the Coal Act, assigned to Eastern the obligation for premiums respecting more
than 1,000 miners who had worked for the company before 1966, based on Eastern's status as
the pre-1978 signatory operator for whom the miners had worked for the longest period of time.
Eastern's premium was in excess of $5 million.

Eastern sued the Commissioner, asserting that the Coal Act, either on its face or as
applied, violated its substantive due process rights and effected an uncompensated taking of its

property in violation of the Fifth Amendment.  Both theories were rejected by the trial court, which entered summary judgment for the Commissioner, and by the First Circuit.

The Supreme Court reversed and remanded, finding that the Coal Act as applied to Eastern violated the Fifth Amendment.  The plurality opinion by Justice O'Connor focused on the Takings Clause.  It stated that a law like the Coal Act would be unconstitutional under the Takings Clause "if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience."  *Id.* at 528-29.  Justice O'Connor's opinion went on to state that the Coal Act met those criteria and that it accordingly should be held unconstitutional as an uncompensated taking of Eastern's property.

The factors that supported a finding of an unconstitutional taking in *Eastern Enterprises* are even more clearly present here.  First, the liability that the risk contribution rule threatens to impose on Atlantic Richfield would be retroactive.  The essential test of retroactivity is whether the claim and proposed remedy attach new legal consequences to conduct previously completed.  *Eastern Enterprises*, 524 U.S. at 532 (citing *Landgraf*, 511 U.S. at 270).  In *Eastern Enterprises*, the Court found that a 1992 statute had retroactive effect because its "reachback" provisions were to be applied to Eastern on the basis of coal operations that had ceased in 1965.  Plaintiff's claim against Atlantic Richfield is similarly retroactive.  From 1936 through 1946, when IS&R manufactured white lead carbonate, no state required that every manufacturer of that product bear legal responsibility for injuries caused by the ingestion of white lead carbonate without

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 17 of 38   Document 75

regard to whether it made the product that caused the injury. Had Wisconsin announced prospectively during the 1936-1946 period that it intended to impose such a rule, a prudent white lead carbonate manufacturer wishing to avoid the draconian consequences of Wisconsin's announced rule could have taken steps to keep its product out of Wisconsin and maintained the records that it would later need to prove that it had done so. IS&R never had a chance to do this. On a purely chronological basis, application of the risk-contribution rule here would be more egregiously retroactive than the statute struck down by *Eastern Enterprises*. In *Eastern Enterprises*, the business activity had occurred twenty-seven years before enactment of the statute imposing new legal consequences on it, while in the present case, IS&R had left the pigment business *almost sixty years* before the Wisconsin Supreme Court decided that IS&R could be liable for injuries caused by white lead carbonate it did not produce.

Second, the inability of IS&R reasonably to anticipate the possibility that its conduct would make it liable for injuries caused by white lead carbonate that it did not make is confirmed by the record concerning the mergers on which Plaintiff relies to sue Atlantic Richfield for the acts of IS&R. Following IS&R's exit from the lead pigment business, The Anaconda Company merged IS&R into itself in 1973, and then Atlantic Richfield merged The Anaconda Company into itself in 1981. Kelly Aff. ¶¶ 13-15 & Exs. 6-8; *Thomas* Stip. ¶¶ 7, 9-10. Each of those mergers broadened the base of assets that might be subject to levy for IS&R's debts. No reasonable business person would have consummated such transactions if Wisconsin had given fair notice that IS&R had an unknown and potentially large contingent liability not only for harm caused by its own products, but also for harm caused by its competitors' products in Wisconsin.

In this respect, Plaintiff's purported claim against Atlantic Richfield "interferes with . . . reasonable investment-backed expectations" just as the Coal Act did in *Eastern Enterprises*. 524 U.S. at 532. As Justice Kennedy noted in his separate opinion on due process issues, discussed below, "[i]f retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548; *see also Am. Exp. Travel Related Servs., Inc. v. Kentucky.*, 597 F. Supp. 2d 717, 727-29 (E.D. Ky. 2009) (citing *Eastern Enterprises* and finding that statute's retroactive reduction of presumptive abandonment period for traveler's checks constituted taking of issuer's property rights through "interference with reasonable investment-backed expectations" because issuer "made investment decisions based on the [longer] abandonment period and these investments [were] clearly up-ended").

