# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ERNEST GIBSON, Minor, by his**
**guardian ad litem, SUSAN M. GRAMLING,**

               Plaintiff,

                                              **Case No. 07-C-864**

      -vs-

**AMERICAN CYANAMID Co.,**
**ARMSTRONG CONTAINERS, Inc.,**
**E.I. Du PONT de NEMOURS and Co.,**
**MILLENIUM HOLDINGS LLC,**
**NL INDUSTRIES, Inc.,**
**ATLANTIC RICHFIELD Co.,**
**THE SHERWIN WILLIAMS Co., and**
**MILWAUKEE COUNTY DEPARTMENT OF**
**HEALTH AND SERVICES,**

               Defendants.

---

# DECISION AND ORDER

---

      This is a childhood lead poisoning case brought pursuant to what is known as the "risk contribution" rule adopted by the Wisconsin Supreme Court in *Thomas ex rel. Gramling v. Mallett*, 701 N.W.2d 523 (Wis. 2005). The case is before this Court because of the diversity of the parties.

      By adopting the risk contribution rule in *Thomas*, the Wisconsin Supreme Court essentially disregarded the black letter rule of tort law that a party's liability for an injury is attached to the causation by that party of that injury. While the court in *Collins v. Eli Lilly Co.*, 342 N.W.2d 37 (Wis. 1984) changed the concept of causation to a degree that fit the

unusual facts of that case, *Thomas* was a dramatic and novel departure from established legal principles. The Wisconsin Supreme Court, as it did in *Collins*, relied upon Article I, Section 9 of the Wisconsin Constitution, which states, in pertinent part, that every person is "entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character . . ." By reading a due process standard into this section, the court found that the injured Thomas should not be foreclosed from recovery simply because he could not prove causation. In essence and effect, when the court's view of due process requires it, every person is "entitled to a certain remedy . . . for all injuries." Wis. Const. art. I, § 9. When an adequate remedy does not exist to "provide due process, the courts, under the Wisconsin Constitution, can fashion an adequate remedy." *Thomas*, 701 N.W.2d at 556 (quoting *Collins*, 342 N.W.2d at 45).

The court's provision of "due process" to Thomas was, in turn, challenged by the Thomas defendants as a violation of their due process rights. These challenges were deemed "not ripe" for adjudication, but defendant Atlantic Richfield Co. ("ARCO") raises them here in its motion for summary judgment. Because the Court finds that the imposition of liability under the risk contribution rule established in *Thomas* would violate ARCO's substantive due process rights under the U.S. Constitution, amend. XIV, § 1, ARCO's motion for summary judgment is granted.

**I.**

The plaintiff, Ernest Gibson ("Gibson"), alleges that in January 1997 his family moved into a residence located at 2904 West Wisconsin Avenue, Milwaukee, Wisconsin.

-2-

He contends that he sustained an injury caused by ingesting paint containing white lead carbonate pigment at that residence. Plaintiff is unable to identify the specific manufacturer, supplier or distributor of the white lead carbonate he allegedly ingested. He does not allege that ARCO itself manufactured, produced or sold white lead carbonate pigment.

Plaintiff's claim against ARCO is based on sales of white lead carbonate by ARCO's alleged predecessors-in-interest, one of which is International Smelting and Refining Company ("IS&R"). IS&R manufactured white lead carbonate at a plant in East Chicago, Indiana from 1936 until 1946, when it sold the plant. During the time from 1936 to 1946 when IS&R operated the East Chicago plant, IS&R sold white lead carbonate under the "Anaconda" brand name to both paint manufacturers and manufacturers of ceramics and other non-paint products. IS&R was a wholly-owned subsidiary of the Anaconda Copper Mining Company (later renamed The Anaconda Company), a publicly traded mining and metals company.

In 1973, The Anaconda Company merged IS&R into itself. In 1977, ARCO acquired 100% of the shares of The Anaconda Company. ARCO operated The Anaconda Company as a wholly-owned subsidiary until 1981, when it merged The Anaconda Company into itself. ARCO does not dispute that, as a result of mergers in 1981 and 1973, it succeeded to the liabilities, if any, of The Anaconda Company and its former subsidiary IS&R.[1]

---

[1] In support of his cross-motion for summary judgment, Gibson asserts that ARCO also succeeded to the liabilities of Anaconda Lead Products Company, Anaconda Sales Company, and the International Lead Refining Company. D. 90-1, Plaintiff's Proposed Findings of Fact, ¶ 1. Plaintiff relies on the disputed allegations of his complaint, while in opposition, ARCO responds with evidence establishing that it did *not* succeed to the liabilities of these various entities. D. 98, ARCO's Additional Responsive Proposed Findings of Fact, ¶¶ 1-22. Whether ARCO succeeded to the liabilities of these companies, in addition to the liabilities of IS&R and the Anaconda Company, is not relevant to the Court's task in determining whether application of the risk contribution rule to ARCO is unconstitutional.

Case 2:07-cv-00864-LA   Filed 06/15/10   Page 3 of 38   Document 111

The use of lead pigments in residential paints was banned by federal and state regulation as early as the 1970s. Wisconsin banned the use of lead paint in 1980.

## II.

## A.

As stated, the Wisconsin Supreme Court originally created the risk contribution rule in *Collins v. Eli Lilly Co.*, 342 N.W.2d 37 (Wis. 1984). In *Collins*, the plaintiff's *in utero* exposure to the drug diethylstilbestrol (DES) caused her to develop vaginal cancer. The plaintiff could not identify "the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time." *Collins*, 342 N.W.2d at 43. Stated another way, the plaintiff could not prove "legal causation between a defendant's conduct and [her] injury," a required tort element at common law. *Id.* at 45. This was an "insurmountable obstacle" for the plaintiff. *Id.*

On the other hand, the court recognized that injuries caused by DES exposure were a serious societal problem. *Id.* "By the time that DES was banned for use in pregnancy in 1971, many women already had been exposed to DES during their mothers' pregnancies. . . . Thus, it is quite clear that in this case we are not dealing with an isolated, unique set of circumstances which will never occur again." *Id.* Accordingly, the court recognized that it was "faced with a choice of either fashioning a method of recovery for the DES case which will deviate from traditional notions of tort law, or permitting possibly negligent defendants

-4-

to escape liability to an innocent, injured plaintiff. In the interests of justice and fundamental fairness," the court chose "the former alternative." *Id.* In doing so, the court relied upon Article I, Section 9 of the Wisconsin Constitution, which allows courts in Wisconsin to "fashion an adequate remedy" if none otherwise exists. *Id.*[2]

The court surveyed a variety of different recovery theories, including alternative liability,[3] concerted action,[4] and enterprise liability.[5] Ultimately, the court adopted a modified version of market share liability, originally espoused by the California Supreme Court in a DES case, *Sindell v. Abbott Labs.*, 607 P.2d 924 (Cal. 1980). In *Sindell*, as in *Collins*, the plaintiff could not identify the DES manufacturer that caused her injury. Instead of denying recovery, the court acknowledged that "some adaptation of the rules of causation and liability may be appropriate in these recurring circumstances." *Sindell*, 607 P.2d at 936 (citing *Escola v. Coca Cola Bottling Co.*, 150 P.2d 436 (Cal. 1944) (Traynor, J., concurring)). As between "an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." *Id.* The plaintiff "is not at fault in failing to provide evidence of causation, and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role in creating the unavailability of proof." *Id.*

---

[2] "Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." Wis. Const. art. I, § 9.