Third, the potential liability to which Atlantic Richfield will be exposed under Wisconsin's risk contribution rule is severe. *Eastern Enterprises* premised its finding of unconstitutionality on a potential liability to Eastern of "on the order of $50 to $100 million" for retiree benefit contributions. 524 U.S. at 529. Plaintiff in this case has claimed damages of an unspecified amount, but this case cannot be considered in isolation. In *Thomas*, the only lead pigment case to be tried under the risk contribution rule, the plaintiff asked the jury to find compensatory damages in excess of $2 million. The Wisconsin Supreme Court stated that the childhood lead poisoning problem in Wisconsin was "widespread," suggesting that it expected many similar cases to be filed. The attorneys representing plaintiff have filed more than thirty such lawsuits against Atlantic Richfield.

Finally, Wisconsin's risk contribution rule, like the Coal Act that *Eastern Enterprises* held unconstitutional, is applied only to a limited class of parties. The historians designated as experts by Plaintiffs' attorneys in *Burton* have testified in other litigation that the defendants in another case (which included all the present defendants other than DuPont and Armstrong) accounted for the overwhelming majority of white lead carbonate production in the United States. Kelly Aff. ¶ 33 & Ex. 19 (Markowitz and Rosner Decl. ¶ 8).

**B.      Imposition Of Liability Under the Risk Contribution Rule Would Violate Atlantic Richfield's Due Process Right To Be Free From Arbitrary, Retroactive Laws**

The application of Wisconsin's risk contribution rule in the present case suffers from a second constitutional flaw: it violates Atlantic Richfield's due process right to be free from arbitrary retroactive lawmaking. The Due Process Clause of the Fourteenth Amendment states, in pertinent part, that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." Like the equivalent Due Process Clause of the Fifth Amendment, this limitation on state action contains a substantive component that protects fundamental rights implicit in the concept of ordered liberty. *E.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Substantive due process rights bar certain arbitrary, wrongful government actions regardless of the procedures used to implement them. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (referring to Fourteenth Amendment due process guarantees).

The Supreme Court has upheld retroactive laws only in limited circumstances, such as where "short and limited periods [of retroactivity are] required by the practicalities of national

legislation," *see United States v. Darusmont*, 449 U.S. 292, 296-97 (1981), or where some curative retroactive effect is necessary to address a mistake made by the immediately preceding Congress. *See United States v. Carlton*, 512 U.S. 26, 32 (1994).

*Eastern Enterprises* demonstrates that Plaintiff's claim against Atlantic Richfield is just as defective under the Due Process Clause as it is under the Takings Clause. All nine Justices agreed that retroactive lawmaking may violate the Due Process Clause. The four who joined in Justice O'Connor's plurality opinion stated that "there is a question whether the Coal Act violates due process in light of the Act's severely retroactive impact," 524 U.S. at 537, but did not reach the issue because they found the Takings Clause dispositive. *Id.* at 538.

The other five Justices agreed that retroactive lawmaking raises due process issues, but disagreed as to whether the facts established a violation of Eastern's due process rights. Justice Kennedy, who provided the fifth vote for holding the Coal Act unconstitutional, found that they did. The core of Justice Kennedy's reasoning was as follows:

> If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them. Both stability of investment and confidence in the constitutional system, then, are secured by due process restrictions against severe retroactive legislation.

*Id.* at 548-49.

-21-

Justice Kennedy carefully distinguished *Turner Elkhorn*, in which the Court had upheld a retroactive imposition of liability on coal mine operators for health benefits for miners suffering from the occupational disease of black lung:

> While we have upheld the imposition of liability on former employers based on past employment relationships, the statutes at issue were remedial, designed to impose an "actual, measurable cost of [the employer's] business" which the employer had been able to avoid in the past. . . . The Coal Act, however, does not serve this purpose. Eastern was once in the coal business and employed many of the beneficiaries, but it was not responsible for their expectation of lifetime health benefits or for the perilous financial conditions of the 1950 and 1974 plans which put the benefits in jeopardy.