[3] *Summers v. Tice*, 199 P.2d 1 (Cal. 1948).

[4] Restatement (Second) of Torts § 876 (1979).

[5] *Hall v. E.I. Du Pont De Nemours & Co., Inc.*, 345 F. Supp. 353 (E.D.N.Y. 1972).

-5-

The Wisconsin Supreme Court did not "question the fundamental fairness of *Sindell*'s shifting the burden of proof to the defendants," but concluded that the market share theory for apportioning damages should not be adopted primarily because of the "practical difficulty of defining and proving market share." *Collins* at 48.[6] Therefore, instead of a pure market share theory, the court adopted what came to be known as the risk contribution rule. "Each defendant contributed to the *risk* of injury to the public and, consequently, the risk of injury to individual plaintiffs. . . . Thus each defendant shares, in some measure, a degree of culpability . . ." *Id.* at 49 (emphasis in original). The "possibly responsible" drug companies were in a better position than the injured plaintiff to absorb the cost of the injury, either by insuring against liability or passing the cost along to the public. *Id.* The court rejected a more expansive version of the risk contribution rule which apportioned damages amongst "all defendants that created unreasonable risks according to the magnitude of the risks they created." *Id.* at 50 n.10. "We still require it to be shown that the defendant drug company reasonably could have contributed in some way to the actual injury." *Id.*

In a DES case under the risk contribution rule, the court emphasized that the plaintiff did not need to prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother. *Id.* at 50. "Rather, the plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the *type* (e.g., color, shape, markings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother." *Id.* at 50

---

[6] However, the court still considered market share to be a "relevant factor in apportioning liability among defendants." *Collins v. Eli Lilly Co.*, 342 N.W.2d 37, 49 (Wis. 1984).

-6-

(emphasis in original). If the plaintiff establishes a *prima facie* case, the burden of proof shifts to the defendant to prove by a preponderance of the evidence that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES. *Id.* at 52. "We believe that this procedure will result in a pool of defendants which it can reasonably be assumed could have caused the plaintiff's injuries. . . . This still could mean that some of the remaining defendants may be innocent, but we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law." *Id.*[7]

## B.

Twenty years later, drawing on *Collins*' observation that the risk contribution rule "could apply in situations which are factually similar to the DES cases," *Id.* at 49, the Wisconsin Supreme Court applied the risk contribution rule to white lead carbonate pigment. *Thomas ex rel. Gramling v. Mallett*, 701 N.W. 2d 523 (Wis. 2005). Wisconsin is the only state to adopt this theory of recovery for plaintiffs injured by ingesting white lead carbonate.

---

[7] In addition to Wisconsin, market share liability (or a version thereof) was adopted for DES cases in New York, Washington, Florida, and California. *See City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 124 n.10 (3d Cir. 1993) (collecting cases). Market share was explicitly rejected for DES cases by Ohio, Rhode Island, Illinois, Iowa, and Missouri. *Id.* at 126 n.12 (collecting cases); *Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187 (Ohio 1998). Except in DES cases, market share liability was "met with virtually universal rejection by the courts during the quarter-century following the Sindell decision." Donald G. Gifford, *The Challenge to the Individual Causation Requirement in Mass Products Torts*, 62 Wash. & Lee L. Rev. 873, 903 (2005); *see, e.g., Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex. 1989) (asbestos); *Black v. Abex Corp.*, 603 N.W.2d 182 (N.D. 1999) (asbestos); *Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169 (Pa. 1997) (lead pigment); *Hamilton v. Berretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001) (firearms); *Bly v. Tri-Continental Indus., Inc.*, 663 A.2d 1232 (D.C. 1995) (benzene).

In *Thomas*, the plaintiff alleged that he suffered lead poisoning by ingesting white lead carbonate pigment contained in paint at homes he lived in as a child. Like the plaintiff in *Collins*, Thomas was "unable to identify the precise producer of the white lead carbonate pigment he ingested at his prior residences due to the generic nature of the pigment, the number of producers, the lack of pertinent records, and the passage of time." 701 N.W.2d at 532.

Even though Thomas had a remedy for his injuries against his landlords,[8] the court extended the risk contribution rule to promote recovery against white lead carbonate pigment manufacturers (or their successors-in-interest). Along the lines of *Collins*, the *Thomas* court reasoned that the plaintiff was an "innocent plaintiff who is probably not at fault and will be forced to bear a significant cost of his injuries if he is not allowed to sue the possibly negligent Pigment Manufacturers." *Id.* at 558. The problem of "lead poisoning from white lead carbonate is real; it is widespread; and it is a public health catastrophe that is poised to linger for quite some time." *Id.* Just like in *Collins*, the defendants contributed to the risk of injury, but the court went farther, reasoning that many of the defendants (or their predecessors-in-interest) "knew of the harm white lead carbonate pigments caused and continued production and promotion of the pigment notwithstanding that knowledge." *Id.* The court relied upon the plaintiff's historical experts who concluded that "by the 1920s the

---

[8] This distinguished the case from *Collins*, but the court held that Article I, Section 9 of the Wisconsin constitution did not bar extension of the risk contribution rule. "The *Collins* court was concerned with more than just ensuring a plaintiff had *a remedy* against someone for something. Instead, the *Collins* court wrote that Article I, Section 9 had been interpreted in a manner that allowed the court to fashion an *adequate remedy* when one did not exist." *Thomas ex rel. Gramling v. Mallett*, 701 N.W. 2d 523, 552 (Wis. 2005) (emphases in original).

-8-

entire industry knew or should have known of the dangers of its products and should have ceased producing the lead pigments, including white lead carbonate." *Id.* Accordingly, the defendants were culpable for, "at a minimum, contributing to creating a risk of injury to the public." *Id.* Also as in *Collins*, the defendants were in a better position to absorb the cost of the injury. *Id.* It was "better to have the Pigment Manufacturers or consumers share the cost of the injury rather than place the burden on the innocent plaintiff." *Id.*

The defendants (referred to as the Pigment Manufacturers) argued that risk contribution shouldn't apply because Thomas could not identify which of the three types of white lead carbonate he ingested. Unlike DES, white lead carbonate is not "fungible" or manufactured from a chemically identical formula. The court rejected this argument because "the formulas for both DES and the white lead carbonate are in a sense on the same footing as being inherently hazardous." *Id.* at 559-60. It would be "imprudent to conclude that chemical identity is a touchstone for fungibility and, in turn, for the risk-contribution theory." *Id.* at 560. "It is the common denominator in the various white lead carbonate formulas that matters; namely, lead." *Id.* at 562.