524 U.S. at 549-50.

Justice Kennedy's distinction of *Turner Elkhorn* illustrates why imposition of liability on Atlantic Richfield under the risk contribution rule would violate due process. It would amount to a radical revision of the legal consequences attending business behavior that took place in 1946 and earlier. There can be no possible claim that IS&R knew prior to 1946 that it would someday be liable for injuries that were caused by the ingestion of white lead carbonate that it did not make. The Due Process Clause prevents the imposition of such arbitrary retroactive liability, and accordingly requires dismissal of the Plaintiff's claim against Atlantic Richfield.

Four dissenting Justices joined two separate opinions by Justice Stevens and Justice Breyer finding that the retroactive application of the Coal Act did not violate Eastern's due process rights. Their reasons for so finding do not apply here. Justice Stevens emphasized the fact-based point that "there was an implicit understanding on both sides of the bargaining table

[in the 1950's and 1960's] that the operators would provide the miners with lifetime health benefits. It was this understanding that kept the mines in operation and enabled Eastern to earn handsome profits." *Id.* at 551. In Justice Stevens' view, the same understanding motivated members of the Coal Commission to conclude that the operators who had employed the "orphaned miners" should share responsibility for their health benefits and also led Congress to conclude that the Coal Act "represented a fair solution to a difficult problem." *Id.* at 552-53.

Justice Breyer's opinion began by noting agreement with Justice Kennedy that the case turned on whether the retroactive nature of the legislation made it so fundamentally unfair as to violate due process. As he put it, the Due Process Clause "safeguards citizens from arbitrary or irrational legislation. And the Due Process Clause can offer protection against legislation that is unfairly retroactive at least as readily as the Takings Clause might, for as courts have sometimes suggested, a law that is fundamentally unfair because of its retroactivity is a law that is basically arbitrary." *Id.* at 556-57. Justice Breyer agreed with the plurality that "an unfair retroactive assessment of liability upsets settled expectations, and it thereby undermines a basic objective of law itself," *id.* at 558, but found that on the record as a whole the assessment of liability against Eastern was not unfair. He found that the acts of mine operators such as Eastern, while they fell short of enforceable contractual promises to provide such benefits, had nevertheless contributed to miners' expectations of lifetime benefits for themselves and their dependents to the point that it was not unfair to expect the operators to fund the benefits. He also considered it significant both that Eastern's liability was to be limited to providing benefits for miners Eastern had itself

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 23 of 38   Document 75

employed and that Eastern had, indirectly through the operations of its subsidiary, stayed in the coal business:

> [M]ost importantly, Eastern played a significant role in creating the miners' expectations that led to this legislation.  Add to these circumstances the two others I have mentioned — that Eastern had benefited from the labor of the miners for whose future health care it must provide, and that Eastern remained in the industry, drawing from it substantial profits (though doing business through a subsidiary, which usually, *but not always*, insulates an owner from liability).

*Id.* at 567 (emphasis in original).

The distinctions relied upon by the *Eastern Enterprises* dissenters to find that the retroactive lawmaking in that case did not violate Eastern's due process rights do not save Plaintiff's present claim against Atlantic Richfield.  There is no evidence that, as of 1946, IS&R had participated in creating expectations that it would pay for the damages of individuals injured by white lead carbonate made by other manufacturers.  Nor is there any evidence that IS&R remained in the white lead carbonate pigment market through a subsidiary.

In his motion to strike Atlantic Richfield's affirmative defense, Plaintiff argues that the constitutional prohibition against retroactive lawmaking only applies where a state enacts a retroactive law by legislation, and does not apply where the state does so through the act of its popularly elected supreme court rewriting the common law.  8/14/09 Mot. to Strike at 4.  This argument is without merit.  It does not matter that Wisconsin seeks to reorder the legal consequences of long-past actions by means of a novel judicially created remedy rather than by legislation.  The Constitution applies to the state's government as a whole.  "State power may be

exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." *BMW of N. Am. v. Gore*, 517 U.S. 559, 573 n.17 (1996) (holding that a state may not impose punitive damages for conduct occurring outside the state); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 349 (2007) (holding that a jury's award of punitive damages for harm to non-parties "would amount to a taking of 'property' from the defendant without due process''); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised"); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief"); *Medtronic v. Lohr*, 518 U.S. 470, 503-04 (1996) (J. Breyer, concurring) (stating that, for purposes of a preemption analysis, "one can reasonably read the word 'requirement' as including legal requirements that grow out of the application, in particular circumstances, of a State's tort law").