The Pigment Manufacturers also argued that the paint allegedly ingested "could have been applied at any time between construction of the two houses [the plaintiff lived in] in 1900 and 1905 and the ban on lead paint in 1978." *Id.* at 562. This "significant time span" greatly exceeds the nine-month window during which a plaintiff's mother would have taken DES. The court rejected this argument because "the window will not always be potentially as large as appears in this case. Even if it routinely will be, the Pigment Manufacturers'

-9-

argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long." *Id.*

The Pigment Manufacturers continued by arguing that Thomas's lead poisoning could have been caused from many different sources, including "ambient air, many foods, drinking water, soil, and dust." *Id.* at 563. Further, unlike in DES cases, lead poisoning does not produce a "signature injury." The court was unconvinced. "Harm is harm, whether 'signature' or otherwise." *Id.* at 563. "While *Collins* concerned a plaintiff who had injuries of a 'signature' nature, that merely means that Thomas may have a harder case to make to his jury. Further, while the Pigment Manufacturers are correct to argue that Thomas's lead poisoning could have come from any number of sources, that is an argument to be made before the jury." *Id.*

Finally, the court rejected the Pigment Manufacturers' argument that they were not in exclusive control of the risk their product created. "First, as doctors were the ones who prescribed the dosage of DES, so too were the paint manufacturers that mixed the amount of white lead carbonate in the paint." *Id.* However, those who mixed paint did not alter the toxicity of the white lead carbonate, just like the pharmacist did not alter the toxicity of DES by filling a prescription. Moreover, the Pigment Manufacturers "actually magnified the risk through their aggressive promotion of white lead carbonate, even despite the awareness of the toxicity of the lead. In either case, whoever had 'exclusive' control over the white lead carbonate is immaterial." *Id.* at 563-64.

-10-

With respect to negligence claims, since the plaintiff "cannot prove the specific type of white lead carbonate he ingested, he need only prove that the Pigment Manufacturers produced or marketed white lead carbonate for use during the relevant time period: the duration of the houses' existence." *Id.* at 564. As to strict liability claims, the plaintiff need only prove that the "pigment manufacturer engaged in the business of producing or marketing white lead carbonate . . ." *Id.* Once the plaintiff makes a *prima facie* case, "the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located." *Id.* If "relevant records do not exist that can substantiate either defense, 'we believe that the equities of [white lead carbonate] cases favor placing the consequences on the [Pigment Manufacturers].'" *Id.* (quoting *Collins*).

The Pigment Manufactuers argued that use of the risk contribution theory for injuries caused by white lead carbonate pigment violated their procedural and substantive due process rights.[9] Instead of addressing these arguments, the court held as previously stated that they were not ripe for consideration and remanded the case for trial in light of its extension of the risk contribution theory. *Id.* at 565. On remand, ARCO once again moved for summary judgment on constitutional grounds. The circuit court denied the motion as premature and without prejudice to renewal after trial. At trial, the jury returned a verdict finding that Thomas failed to prove that his injuries were caused by the ingestion of white lead carbonate

---

[9] ARCO, as stated, now brings the same substantive due process challenge. *See Enterprises v. Apfel*, 524 U.S. 498 (1998); *Thomas* at 595 (Prosser, J., dissenting). ARCO does not raise a procedural due process challenge.

Case 2:07-cv-00864-LA   Filed 06/15/10   Page 11 of 38   Document 111

pigment. Accordingly, the jury did not apply the risk contribution rule formulated by the Wisconsin Supreme Court.

## III.

## A.

*Thomas* generated a great deal of commentary and criticism.[10] In one of two highly critical dissents, Justice Prosser predicted that Wisconsin would become "the mecca for lead paint suits." *Thomas* at 590. He was correct. In the wake of *Thomas*, over thirty cases were filed in state court by the same attorneys who represented the plaintiff in *Thomas*. D. 70, Affidavit of Bruce Kelly, ¶ 2; Tom Held and John Diedrich, *Lead lawsuits go to U.S. Court*, Milwaukee Journal Sentinel, May 1, 2007. Some of these cases, including the case at bar, were removed to federal court and are currently pending. *Burton v. Am. Cyanamid, et al.*, Case No. 07-CV-303 (LA) (E.D. Wis.); *Owens v. Am. Cyanamid, et al.*, Case No. 07-CV-441 (LA) (E.D. Wis.); *Stokes v. Am. Cyanamid, et al.*, Case No. 07-CV-865 (LA) (E.D. Wis.). One case was dismissed without prejudice, re-filed in federal court and is currently pending. *Sifuentes v. American Cyanamid, et al.,* Case No. 10-CV-75 (LA) (E.D. Wis.). Two cases are currently pending in state court. *Clark v. 3738 Galena LLC, et al.*, Case No. 06-CV-12653 (Milwaukee County Circuit Court); *Godoy v. E.I. Dupont, et al.*, Case No. 06-CV-277 (Milwaukee County Circuit Court). The remaining cases were dismissed without prejudice.

---

[10] *See* Richard Esenberg, *A Court Unbound? The Recent Jurisprudence of the Wisconsin Supreme Court* (2007) (Federalist Society White Paper); Diane S. Sykes, *Hallows Lecture: Reflections on the Wisconsin Supreme Court*, 89 Marq. Law Rev. 723, 728-31 (2006); Donald G. Gifford, *The Death of Causation*, 41 Wake Forest L. Rev. 943, 985-88 (2006); Laura Worley, *The Iceberg Emerged: Wisconsin's Extension of Risk Contribution Theory Beyond DES*, 90 Marq. L. Rev. 383 (2006); Michael B. Brennan, *Are Courts Becoming Too Activist? Wisconsin's Supreme Court Has Shown a Worrisome Turn In That Direction*, Milwaukee Journal Sentinel, Oct. 2, 2005; Donald G. Gifford, *The Challenge to the Individual Causation Requirement in Mass Products Torts*, 62 Wash. & Lee L. Rev. 873, 903-08 (2005).

D. 70-7, Exhibit 7 (listing cases and status as of September 15, 2009).  ARCO is (or was) a

defendant in all but two of the lead paint cases filed after *Thomas*.  *Godoy*; *Hardison v. E.I.*

*DuPont De Nemours & Co. et al.*, 06-CV-606 (Milwaukee County Circuit Court).

**B.**

As noted, the instant lawsuit was originally filed in Milwaukee County Circuit Court.