Two Supreme Court cases contradict Plaintiff's argument that retroactive lawmaking is exempt from constitutional scrutiny where it is done through judicial decisions rather than statutes. In *Bouie v. City of Columbia*, 378 U.S. 347 (1964), the Court considered a South Carolina Supreme Court decision that retroactively expanded a trespass statute making it a misdemeanor to enter onto another's property after receiving notice that such entry was prohibited. The South Carolina Supreme Court extended the statute to situations in which a person did not receive such notice prior to entering another's property, but rather had remained on the property after being asked to leave. 378 U.S. at 350. The Supreme Court concluded that

retroactive application of the state court's decision violated due process and held that "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect." *Id.* at 354 (citations and internal quotation marks omitted).[5]

In *Rogers v. Tennessee*, 532 U.S. 451 (2001), the Supreme Court applied the same standard it had applied in *Bouie*. In *Rogers*, a defendant argued that his murder conviction was precluded by the common law rule prohibiting murder convictions based on conduct that occurred more than a year and a day before the victim's death. In affirming the defendant's conviction, the Tennessee Supreme Court abolished the "year and a day" rule, which previously had been understood to be the law of Tennessee. *Id.* at 454-56. The United States Supreme Court affirmed, rejecting the defendant's argument that the Tennessee Supreme Court's decision violated the *Ex Post Facto* clause of the Constitution. *Id.* at 456-467. The Court held that because the *Ex Post Facto* Clause states that "[n]o State shall . . . pass any . . . ex post facto Law," by its very terms the clause is only "'a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.'" *Id.* at 456 (quoting *Marks v. United States*, 430 U.S. 188, 191 (1977)). Nevertheless, the Court, relying on *Bouie*, stated that retroactive application of a judicial decision altering the common law may violate due

<hr>

5    Although the quoted statement in *Bouie* referred to retroactive judicial interpretation of a criminal statute, the principle recognized in *Bouie* also applies to civil cases. In *BMW*, the Court held unconstitutional a "grossly excessive" award of punitive damages under an Alabama statute that codified the common law of fraud. 517 U.S. 559. The Court cited *Bouie* for the proposition that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574.

process.  *Rogers*, 532 U.S. at 462.  The Court proceeded to apply the standard for due process analysis that it had stated in *Bouie*, and found that the Tennessee Supreme Court's decision could permissibly be given retroactive effect without violating due process.  The Court noted that because the "year and a day rule" had been abolished in almost every jurisdiction that had considered its continued viability and had only a "tenuous foothold" in Tennessee law as it "did not exist as part of Tennessee's statutory criminal code" and "had never once served as a ground of decision in any prosecution for murder in [Tennessee]."  *Id.* at 462-67.  According to the Court, "[f]ar from a marked and unpredictable departure from prior precedent, the [Tennessee Supreme Court's] decision was a routine exercise of common law decision making in which the court brought the law into conformity with reason and common sense."  *Id.* at 467.

Wisconsin's adoption of the risk contribution rule does not meet the standard stated in *Bouie* and followed in *Rogers*.  The requirement that a plaintiff prove that a defendant actually caused his or her injury cannot be said to have had only a "tenuous foothold" in Wisconsin law prior to the decision in *Collins*.  That requirement was well-established in Wisconsin law, and the decision in *Collins* to abrogate it represented a sharp break from tradition.  While the "year and a day rule" at issue in *Rogers* had been abolished in almost every jurisdiction that had considered its continued validity, the requirement of proving that the defendant actually caused the plaintiff's injury has remained the law in most states.  The decision in *Collins* to abandon that requirement placed Wisconsin in a distinct minority.  Other states' highest courts have rejected the approach taken by *Collins* and have held that the proof of actual causation is required in

cases involving a wide variety of products.[6]  Wisconsin's decision to follow a different path is a "marked and unpredictable departure from prior precedent" of the sort that *Rogers* and *Bouie* teach cannot be given retroactive effect.