The original complaint named the State of Wisconsin, Department of Health and Family

Services as a defendant.  On March 22, 2007, the circuit court endorsed a stipulation that the

Milwaukee County Department of Health and Human Services should be substituted for the

State of Wisconsin as the proper party pursuant to Wis. Stat. § 803.03(2)(a)(any "public

assistance recipient . . . asserting a claim against a 3rd party for which the public assistance

provider has a right of subrogation or assignment . . . shall join the provider as a party to the

claim").

Defendants removed in April 2007, but Gibson moved for remand.  On July 11, 2007,

this Court held that the substitution of Milwaukee County for the State of Wisconsin created

complete diversity because Milwaukee County is a citizen of Wisconsin and should be

aligned as a plaintiff, not a defendant.  *Am. Motorists Ins. Co. v. Trane Co.*, 657 F.2d 146,

149 (7th Cir. 1981) (where "jurisdiction is based on diversity of citizenship, the court may

ascertain whether the alignment of the parties as plaintiff and defendant conforms with their

true interests in the litigation"); *Moor v. Alameda County*, 411 U.S. 693, 717-18 (1973)

(municipal corporation is a corporation for diversity purposes). However, the Court

-13-

remanded for failure to satisfy the amount in controversy requirement. *Gibson v. Am. Cyanamid, et al*, No. 07-C-358 (E.D. Wis.) (D. 48).

After pursuing damages discovery in state court, the defendants removed again on September 26, 2007.[11] The plaintiff and his guardian ad litem are citizens of Wisconsin. All of the corporate defendants are citizens of states other than Wisconsin. The presence of Milwaukee County, as noted above, does not destroy diversity. The removing defendants allege, and Gibson no longer disputes, that the amount in controversy exceeds $75,000. Accordingly, the Court may exercise jurisdiction under the diversity statute. 28 U.S.C. § 1332(a).

## C.

The federal cases were stayed for over a year pending a ruling from the Wisconsin Supreme Court in *Godoy ex rel. Gramling v. E.I. DuPont de Nemours & Co.*, 768 N.W.2d 674 (Wis. 2009).[12] After the stay was lifted in July 2009, a flurry of motions were filed, including: (1) plaintiffs' motion to consolidate this case (No. 07-CV-864) with Case Nos. 07-CV-303, 07-CV-441 and 07-CV-865 before Judge Adelman; (2) plaintiffs' motion to strike the affirmative defenses asserted by ARCO and the Sherwin-Williams Company; (3) ARCO's motion for summary judgment; (4) plaintiffs' cross-motion for partial summary judgment; and (5) the Sherwin-Williams Company's motion for the recusal of Judge

---

[11] *Stokes v. Am. Cyanamid, et al.*, Case No. 07-CV-865 (LA) (E.D. Wis.), followed the same path of removal, remand, and re-removal. Judge Stadtmueller issued the remand order, but he recused himself when the case was removed the second time, and the case was eventually assigned to Judge Adelman.

[12] This ruling has no bearing on the motions now before the Court.

-14-

Adelman.[13]  The motions for summary judgment and the motions to strike were filed in all four cases and they are identical in all material respects.

After Judge Adelman denied the motion to consolidate,[14] this Court issued an order denying Gibson's motion to strike.  The Court reasoned that the motion "essentially amounts to the argument that the constitutional affirmative defenses are insufficient as a matter of law. This may turn out to be the case, but a more appropriate vehicle for deciding the merits of these affirmative defenses is in the context of dispositive motions or trial."  D. 107, at 3.

## IV.

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Gibson does not dispute any of the facts that are relevant to ARCO's motion for summary judgment.

---

[13]  Sherwin-Williams argued that Judge Adelman should recuse himself based upon the opinions he expressed regarding *Thomas* in a law review article.  Hon. Lynn Adelman, *Exercising Judicial Power: A Response to the Wisconsin Supreme Court's Critics*, 91 Marq. L. Rev. 425, 446 (2007).  Judge Adelman denied this motion on February 16, and the Seventh Circuit affirmed.  *In re Sherwin-Williams Co.*, — F.3d —, 2010 WL 2244119 (7th Cir. June 7, 2010).

[14]  Under the local rules of this judicial district, motions to consolidate "must be decided by the judge to whom the lowest numbered case is assigned."  Civil L.R. 42(a) (E.D. Wis.).  Accordingly, the Court deferred ruling on any motions before it until Judge Adelman resolved the consolidation motion.  Once Judge Adelman declined to take the case, the Court addressed the pending motions.

## A.

The potential imposition of liability under the risk contribution rule violates the constitutional bar to retroactive liability expressed in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998); *Thomas* at 595-96 (Prosser, J., dissenting). In *Eastern Enterprises*, the U.S. Supreme Court considered a challenge under the Takings Clause and the Due Process Clause to the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), 26 U.S.C. §§ 9702(a)(1), (2). The Coal Act was enacted in response to the problem created by "orphan retirees" in the coal industry who were promised lifetime health benefits under prior benefit plans. The Coal Act "merged the 1950 and 1974 Benefit Plans into a new multiemployer plan" called the Combined Fund. *E. Enters.*, 524 U.S. at 514. The Combined Fund provided substantially the same health benefits to retirees and their dependents as they were receiving under those plans. It was financed by "annual premiums assessed against 'signatory coal operators,' *i.e.*, coal operators that signed any [National Bituminous Coal Wage Agreement] [NBCWA] or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans." *Id.* Any signatory operator who "'conducts or derives revenue from any business activity, whether or not in the coal industry,'" could be liable for those premiums. *Id.* Where a signatory was no longer involved in any business activity, premiums could be levied against "related persons," including successors in interest and businesses or corporations under common control. *Id.*

Eastern Enterprises conducted "extensive coal mining operations" until 1965, when it transferred its coal-related operations to a subsidiary, Eastern Associated Coal Corp.

-16-

(EACC). Eastern retained its stock interest in EACC through a subsidiary corporation, Coal Properties Corp. (CPC), until 1987, when Eastern sold its interest in CPC to Peabody Holding Company. When the Coal Act was enacted, Eastern was no longer involved in the coal industry, but it was "in business" within the meaning of the Coal Act.

Pursuant to the Coal Act, the Commissioner of Social Security assigned to Eastern the obligation for Combined Fund premiums for over 1,000 retired miners who had worked for the company before 1966, based on Eastern's status as the pre-1978 signatory operator for whom the miners had worked for the longest period of time. 26 U.S.C. § 9706(a)(3) (eligible beneficiary assigned to signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement). Eastern's premium for a 12-month period was $5 million.

**1.**

A plurality of the Supreme Court, led by Justice O'Connor,[15] held that the Coal Act violated the Takings Clause as applied to Eastern. After surveying previous decisions that considered "constitutionality of somewhat similar legislative schemes," *see Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976), *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984), *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986), and *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602 (1993), Justice O'Connor noted that those decisions "left open the possibility that

---

[15] The plurality opinion was joined by Rehnquist, C.J., Scalia, J., and Thomas, J..

legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience."  *Id.* at 524, 528-29.