As the sole legal support for his motion to strike, Plaintiff quotes out of context the statement in *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 859 (3d Cir. 1975), that "[t]he general rule is clear, that to contravene the strictures of the Constitution requires a legislative enactment."  Mot. to Strike at 3.  Plaintiff's reliance on *Mariniello* is misplaced.  That decision rejected the argument that the Impairment of Contracts Clause was violated by retroactive application of a New Jersey decision holding unenforceable at-will termination clauses in franchise agreements.  *Mariniello*, 511 F.2d at 859.  The court's holding was based on the same narrow ground on which *Rogers* held that a judicial decision cannot violate the *Ex Post Facto* Clause:  The very language of the clause is directed only at legislation.  *See* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts.").  The language of the Due Process Clause contains no such limitation; nor does the Takings Clause. Indeed, *Mariniello* declined to consider whether the New Jersey decision also violated due

---

6    *E.g.*, *Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187 (Ohio 1998) (DES); *Gorman v. Abbott Lab.*, 599 A.2d 1364, 1364 (R.I. 1991) (DES); *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 344-45 (Ill. 1990) (DES); *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 75-76 (Iowa 1986) (DES); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 245-46 (Mo. 1984) (DES); *Black v. Abex Corp.*, 603 N.W.2d 182, 189-91 (N.D. 1999) (asbestos); *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 70-71 (Tex. 1989) (asbestos); *Case v. Fibreboard Corp.*, 743 P.2d 1062, 1067 (Okla. 1987) (asbestos); *Goldman v. Johns-Manville Sales Corp.*, 514 N.E.2d 691, 699-702 (Ohio 1987) (asbestos); *Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169, 171-73 (Pa. 1997) (lead pigment); *Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987) (asbestos); *Celotex Corp. v. Copeland*, 471 So. 2d 533, 537-39 (Fla. 1985) (asbestos); *Hamilton v. Berretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001) (firearms); *Bly v. Tri-Continental Indus., Inc.*, 663 A.2d 1232, 1241-45 (D.C. 1995) (benzene); *Shackil v. Lederle Lab.*, 561 A.2d 511, 529 (N.J. 1989) (DPT vaccine).

-28-

process only because it found the record too undeveloped to make such a determination, and invited the lower court to address it on remand. *Id.* at 860. This would make no sense if the court could have simply held that as a matter of law a judicial decision could not violate due process.

A Judge of this Court has published a law review article defending the result in *Thomas* (and, by implication, the result in *Collins*). Hon. Lynn Adelman, Exercising Judicial Power: A Response to the Wisconsin Supreme Court's Critics, 91 Marq. L. Rev. 425, 446 (2007). That article argued that the departure from common-law principles in *Thomas* was acceptable, because "the court examined a case in which each of the defendants manufactured a product that (the court assumed, for summary judgment purposes) injured a wholly innocent plaintiff. . . . The facts raised the possibility that the innocent plaintiff would be left with no compensation from the industry that actually harmed him. Thus, . . . the court ensured that the doors of the courthouse remained open." *Id.*

This statement does not address the constitutional violation involved in giving retroactive effect of the *Thomas* decision. Indeed, the statement illustrates the problem. *Thomas* did not "ensure that the doors of the courthouse remained open." The doors of the courthouse had always been open, but a plaintiff was required to prove causation against an identified tortfeasor, which the *Thomas* plaintiff could do only against his landlords. *Thomas* opened a door not previously open, creating a novel claim unknown to the common law. The common law, as it existed prior to 1946 when Atlantic Richfield's alleged predecessors conducted the business for

which Plaintiff would hold Atlantic Richfield liable today, did not recognize such a thing as a claim against an entire "industry" without proof of causation in fact.