The plurality opinion proceeded to analyze the case as a regulatory taking.  First, the plurality concluded that the economic impact of the regulation was substantial.  Eastern's cumulative payments under the Act were estimated between $50 and $100 million.  *Id.* at 529.  Next, the plurality reasoned that this liability was not "proportional" to Eastern's experience with the plans.  While Eastern "contributed to the 1947 and 1950 W&R Funds, it ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans under the 1974, 1978, or subsequent NBCWA's."  *Id.* at 530.  It was only the "latter agreements" that first suggested the industry commitment to the funding of lifetime health benefits for retirees and their family members.  Even though EACC continued coal mining through 1987 as a subsidiary of Eastern, Eastern's liability under the Act bore "no relationship to its ownership of EACC; the Act assign[ed] Eastern responsibility for benefits relating to miners that Eastern itself, not EACC, employed. . . ."  *Id.*  "Although Eastern at one time employed the Combined Fund beneficiaries" assigned under the Coal Act, the "correlation between Eastern and its liability to the Combined Fund" was tenuous, and the amount assessed against Eastern resembled a calculation "made in a vacuum."  *Id.* at 531 (citing *Connolly*, 475 U.S. at 225).  Eastern's obligations under the Act depended "solely on its roster of employees some 30 to 50 years

-18-

before the statute's enactment, without regard to any responsibilities that Eastern accepted under any benefit plan the company itself adopted." *Id.*

Accordingly, the Coal Act "substantially interfere[d] with Eastern's reasonable investment-backed expectations" by reaching back "30 to 50 years to impose liability . . . based on the company's activities between 1946 and 1965." *Id.* at 532. The Coal Act operated "retroactively, divesting Eastern of property long after the company believed its liabilities . . . to have been settled." *Id.* at 534. When a remedy "singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental fairness principles underlying the Takings Clause." *Id.* at 537. Therefore, the plurality concluded that the Coal Act's application to Eastern effected an unconstitutional taking.

**2.**

In a concurring opinion, Justice Kennedy found that the Coal Act should be invalidated under the Due Process Clause, not the Takings Clause. "The law simply imposes an obligation to perform an act, the payment of benefits. . . . To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise." *Id.* at 540 (Kennedy, J., concurring). The injury suffered by Eastern was "so unlike the act of taking specific property that it is incongruous to call the Coal Act a taking, even as that concept has been expanded by the regulatory takings principle." *Id.* at 542. Justice Kennedy chided the plurality for its failed attempt to "avoid making a normative

-19-

judgment about the Coal Act. . . . The imprecision of our regulatory takings doctrine does open the door to normative considerations about the wisdom of government decisions." *Id.* at 544-45. "This sort of analysis is in uneasy tension with our basic understanding of the Takings Clause, which has not been understood to be a substantive or absolute limit on the government's power to act." *Id.* at 545. The Takings Clause is a "conditional limitation, permitting the government to do what it wants so long as it pays the charge. The Clause presupposes what the government intends to do is constitutional." *Id.*

Justice Kennedy's analysis proceeded under the Due Process Clause, which "requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way." *Id.* at 547. If retroactive laws "change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548. Justice Kennedy concluded that "the remedy created by the Coal Act bears no legitimate relation to the interest which the Government asserts in support of the statute. . . . As the plurality explains today, in creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope." *Id.* at 549. Retroactivity was unjustified because the Coal Act was not designed to impose an "actual, measurable cost" of business which was avoided in the past. *Id.* "As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving the framework of the [NBCWA]." *Id.* at 550. Accordingly, the Coal Act's

-20-

application to Eastern was "far outside the bounds of retroactivity permissible under our law," representing "one of the rare instances" where the permissive standard of due process was violated. *Id.* at 550.

**3.**

In dissent, Justice Breyer[16] agreed with Justice Kennedy that the appropriate constitutional analysis was under the Due Process Clause, not the Takings Clause. Application of the Takings Clause "bristles with conceptual difficulties," but the Court "need not face these difficulties . . . for there is no need to torture the Takings Clause to fit this case. The question involved – the potential unfairness of retroactive liability – finds a natural home in the Due Process Clause . . ." *Id.* at 556 (Breyer, J., dissenting). Due process "can offer protection against legislation that is unfairly retroactive at least as readily as the Takings Clause might, for as courts have sometimes suggested, a law that is fundamentally unfair because of its retroactivity is a law that is basically arbitrary." *Id.* at 557. Justice Breyer dismissed the plurality's "fear of resurrecting" the substantive due process era of *Lochner v. New York*, 198 U.S. 45 (1905) as "misplaced." *Id.*

> To find that the Due Process Clause protects against this kind of fundamental unfairness – that it protects against an unfair allocation of public burdens through this kind of specially arbitrary retroactive means – is to read the Clause in light of a basic purpose: the *fair application of law*, which purpose hearkens back to the Magna Carta. It is not to resurrect long-discredited substantive notions of 'freedom of contract.'

---

[16] Justice Breyer was joined by Stevens, J., Souter, J., and Ginsburg, J..

*Id.* at 558 (emphasis in original). Accordingly, like the plurality, Justice Breyer would "inquire if the law before us is fundamentally unfair or unjust," but he would "ask this question because, like Justice Kennedy," he believed that "*if so*, the Coal Act would 'deprive' Eastern of 'property, without due process of law.'" *Id.* (emphasis in original).

Unlike Justice Kennedy and the plurality, Justice Breyer concluded that the Coal Act was not "fundamentally unfair or unjust" as applied to Eastern. "The substantive question before us is whether or not it is fundamentally unfair to require Eastern to make *future* payments for health care costs of retired miners and their families, on the basis of Eastern's *past* association with these miners." *Id.* at 558-59 (emphases in original). Justice Breyer relied on the fact that the liability was only for miners that Eastern employed in the past. "Insofar as working conditions created a risk of future health problems for those miners, Eastern created those conditions." *Id.* at 560. Justice Breyer also disagreed with the historical analysis of the plurality and Justice Kennedy regarding the "promise" to coal workers before Eastern withdrew from the industry in 1965. "That 'promise,' even if not contractually enforceable, led the miners to 'develo[p]' a reasonable 'expectation' that they would continue to receive '[retiree] medical benefits.'" *Id.* at 560-61. Finally, Justice Breyer noted that Eastern continued to receive profits from the coal mining industry after 1965 through its subsidiary. *Id.* at 565. Therefore, according to Justice Breyer, Eastern could not show a "sufficiently reasonable expectation that it would remain free of future health care cost liability for the workers whom it employed. Eastern has therefore failed to show that the law unfairly upset its legitimately settled expectations." *Id.* at 567-68.