## II.    IMPOSITION OF LIABILITY THROUGH A RULE THAT FAILS TO REQUIRE ANY PROOF OF A CAUSAL NEXUS BETWEEN ATLANTIC RICHFIELD'S ALLEGED CONDUCT AND PLAINTIFF'S ALLEGED HARM VIOLATES DUE PROCESS

### A.    The Due Process Clause Limits a State's Ability To Exact Damages Without Proof of a Nexus Between the Defendant's Conduct and the Plaintiff's Harm

Wisconsin's risk contribution rule violates the Due Process Clause for a second, independent reason apart from its retroactive character.  The Due Process Clause limits a state's authority to decree through judicial proceedings that the property of one person shall be seized and given to another.  A state may do this only based upon a determination that the person whose property is to be seized did something that harmed the person to whom that property will be given.  There must be a *nexus* between the conduct of the defendant that is to be stripped of its property and the plaintiff who is to receive it.

This constitutional principle has been explicitly recognized in Supreme Court decisions on punitive damages.  Those cases were decided after *Collins*; they therefore were not available for consideration when Wisconsin created the risk contribution rule in *Collins* or when the defendants in that case unsuccessfully sought review by certiorari in the Supreme Court.  Two of those decisions establish that a state may exact punitive damages from a defendant only for conduct having some nexus with the plaintiff to whom the damages will be paid.  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003), held that a state court's award of $145 million in punitive damages against an insurance carrier for a bad faith refusal to settle a

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 30 of 38   Document 75

claim within policy limits violated the insurance carrier's right to due process. The record

demonstrated that the state court permitted the lawsuit to be "used as a platform to expose, and

punish, the perceived deficiencies of [the carrier's] operations throughout the country," and that

the insurance carrier was being "condemned for its nationwide policies rather than for the

conduct directed towards the [plaintiffs in the immediate case]." *Id.* at 420. Although the

Supreme Court recognized that the carrier's conduct had been "reprehensible," it stated that due

process prohibits a court from awarding damages to "punish and deter conduct" that bears no

relationship to the plaintiff's actual harm:

> The [Utah] courts awarded punitive damages to punish and deter
> conduct that bore no relation to the [plaintiffs'] harm. A
> defendant's dissimilar acts, independent from the acts upon which
> liability was premised, may not serve as the basis for punitive
> damages. A defendant should be punished for the conduct that
> harmed the plaintiff, not for being an unsavory individual or
> business. Due process does not permit courts, in the calculation of
> punitive damages, to adjudicate the merits of other parties'
> hypothetical claims against a defendant under the guise of the
> reprehensibility analysis, but we have no doubt the Utah Supreme
> Court did that here.

*Id.* at 422-23 (citation omitted).

In *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), the Court made explicit what was

implicit in *State Farm* – that it is a violation of due process for a state to award punitive damages

to a plaintiff based on conduct causing harm to nonparties. In *Williams*, a smoker's widow sued

a tobacco company, alleging that the company was liable for fraud and negligence because it

deceived her husband into smoking. Plaintiff was awarded punitive damages in the amount of

$79.5 million. The Oregon Supreme Court held that the jury was entitled to find that the

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 31 of 38   Document 75

company had deceived other smokers in Oregon besides plaintiff's husband, and that the company's cigarettes had caused other deaths in Oregon.  *Williams v. Philip Morris Inc.*, 127 P.3d 1165, 1170 (Or. 2006).

The Supreme Court found that Oregon had violated the defendant's due process rights by permitting the jury to assess punitive damages based even in part on conduct that caused harm to persons other than the plaintiff.  The Court provided three reasons for its holding.  First, the Due Process Clause requires that a defendant be given an opportunity to present every available defense.  *Williams*, 549 U.S. at 353.  Punishing a defendant for harm to non-parties violates this principle because "a defendant . . . has no opportunity to defend against the charge" that it injured a nonparty victim "by showing, for example . . . that the [nonparty] victim was not entitled to damages because he or she knew that smoking was dangerous or did not rely upon the defendant's statements to the contrary."  *Id.* at 353-54.  Second, allowing a jury to impose "punishment for injuring a nonparty victim would add a near standardless dimension to the punitive damages equation" because the "jury will be left to speculate."  *Id.* at 354.  Among other things, the jury would have to guess the answers to questions such as, "[h]ow many such victims are there?  How seriously were they injured?  Under what circumstances did the injury occur?" *Id.*  The Court reasoned that jury speculation on these issues would magnify "the fundamental due process concerns to which our punitive damages cases refer – risks of arbitrariness, uncertainty and lack of notice."  *Id.* (citation omitted).  Third, the Court found "no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others." *Id.*