**B.**

Even though *Eastern Enterprises* invalidated a legislative imposition of retroactive liability, the constitutional principles expressed therein apply with equal force to the prospective application of a common law rule in a civil lawsuit. "The federal guaranty of due process extends to state action through its judicial as well as through its legislative, executive, or administrative branch of government." *Shelley v. Kramer*, 334 U.S. 1, 15 (1948); *Ownbey v. Morgan*, 256 U.S. 94, 111 (1921); *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 573 n.17 (1996) ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (it is not "the form in which state power has been applied" that matters "but, whatever the form, whether such power has in fact been exercised"). The exercise of judicial power to apply a state rule of law is subject to constitutional restraints.[17]

Gibson argues that *Eastern Enterprises* cannot be used to invalidate *Thomas*' retroactive effect because the development of the common law is presumptively retroactive. "The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982). Gibson relies on *Harper v. Va. Dep't of Taxation*, 509 U.S. 86 (1993), which

---

[17]  The Court presumes that its application of judicial power is subject to the Fourteenth Amendment rather than the Fifth Amendment. *Cf. Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 664-65 (7th Cir. 1986) (federal court sitting in diversity must ask if exercise of jurisdiction would violate due process under the Fourteenth Amendment). The analysis is the same under either provision. *See Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137 (7th Cir. 1975) ("we can perceive no operative difference between the concept of due process as applied to the states and as applied to the federal government"); *Hampton v. Dillard Dept. Stores, Inc.*, 18 F. Supp. 2d 1256, 1276 n.14 (D. Kan. 1998) ("Federal courts have suggested that the Fifth Amendment due process protection would apply 'equally to the review of punitive damages awarded in federal court'") (quoting *Lee v. Edwards*, 101 F.3d 805, 809 n.2 (2d Cir. 1996)).

-23-

held: "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." 509 U.S. at 97. *Harper* does not apply because the United States Supreme Court's interpretation of federal law is not at issue. Moreover, with regard to its own decisions, the Wisconsin Supreme Court does not even follow the *Harper* standard. *Trinity Petroleum, Inc. v. Scott Oil Co., Inc.*, 735 N.W.2d 1, 17 (Wis. 2007). Even if the Wisconsin Supreme Court did apply *Harper* to determine the retroactive impact of its own judicial rulings, indeed no matter what standard the Wisconsin Supreme Court applies, the retroactive application of rulings made by the state judiciary is a matter of state law. The presumed retroactive application of a common law judicial decision cannot circumvent constitutional implications when the rule expressed by that decision is applied.

Accordingly, it is not surprising that the United States Supreme Court considers due process principles in the context of the retroactive application of common law judicial rulings *without regard to the presumptive retroactive effect of those rulings*. For example, in *Bouie v. City of Columbia*, 378 U.S. 347 (1964), the Supreme Court considered the judicial expansion of a trespass statute. As written, the statute made it a crime to enter onto property after receiving notice that entry was prohibited, but the state court expanded it to encompass situations where an individual remains on the property after being asked to leave. The Court held that the retroactive application of the state court's decision violated due process. "If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the

-24-

law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." *Bouie*, 378 U.S. at 354. Similarly, in *Rogers v. Tennessee*, 532 U.S. 451 (2001), the Court considered the judicial abrogation of the "year and a day" rule, which provided that no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act. Distinguishing *Bouie*, the court held that due process principles were not violated by the retroactive abolition of the rule. "There is, in short, nothing to indicate that the Tennessee court's abolition of the rule in petitioner's case represented the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." *Rogers*, 532 U.S. at 466-67. The due process principles applied in cases like *Rogers* and *Bouie* are in many ways distinct from the due process principles that were at issue in *Eastern Enterprises*. However, *Rogers* and *Bouie* illustrate that the retroactive application of judicial rulings cannot trump due process concerns.

## C.

*Eastern Enterprises* was of course a fragmented decision, meaning that five Justices concurred in the judgment but did not agree upon a single rationale for the result. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). Courts continue to follow the *Marks* approach, but the Supreme Court signaled that it should not be applied in every case involving a fragmented opinion. "We think it not

-25-

useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it." *Nichols v. United States*, 511 U.S. 738, 745-46 (1994).

Appellate courts have applied *Marks* to *Eastern Enterprises* with varying results. The D.C. Circuit rejected an attempt to "cobble together a due process holding from *Eastern Enterprises*' fragmented parts." *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 (D.C. Cir. 1998). "We have previously held that the rule of *Marks* . . . does not apply unless the narrowest opinion represents a 'common denominator of the Court's reasoning' and 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'" *Id.* (internal citations omitted). The court found that Justice Kennedy's due process analysis "clearly does not meet this standard because he alone was willing to invalidate economic legislation on the ground that it violated the Due Process Clause. And, as should be obvious, Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's takings analysis." *Id.* at 1254-55. *See also United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003); *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161 (3d Cir. 1999). Other courts observe that the Takings Clause analysis is inapplicable because a majority of justices "concluded that a Takings Clause issue can arise only after a plaintiff's property right has been independently established." *Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999) (citing *E. Enters.*, Kennedy, J., concurrence and Breyer, J., dissent); *see also Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc)

-26-

("Thus five justices of the Supreme Court in *Eastern Enterprises* agreed that regulatory actions requiring the payment of money are not takings"); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 659 (3d Cir.) ("[W]e are bound to follow the five-four vote against the takings claim in *Eastern*"), *cert. denied*, 528 U.S. 963 (1999); *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 606 (4th Cir. 1999), *cert. denied*, 528 U.S. 1117 (2000).

Shedding more light on the subject is the First Circuit's observation that after *Marks*, "several members of the Court have indicated that whenever a decision is fragmented such that no single opinion has the support of five Justices, lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced." *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006). The Seventh Circuit appeared to endorse such an approach in *United States v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006) (analyzing the plurality, concurring, and dissenting opinions in *Rapanos v. United States*, 547 U.S. 715 (2006)). Using this approach, the Court agrees that a case involving the imposition of retroactive liability should not be analyzed as a taking because of the five to four alignment of the justices in *Eastern*. *See Parella*; *Commonwealth Edison Co.*; *Unity Real Estate*. The obvious corollary is that five of the justices perceived the problem of retroactive liability as a substantive due process issue. Note, *Substantive Due Process Since Eastern Enterprises, With New Defenses Based on Lack of Causative Nexus: The Superfund Example*, 32 B.C. Envtl. Aff. L. Rev. 395, 415-16 (2005) ("If one counts the votes, however, a majority opinion – composed of Justice Breyer's dissent and Justice

Kennedy's concurrence – held that substantive due process, and not takings, is the appropriate analysis for government actions against a private party").