The Supreme Court has yet to hold explicitly that the due process concerns that preclude a state from awarding *punitive* damages based on a defendant's conduct toward non-parties also preclude awarding *compensatory* damages for conduct that has not been proved to have harmed the plaintiff. But the reasoning of *State Farm* and *Williams* leads to the conclusion that the same due process limits apply to both types of damages. Certainly the three reasons offered to support the decision in *Williams* apply equally to compensatory damages. First, a defendant has a constitutional right to present every possible defense against a claim for compensatory damages. If Plaintiff A is permitted to recover compensatory damages based on harm the defendant may have caused Non-Parties B, C, D, etc., the defendant is deprived of that right. Second, whether a jury is considering compensatory damages or punitive damages, where liability and damages are based on injury to nonparties, the jury's verdict will be based on speculation, and the risks of arbitrariness, uncertainty, and lack of notice will be magnified. Finally, as with punitive damages, there is no support in history or tradition for permitting an award of compensatory damages based on the defendant's conduct toward persons other than the plaintiff. The entire history of the common law is to the contrary. As the Court stated in *State Farm*, "[c]ompensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered *by reason of the defendant's wrongful conduct*.'" 538 U.S. at 416 (emphasis added) (citation omitted).

An instructive line of Supreme Court authority can be found in decisions determining the scope of private remedies afforded by, or implied from, federal regulatory statutes. The Court has ruled that such remedies must be subject to the same requirement of proof of proximate

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 33 of 38   Document 75

causation traditionally imposed under the common law of torts. The Court has applied this principle to private damage suits under the antitrust laws, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 532-33 (1983), to private actions under SEC Rule 10b-5, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338 (2005), and to private actions under the RICO statute. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring in the judgment) (citations and footnotes omitted).

These decisions speak of "proximate" causation. Any determination that a plaintiff must prove proximate or "legal" causation presupposes that the plaintiff already has satisfied the less exacting requirement of causation-in-fact – that is, depending on the jurisdiction, proving that the defendants' conduct was a "but for" cause of, or a substantial factor causing, the plaintiff's injury. That requirement has historically been part of the common law of torts in Wisconsin and elsewhere. *See Morgan v. Penn. Gen. Ins. Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660, 666 (1979) ("Legal cause in negligence actions is made up of two components, cause-in-fact and 'proximate cause,' or policy considerations. . . . The test of cause-in-fact is whether the negligence was a 'substantial factor' in producing the injury.") (citations omitted); *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, ¶ 23, 717 N.W.2d 17, ¶ 23 (noting that Wisconsin courts have recognized "[f]or decades" that "a causal connection between the defendant's breach of the duty of care and the plaintiff's injury" is among the necessary elements of an actionable negligence claim).[7]

---

[7]    *See also* Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser & Keeton on Torts § 41 (5th ed. 1984). ("An essential element of the plaintiff's cause of action for negligence, or for that matter for any tort, is that there be

[Footnote is continued on next page]

**B.      Wisconsin's Risk Contribution Rule Violates These Principles**

As discussed above, it necessarily follows from the Supreme Court's decisions on *punitive* damages that the Due Process Clause also prohibits a state from exacting *compensatory* damages without proof that the defendant's conduct actually harmed the plaintiff.  Wisconsin's risk contribution rule does exactly that.

Even if the due process requirement of a nexus between the plaintiff and defendant were limited to punitive damages, the risk contribution rule still would be unconstitutional.  Although it does not involve punitive damages as they are traditionally understood, the risk contribution rule is in part intended to achieve the same purposes as punitive damages and has similar effects.