Going further, even though the plurality labeled their analysis as a takings analysis, "the rationale employed in the [plurality and in Justice Kennedy's concurrence] is strikingly similar." *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1059 n.12 (11th Cir. 2008); *see also United States Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412, 420 (5th Cir. 2000) ("Justice Kennedy's due process analysis focuses on retroactivity and is essentially harmonious with the reasoning of the other four justices"). Indeed, the Justices recognized as much in their opinions. *E. Enters.* at 537 ("Our analysis of legislation under the Takings and Due Process Clauses is correlated to some extent, and there is a question whether the Coal Act violates due process in light of the Act's severely retroactive impact") (internal citation omitted); *Id.* at 548 ("Indeed, it is no accident that the primary retroactivity precedents upon which today's plurality opinion relies in its takings analysis were grounded in due process") (citing *Turner Elkhorn*, *R.A. Gray* and *Concrete Pipe*) (Kennedy, J., concurring). The bottom line is that five of the justices (indeed, all nine of the justices) generally agreed upon a substantive standard that should apply to retroactive liability, and five of the justices agreed that the liability imposed by the Coal Act upon Eastern violated that standard. Even if the Court is incorrect in applying the First Circuit's approach to fragmented opinions, the "common view of five Justices obviously carries persuasive authorities." *Swisher*, 550 F.3d at 1057 n.8.

For the foregoing reasons, this Court will apply the following framework to analyze whether ARCO's potential liability under the risk contribution rule is unconstitutional. After

-28-

surveying a series of opinions that were "grounded in due process," *E. Enters.* at 548 (Kennedy, J., concurring), the plurality observed that a liability "might be unconstitutional if it imposes (1) severe (2) retroactive liability on a (3) limited class of parties that (4) could not have anticipated the liability, and the extent of that liability is (5) substantially disproportionate to the parties' experience." *Id.* at 528-29; *see also Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 378 (1999) (if *Eastern Enterprises* "does not stand for a single, distinct approach to the problem before it, it nonetheless stands for a clear principle: a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not be constitutionally imposed"). This is simply a more specific way of saying what Justice Kennedy couched in due process terms: the imposition of retroactive liability is "arbitrary and irrational" if it bears "no legitimate relation to the interest which the Government asserts in support of the statute." *E. Enters.* at 547, 549 (Kennedy, J., concurring).

The Court analyzes these factors in the framework it has adopted as follows:

**Severity.** In *Eastern Enterprises*, the plaintiff faced potential liability "on the order of $50 to $100 million" for retiree benefit contributions under the Coal Act. *E. Enters.* at 529. Gibson requests an unspecified amount of damages in this case, but by way of comparison, the plaintiff in *Thomas* asked for damages in excess of $2 million dollars when the case reached the jury. As it currently stands, ARCO is a defendant in seven cases that are currently pending and a potential defendant in many more cases, including those that were previously filed and then dismissed without prejudice. Accordingly, ARCO faces a

severe financial burden in this lawsuit, and also through the cumulative impact of multiple lawsuits brought pursuant to the risk contribution rule.

**Retroactive liability.** "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). It presents "problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992). The risk contribution rule threatens to impose liability based upon the operations of ARCO's predecessor-in-interest, IS&R, which stopped manufacturing white lead carbonate pigment in 1946. Now, unlike then, ARCO (via IS&R) faces liability for all of the injuries caused by white lead carbonate pigment in Wisconsin simply by selling its products in Wisconsin. Accordingly, the risk contribution rule is retroactive because it "attaches new legal consequences" to IS&R's manufacturing operations that occurred between 1936 and 1946. *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994). If IS&R knew that it faced this expansive liability, it would have ensured that its products did not reach Wisconsin in the first instance and would have kept records to prove as much. *Thomas* at 564 (after plaintiff makes a prima facie case, defendant has burden of proof that it "did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located").

**Limited class of parties.** The Coal Act "singles out certain employers to bear a burden that is substantial in amount. . . ." *E. Enters*. at 537. Similarly, a small number of manufacturers were responsible for the manufacture of white lead carbonate pigment in the

-30-

United States. D. 77, Kelly Aff. ¶ 33, Ex. 19 (Markowitz and Rosner Decl. ¶ 8). ARCO is the successor to the liabilities of one of those companies. *Thomas*' "intricate tapestry of malfeasance and culpability on the part of the lead paint industry as a whole," *Thomas* at 569 (Wilcox, J., dissenting), highlights Justice Kennedy's warning about the temptation to use retroactive liability "as a means of retribution against unpopular groups or individuals." *E. Enters.* at 548 (quoting *Landgraf* at 266) (Kennedy, J., concurring).

**Unable to anticipate/settled expectations**. ARCO executed a series of transactions in 1973, 1977 and 1981 whereby it assumed the outstanding liabilities of the Anaconda Company (and, by extension, IS&R). ARCO likely would not have completed these transactions if it knew that it was assuming liability for injuries caused not just by IS&R's products, but for harm caused by other white lead carbonate pigment manufacturers whose products reached Wisconsin. The liability imposed by the risk contribution rule is disruptive of ARCO's settled expectations. It was impossible for ARCO to anticipate the eventual application of the risk contribution rule to white lead carbonate pigment in Wisconsin.

**Disproportionate to experience**. The risk contribution rule threatens liability that is completely unrelated and disproportionate to ARCO's experience. Under the risk contribution rule, ARCO can be held liable for a product it "may or may not have produced, which may or may not have caused the plaintiff's injuries, based on conduct that may have occurred [when ARCO was] not even part of the relevant market." *Thomas* at 568 (Wilcox, J., dissenting). ARCO faces this expansive liability not because of its own conduct, but simply because of its legal status as successor to the liabilities of IS&R, which participated

-31-

in the industry between 1936 and 1946 and may or may not have been responsible for products that entered Wisconsin.

**Arbitrary and irrational.** If it is a legitimate governmental objective to compensate childhood victims of lead poisoning and fund health care benefits for retired coal miners, the government cannot achieve those objectives through means that are arbitrary and irrational. *E. Enters.* at 547 (Kennedy, J., concurring). Use of the risk contribution rule to compensate Gibson for lead poisoning injuries does just that because it is arbitrary and irrational as applied to ARCO.

In *Turner Elkhorn*, the Supreme Court rejected a due process challenge to the Black Lung Benefits Act. The legitimate purpose of the Act was to "satisfy a specific need created by the dangerous conditions under which the former employee labored to allocate to the mine operator an actual, measurable cost of his business." *Turner Elkhorn*, 428 U.S. at 19. The "imposition of liability for the effects of disabilities bred in the past" was justified "as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor – the operators and the coal consumers." *Id.* at 18. Accordingly, in *Turner Elkhorn*, there was a specific connection between coal operators and their former employees – an employment relationship – which justified the imposition of retroactive liability. Even in *Eastern Enterprises*, the proposed liability was limited to health care benefits for former employees. *E. Enters.* at 559 (Breyer, J., dissent).