In *Thomas*, the court decided to extend the risk contribution rule to white lead carbonate pigments to achieve the same deterrer purposes traditionally understood to justify punitive damages.  The *Thomas* opinion contains a lengthy recitation of the plaintiff's allegations that pigment manufacturers deliberately engaged in "knowingly wrongful conduct" by selling a product they knew would harm children.  *Thomas* offered as an "additional policy consideration" for extending the risk contribution rule to manufacturers of white lead carbonate that such an

---

[Footnote continued from previous page]

some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.  This connection is usually dealt with by the courts in terms of what is called 'proximate cause,' or 'legal cause.' . . . An act or an omission is not regarded as the cause of an event if the particular event would have occurred without it."); *id.* § 42 ("*Once it is established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury*, there remains the question whether the defendant should be legally responsible for the injury.") (emphasis added); Restatement (Second) of Torts § 9, cmt. b (1965) ("In order that a particular act may be the legal cause of an invasion of another's interest, the act or omission must be a substantial factor in bringing about the harm.").

extension would have the effect of "deterring knowingly wrongful conduct that causes harm." *Thomas*, 2005 WI 129, ¶ 136 fn. 44, 285 Wis. 2d 236, ¶ 136 fn. 44, 701 N.W.2d 523, ¶ 136 fn. 44.  Similarly, deterrence of wrongful conduct is one of the principal justifications for the imposition of punitive damages:

> Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." …. By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution.

*State Farm*, 538 U.S. at 416 (emphasis added; citations omitted); *see also Collins,* 116 Wis. 2d at 201-02, 342 N.W.2d 37 at 54 ("Punitive damages are designed to punish a wrongdoer and to serve as a deterrent.").

Although the risk contribution rule does not allow for the awarding of punitive damages to any particular claimant, its application in multiple cases would yield a greater punitive effect than that which a defendant would face it if were exposed only to traditional tort suits in which individual plaintiffs could recover punitive damages.  Consider a hypothetical manufacturer that sold *some* white lead carbonate now present in Wisconsin homes, but whose sales of white lead carbonate amounted to only a small percentage of the total amount used in residential paint in Wisconsin.  Under traditional rules of tort law, that manufacturer could be sued only for harm caused to people living in the homes where its product is present.  Each plaintiff in the small body of cases to which the manufacturer was exposed could claim punitive damages.  But under *Williams*, the jury hearing any given case could award punitive damages only based on evidence concerning harm to the specific plaintiff.  The amount of punitive damages would be limited to a

-36-

multiple of compensatory damages.  *See State Farm*, 538 U.S. at 424-28.  And, across multiple cases, juries might reach disparate results about whether punitive damages are warranted at all.

In contrast, consider the exposure that such a hypothetical manufacturer faces under the risk contribution rule.  It will not have to pay damages labeled "punitive" to any given plaintiff.  But it is exposed to liability in all cases in which a plaintiff alleges that he or she was injured by ingesting white lead carbonate in Wisconsin, including the great majority of cases in which its product played no part in causing the plaintiff's harm and in which it therefore would face no liability of any kind under traditional rules of law.  Depending on the continued existence and solvency of other manufacturers, a manufacturer may find itself the "last man standing" and be forced to pay compensatory damages in multiple cases that in the aggregate vastly exceed the actual harm its product may have caused.  This is not a mere classroom hypothetical.  One former manufacturer of lead pigments, the Eagle-Picher Company, could not be joined as a defendant in this case because it long ago went bankrupt and is out of business; another manufacturer, Millennium, the alleged successor to the Glidden Company, was sued in this case and filed a Chapter Eleven proceeding while this case was pending.  In short, the regime Wisconsin has created for the stated purpose of "deterring knowingly wrongful conduct that causes harm" presents a specter of punitive effect on a given defendant even though it does not offer the windfall that traditional punitive damages sometimes provide to a particular plaintiff.

Case 2:07-cv-00864-LA   Filed 09/15/09   Page 37 of 38   Document 75

**CONCLUSION**

For the foregoing reasons, any decision holding Atlantic Richfield liable under Wisconsin's risk contribution rule would violate the United States Constitution. Accordingly, Atlantic Richfield's motion for summary judgment should be granted and Plaintiff's complaint against Atlantic Richfield should be dismissed.

Dated: September 15, 2009

By: s/ David G. Peterson
Philip H. Curtis
Bruce R. Kelly
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000

David Peterson
GODFREY & KAHN, S.C.
780 North Water Street, Suite 1500
Milwaukee, WI 53202-3590
(414) 273-3500

*Attorneys for Defendant Atlantic Richfield Company*

4177647_1

-38-