By contrast, under the risk contribution theory, the only potential connection between ARCO and Gibson is that ARCO's predecessor-in-interest IS&R "produced or marketed

Case 2:07-cv-00864-LA   Filed 06/15/10   Page 32 of 38   Document 111

white lead carbonate for use" at some point "during the relevant time period: the duration of the houses' existence." *Thomas* at 564. Gibson does not allege when his home was built, but the Court can assume that it was built sometime before 1946, the year that IS&R stopped producing white lead carbonate pigment.[18] The white lead carbonate that allegedly injured Gibson could have been applied at any time during that expansive time period, even when ARCO was no longer producing or marketing white lead carbonate. This raises a substantial possibility that defendants "not only could be held liable for more harm than they actually caused, but also could be held liable when they did not, in fact, cause any harm to plaintiff at all." *Santiago v. Sherwin Williams Co.*, 3 F.3d 546, 551 (1st Cir. 1993); *Skipworth v. Lead Indus. Ass., Inc.*, 690 A.2d 169, 173 (Penn. 1997) ("application of the market share theory to this situation would virtually ensure that certain pigment manufacturers would be held liable where they could not possibly have been a potential tortfeasor"). The risk contribution rule imposes and apportions liability among the pigment manufacturers in a manner that is arbitrary and irrational. "Application of market share liability to lead paint cases such as this one would lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair." *Skipworth*, 690 A.2d at 172.

Because it is impossible to identify the manufacturer of the white lead carbonate pigment that caused a particular injury, it is also impossible to know whether ARCO or any other defendant avoided liability for injuries caused by its own products. *E. Enters.* at 549

---

[18] If the house was built after 1946, ARCO could evade liability under the risk contribution rule because it would not have been producing or marketing white lead carbonate pigment at any time during the relevant time period (the duration of the houses' existence).

-33-

(Kennedy, J., concurring) (citing *Turner Elkhorn* at 19). Under the inherent logic of the risk contribution rule, the amount of actual harm caused by a particular defendant's products (if any) is speculative and immeasurable. Indeed, if the amount of liability avoided in the past could be measured, there would be no need for the risk contribution rule in the first instance. Accordingly, the risk contribution rule does not impose an actual or measurable cost of business that was heretofore avoided.

Ultimately, while IS&R's involvement in the lead pigment industry may have increased the risk that Gibson would be exposed to a dangerous substance, the extent to which that risk was increased is unknowable, rendering the connection between Gibson and ARCO completely nonexistent. Simply put, by eliminating the traditional causation requirement in tort for those who were injured by white lead carbonate pigment, the risk contribution rule imposes a burden that is unrelated to any injury that was actually caused by ARCO and bears no legitimate relationship to the government's interest in compensating the victims of lead poisoning for their injuries. *See Connolly*, 475 U.S. at 229 ("the imposition of retroactive liability on employers for the benefit of employees may be arbitrary and irrational in the absence of any connection between the employer's conduct and some detriment to the employee") (O'Connor, J., concurring). Instead, the risk contribution rule creates an arbitrary and irrational remedy aimed at compensating the victims of a "public health catastrophe." *Thomas* at 558.

-34-

**V.**

Apart from the issue of retroactive liability, the imposition of liability under the risk contribution rule violates ARCO's due process rights for separate, but closely related reasons. In *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), the Supreme Court considered a due process challenge to a $145 million dollar punitive damages award in state court. The plaintiffs brought claims for bad faith, fraud, and intentional infliction of emotional distress, but the case was also used as a "platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country." *State Farm*, 538 U.S. at 420. While the most important factor in a punitive damages calculation is the "reprehensibility of the defendant's conduct," the state court erred by awarding punitive damages to "punish and deter conduct that bore no relation" to the plaintiff's harm. *Id.* at 422. "A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct which harmed the plaintiff, not for being an unsavory individual or business." *Id.* at 422-23. Therefore, the Court found that the punitive damages award "was neither reasonable nor proportionate to the wrong committed, and it was an arbitrary and irrational deprivation of the property of the defendant." *Id.* at 429. "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of a reprehensibility analysis . . ." *Id.* at 423.

-35-

The Supreme Court expanded these principles in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), a case involving a $79.5 million dollar punitive damages award in favor of a widow for the smoking-related lung cancer death of her husband. Similar to *State Farm*, the plaintiff sought to punish the defendant for the reprehensibility of its conduct in relation to harm inflicted upon nonparties to the litigation. A defendant that is "threatened with punishment for injuring a nonparty victim has no opportunity to defend against the charge, by showing, for example in a case such as this, that the other victim was not entitled to damages because he or she knew that smoking was dangerous or did not rely upon the defendant's statements to the contrary." *Philip Morris*, 549 U.S. at 353-54. The Court vacated the award, reasoning that due process "requires States to provide assurance that juries are not asking the wrong question, *i.e.*, seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." *Id.* at 355. The Court found "no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others." *Id.* at 354.

Gibson argues that these cases are distinguishable because he is not seeking punitive damages, nor did the plaintiff in *Thomas* seek punitive damages. There is, of course, a traditional distinction between compensatory damages, intended to redress the "concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," and punitive damages, aimed at deterrence and retribution. *State Farm* at 416. However, one of the stated policy considerations in *Thomas* was "deterring knowingly wrongful conduct that causes harm." *Thomas* at 558 n.44. The risk contribution rule is premised upon the culpability of

-36-

the entire lead paint industry. *Id.* at 536-48 (describing efforts of the Lead Industries Association to discredit findings regarding health risks of lead pigments). In that respect, damages awarded under the risk contribution rule promote the same policies that are prohibited in punitive damages awards. Moreover, the cumulative impact of multiple lawsuits achieves a punitive result, even if the damages in a particular case are labeled compensatory. Instead of liability for cases where its product caused a specific injury to a specific plaintiff, ARCO is subject to liability in every case in Wisconsin.

But whether the damages in a risk contribution case are considered compensatory or punitive is not particularly relevant to the due process concerns expressed in *State Farm* and *Philip Morris*. These cases stand for the principle that it violates due process to impose damages for the wrongful conduct of others. Stated another way, it violates due process when there is no nexus or provable connection between a damages award and the harmful conduct of the defendant. When liability is imposed under the risk contribution rule, the end result is the same as that condemned in *State Farm* and *Philip Morris*.

\*\*\*

For all of the foregoing reasons, the creation of the risk contribution rule on due process principles pursuant to Article I, Section 9 of the Wisconsin Constitution in turn violates ARCO's substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.

Therefore, **IT IS HEREBY ORDERED THAT** ARCO's motion for summary judgment [D. 74] is **GRANTED**, and Gibson's cross-motion for summary judgment [D. 90] is **DENIED**.

Dated at Milwaukee, Wisconsin, this 15th day of June, 2010.

**SO ORDERED,**


**s/ Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**