UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ERNEST GIBSON

Plaintiff,

vs.

Case No.: 07-C-0864

AMERICAN CYANAMID ET AL,

Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT BY THE DEFENDANTS SHERWIN-WILLIAMS, AMERICAN CYANAMID, ARMSTRONG CONTAINERS, E.I. DUPONT DE NEMOURS, AND N.L. INDUSTRIES

---

### FACTUAL BACKGROUND

In the course of applying the risk contribution doctrine to the widespread public health catastrophe of childhood lead poisoning, the Wisconsin Supreme Court in *Thomas v. Mallett, et. al.*, 2005 WI 129, 285 Wis.2d 236, 701 N.W.2d 523 (2005), struck a balance between the competing interests of innocent children and culpable lead pigment manufacturers. This balance was reached only after a careful and exhaustive consideration of the factual record in the light of the applicable public policies and legitimate state interests in the public health, safety and welfare. The facts gleaned from the summary judgment record which were deemed by the Wisconsin Supreme Court material to its decision to modify the common law of the state in order to bring it into conformity with the requirements of Article I, § 9, of the Wisconsin Constitution are set forth in ¶¶ 1 through 98 of the Plaintiff's Statement of Additional Facts which have been filed in support of this brief. Those facts are incorporated herein by reference. Furthermore,

1

those facts must be considered as the dispositive basis for the Wisconsin Supreme Court's decision to apply the risk contribution doctrine to the lead poisoning claims of children injured by white lead carbonate pigments in residential paints and coatings. Those facts are offered as absolute evidence of the Wisconsin Supreme Court's rational basis for clarifying the state's common law in pursuit of legitimate state objectives. As such, these facts are not subject to "courtroom fact finding" by federal courts. *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 124, 1127 (7th Cir. 1995). That individual U.S. District Court Judges may agree or disagree with the manner in which the Wisconsin Supreme Court balanced the competing interests is irrelevant.

Six years before *Thomas*, in *Peace v. Northwestern National Insurance Co.*, 596 N.W.2d 429 (Wis. 1999), the Wisconsin Supreme Court noted that lead from residential paint is an extreme neurotoxin and that "even a single atom of lead, once in the human body, binds to a protein and induces some damage; the greater the exposure, the more serious the effects." *Id.*, at 438, n. 14 (citing Sergio Piomelli, *Childhood Lead Poisoning in the '90's,* 93 Pediatrics 508 (Mar. 1994); Michael W. Shannon & John W. Graef, *Lead Intoxication in Infancy*, 89 Pediatrics 87 (Jan. 1992). The *Peace* court emphasized that the consequences of exposure can be disastrous for children:

> At high blood levels . . . lead may cause encephalopathy and death. Survivors of encephalopathy may have lifelong severe disabilities, such as seizures and mental retardation. Lead toxicity affects almost every organ system, most importantly, the central and peripheral nervous systems, kidneys, and blood. . . . Lead interferes with enzymes that catalyze the formation of heme. It also inhibits both prenatal and postnatal growth. Lead impairs hearing acuity. Lead is a carcinogen in laboratory animals, and there is some evidence for carcinogenicity in workers exposed to lead but not in children.
>
> Although the impairment of cognition in young children . . . has been reported, no threshold has been identified. . . . The relationship between lead levels and IQ deficits was found to be remarkably consistent. A number of studies have found that for every 10 ug/dL increase in blood

2

lead levels, there was a lowering of mean IQ in children by four to seven points.

*Id.*, at 437 (*quoting* George A. Gellert, *et al*, *Lead Poisoning: From Screening to Primary Prevention*, 92 Pediatrics 176, 177 (July 1993)).

The *Peace* court expressed an urgent concern that the devastating scope of the problem had reached epidemic proportions:

> Six hundred seventy-five thousand American children are estimated to have blood lead levels indicating lead toxicity. Four to five million more have blood lead levels associated with impaired neurological and intellectual functions. The two most important sources of exposure among children are lead-based paint and household dust.

*Id.* at 446-447 (citing Martha R. Mahoney, *Four Million Children at Risk: Lead Paint Poisoning Victims and the Law*, 9 STAN. ENVTL. L.J. 46-47 (1990)).

The *Peace* court also indicated that the scope and gravity of lead poisoning prompted the United States Department of Health and Human Services to say in 1991 that childhood lead poisoning was "the most important environmental health problem for young children." *Id.* (citing 92 PEDIATRICS 176 (1993)).

Building on the developing judicial concern for the devastating impact of lead poisoning on children in Wisconsin, the *Thomas* court elaborated on the tender vulnerability of children to lead poisoning:

> According to the Center for Disease Control's ("CDC's") *Preventing Lead Poisoning in Young Children*, it is well-recognized that given children's rapidly developing nervous systems, "[c]hildren are particularly susceptible to lead's toxic effects." Because the human body cannot differentiate between lead and calcium, after lead has remained in the bloodstream for a few weeks, it is then absorbed into bones, where it can collect for a lifetime. Once lead enters the child's system, more lead is absorbed than would be in adults.
>
> Children "are more exposed to lead than older groups because their normal hand-to-mouth activities may introduce many nonfood items into their gastrointestinal tract." The CDC noted that "[p]ica, the repeated ingestion of nonfood substances, has been implicated in cases of lead poisoning; however, a child does not have to eat paint chips to become poisoned." It is more common for children to ingest dust and soil contaminated with lead from paint that either has flaked or chalked as it aged or has been otherwise disturbed during home maintenance or

3

renovation. "This lead-contaminated house dust, ingested via normal repetitive hand-to-mouth activity, is now recognized as a major contributor to the total body burden of lead in children." Thus, "[b]ecause of the critical role of dust as an exposure pathway, children living in substandard housing and in homes undergoing renovation are at particular risk for lead poisoning."

*Thomas*, at ¶¶ 29, 30 (internal citations omitted).

After reviewing the medical literature and the voluminous summary judgment record, the *Thomas* Court concluded that the single most significant cause of childhood lead poisoning is lead from residential paint. *Id., See also Thomas*, at ¶ 32 ("[L]ead paint is the primary culprit." "The CDC concluded that 'lead-based paint is the most common source of high-dose lead poisoning.'"). In Wisconsin, state authorities report that as of 2005 there were 765,978 homes with lead-based hazards. Earle Affidavit, Exhibit No. 1 (Dep't of Health & Family Services, Division of Public Health, Report to the Governor and the Legislature, STATE EFFORTS TO END CHILDHOOD LEAD POISONING: EVALUATION OF ACT 113, p.3 (Apr. 13, 2005)). It is estimated that one in six, or 120,000 of these toxic homes, were occupied by children under six years of age. *Id.* Given the levels of publicly funded programs available in Wisconsin, about 1,500 of these homes may be rendered lead safe for children per year. *Id.* Accordingly, Wisconsin public health authorities estimate that it will take many decades to eliminate significant existing lead hazards from homes currently occupied by vulnerable potential victims. *Id.*

The *Thomas* court noted that approximately 3 million tons of lead remain in an estimated 57 million homes nationwide and 3.8 million of those homes contain both lead hazards *and* vulnerable children. *Thomas,* at 34. Researchers estimate that American housing contains 7.5 billion square feet of interior surfaces covered with lead paint and 29.2 billion square feet of exterior surfaces covered with lead paint. Earle Affidavit, Exhibit No. 2 (David E. Jacobs et al., *The Prevalence of Lead-Based Paint Hazards in U.S. Housing*, 110 ENVTL. HEALTH PERSP. 599,

4

603 (2002)). Calculated in terms of square miles, this data indicates that there are a total of 1316.4 square miles of lead painted surfaces covering homes nationwide. *Id.* The average home with lead paint contains 259 square feet of interior lead paint and 996 square feet of exterior lead paint. *Id.* In fully one third of all homes containing lead paint that is *not* deteriorated, impact and friction surfaces nevertheless produce hazardous levels of lead contaminated dust. *Id.* The *Thomas* court echoed this concern noting that lead painted windows generate lead dust through normal open and closing even if the paint is otherwise intact. *Thomas* at ¶ 35. Thus, the dangers of lead poisoning from lead paint exist even when the paint is not deteriorated or otherwise might be considered to be in a "lead-safe status." *Id.*, at ¶117.

A child exposed to white lead carbonate pigments in the paint of his or her home is exposed to the totality of lead in that paint. Mushak Affidavit, p. 3. Furthermore, lead-based paint on a residential surface over time becomes incorporated into a common pool of toxic exposure risk through a variety of processes, including peeling, flacking, crushing, weathering, chalking, and friction generated by impact and abrasion of surfaces undergoing normal usage such as windows opening and closing. *Id.*, at pp. 5-8. In other words, all the lead in all the paint in a home combines to form a single indivisible unitary toxic risk to a child.

The record from *Thomas* reveals that the two homes at which the child was exposed to white lead carbonate were built in 1900 and 1905. *Thomas* at ¶ 13. An electron microscopic analysis of the elemental composition of each paint layer of paint chip samples taken from numerous accessible locations throughout both homes found that out of a total of 185 paint layers, 97 contained lead. Earle Affidavit, Exhibit No. 3 (Reports of Aspen Consulting). The vast majority the lead contained in the pigments of the painted surfaces of Steven Thomas's home was white lead carbonate. *Thomas* at ¶ 12.

5

The culpable conduct of the white lead carbonate manufacturers created a truly monstrous risk of severe and devastating harm for children. Against this backdrop, the *Thomas* court tersely responded to the arguments that since any given child could have been poisoned at any time between 1900 and 1978, risk contribution should not be extended to white lead carbonate:

> [T]he Pigment Manufacturers' argument must be put into perspective: they are essentially arguing that their negligent conduct should be excused because they got away with it for too long. As Thomas says, the Pigment Manufacturers "are arguing that they should not be held liable under the risk contribution doctrine because of the magnitude of their wrongful conduct."

*Thomas* at ¶ 152.

The *Thomas* Court carefully reviewed the long history of knowingly wrongful conduct by the Defendants in the course manufacturing, marketing and selling white lead carbonate for use as a pigment in residential paints. *Thomas*, at ¶¶ 41- 98. For example, the *Thomas* court specifically noted that Sherwin Williams appreciated the dangers of residential lead paint even before it started manufacturing white lead carbonate as a pigment for residential use:

> In July 1904, in its monthly publication *The S.W.P.*, Sherwin-Williams publicized the hazards of white lead paint. Under the bold headline, "DANGERS OF WHITE LEAD," Sherwin-Williams reported that a committee in France had been appointed to investigate the use of white lead and other lead mixtures for painting houses. Sherwin-Williams noted that one of the committee's experts indicated that lead paints were "poisonous in a large degree, both for the workmen and for the inhabitants of a house painted with lead colors." Sherwin-Williams also noted that the expert was of the opinion "that the absolute disuse of white lead has become an imperative necessity." Nevertheless, six years later, in 1910, Sherwin-Williams began manufacturing white lead carbonate after it acquired a white lead processing plant. Moreover, in 1917, during the First World War, Sherwin-Williams advised the War Department that government specifications for 50 percent white lead carbonate paint for war helmets should be replaced with its lead-free lithopone pigment. Sherwin-Williams stated that the advantage of switching to its lithopone pigment was that the danger from lead poisoning was entirely eliminated.

*Thomas* at ¶ 45.

In contrast, the *Thomas* court observed that in 1909 France and Austria had banned or severely limited the use of white lead carbonate as a pigment in residential paints. The League of Nations held a conference in Geneva in 1921, attended by 400 delegates from 40 nations, after which many nations acted to limit the residential use of white lead carbonate, including Belgium, Tunisia, Greece, Czechoslovakia, Great Britain, Hungary, Sweden, Poland, Spain, Yugoslavia, and Cuba. *Id.*, at ¶ 44, fn 19. The lead pigment manufacturers perceived the conference and the recommended limitations on using white lead carbonate for residential paints as a sinister plot by organized labor. *Id.*, at ¶ 44

Physicians employed by Sherwin Williams and other pigment manufacturers attended a confidential conference in Chicago in 1937 which was sponsored by their trade association, the Lead Industries Association (LIA). The particular vulnerability of children to lead poisoning was discussed at the conference. Wisconsin's highest court took particular umbrage at the culpable mindset exhibited by the pigment industry, noting that

> At this confidential conference, there was discussion on how to defeat workers' compensation claims by clearing the blood of lead poisoning evidence. Some suggestions included injecting the worker with liver in order to "bring him up" even though "it doesn't do him any good."

*Thomas* at ¶ 67, fn 25.

In 1939, the National Paint Varnish and Lacquer Association (NPVLA) confidentially warned its members, including Sherwin Williams, that it was vital to safe-guard the public with adequate warnings concerning toxic pigments such as white lead carbonate:

> 1. A manufacturer who puts out a dangerous article or substance without accompanying it with a warning as to its dangerous properties is ordinarily liable for any damage which results from such failure to warn.
> . . . .
>
> 9. The manufacturer . . . must know the qualities of his product and cannot escape liability on the ground that he did not know it to be dangerous.

> 10. The general rule that a manufacturer is not liable to those not in privity of contract with him does not apply when his product is imminently or inherently dangerous.

*Thomas* at ¶ 48.

At the same time that Sherwin Williams manufactured and promoted white lead carbonate pigments for residential use, it also manufactured safer and more cheaply produced alternatives including zinc based paints and lithopone. *Thomas* at ¶ 50. By 1942, the National Safety Council came to the conclusion that "the most obvious method of preventing lead poisoning is to substitute for lead and its compounds other materials that are non-toxic." *Id.* As of December of 1945, despite advisories from the U.S. Children's Bureau, the LIA and its members continued to promote lead paint for interior residential use, and Sherwin Williams as of that point in time went so far as to actually promote lead paint for use on toys. *Thomas* at ¶ 73. Sherwin Williams ceased manufacturing white lead carbonate in 1947, but continued to sell interior residential paints with white lead carbonate manufactured by the National Lead Company as late as the 1950's. *Thomas* at ¶89.

No reasonable person could deny that hundreds of thousands of children were poisoned by white lead carbonate produced by each of the leaded pigment manufacturers, including Sherwin Williams, DuPont, ARCO (as successor to Anaconda and IS&R), NL Industries, Armstrong (as successor the MacGregor Lead Company) and American Cyanamid. The massive scale of each manufacturer's tortious contribution to the public health catastrophe of childhood lead poisoning, is evidenced by the fact that as of 1995, it was estimated that 675,000 children suffered from the devastating consequences of lead poisoning. *Peace ex rel. Lerner v. Nw. Nat'l Ins. Co.*, 596 N.W.2d 429, 446-47 (Wis. 1999). Given the latent nature of those injuries, the passage of time, and the generic/fungible nature of the pigment, the vast majority of those children, including Steven Thomas and Ernest Gibson are unable to prove that Sherwin Williams or any of the other

8

tortious manufacturers were the specific manufacturer of the pigment in anyone of the many, if not hundreds of layers of leaded paint in their homes. In the *Thomas* case, the Wisconsin Supreme Court knew that there were at least 97 different layers of leaded paint in various accessible locations in the two homes that were applied over many years. This fact mandated the logical conclusion that many lead pigment manufacturers contributed to the single unitary risk of injury to Steven Thomas. Nevertheless, many of thousands upon thousands of children poisoned by white lead carbonate pigments in their home in Wisconsin have suffered life crippling injuries. Many more children will be poisoned in the future as a direct result of the substantial contribution of Sherwin Williams and the other Defendants to the creation of the risk of lead poisoning.

The facts, as set forth in the attached Statement of Additional Facts filed in opposition to each of the Defendant's Motions for Summary Judgment pursuant to the requirements of Civil L.R. 56(b)(2)(B)(ii), and as briefly and illustratively described above, establish indisputably that the Wisconsin Supreme Court determined that that there existed a rational relationship between the legitimate state objectives of protecting the public health, safety and welfare and the application of the risk contribution doctrine to those former manufacturers of white lead carbonate pigments for use in residential paints who can be proven to have breached legal duties to the entirely innocent victims of childhood lead poisoning caused by that product. It is not for this Court to pass judgment on the perceived fairness or wisdom of how the Wisconsin Supreme Court's balanced of the interests of the entirely innocent children who have suffered the consequences of lead poisoning and the interests of the manufacturers who must first be proven to have tortiously manufactured, marketed and sold the toxic product that injured those children.

That there exists a rational relationship between the risk contribution doctrine and the public health, safety and welfare of the children of Wisconsin is enough.

## ARGUMENT

By adopting risk-contribution, the Wisconsin Supreme Court pursued legitimate state objectives in a rational process which followed the natural development of the common law in Wisconsin. The United States Supreme Court has long recognized the "flexibility and capacity for growth and adoption is the peculiar boast and excellence of the common law." *Hurtado v. California,* 110 U.S. 516, 530. Under the Constitution, "[a] State cannot deprive a person of his property without due process of law…. This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. *Murray's Lessee v. Hoboken L. & I. Co.*, 18 How. 280. Due process of law is process due according to the law of the land. This process in the States is regulated by the law of the State." *Walker v. Sauvinet*, 92 U.S. 90, 92-93 (U.S. 1876).

Five of the Defendants in this case argue that the Wisconsin Supreme Court's ruling in *Thomas v. Mallett*, 701 N.W.2d 523 (Wis. 2005) violates the Taking Clause, as well as the substantive due process protections of the United States Constitution.[1] Sherwin-Williams alone argues that risk contribution also violates the Commerce Clause[2] and procedural due process as well. Each of these arguments is unavailing. None of these provisions apply to the case at hand, and even if they do, Defendants cannot make the required showings.

---

[1] American Cyanamid, Armstrong Containers, DuPont, NL Industries and Sherwin-Williams.
[2] The motion of Sherwin-Williams based on the Commerce Clause lacks any basis in fact or law and contains no reasoned argument for the extension of existing law. For the reasons set forth *infra* the argument is frivolous under Rule 11 and the Plaintiff requests sanctions.

I. **The *Thomas* Court's Application of Risk Contribution Liability Does Not Violate Defendant's Substantive Due Process Rights**

   A. **The Defendants Have Failed to State a Valid Substantive Due Claim**

The Defendants' claims of substantive due process violations must fail because they have failed to allege property interests, protected by the Fourteenth Amendment, of which they have been deprived. *Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548.   The Supreme Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>    Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 578. There is no property interest in avoiding liabilities caused by one's tortious conduct.

In the recent case of *Albrecht v. Treon*, 2010 U.S. App. LEXIS 17659, 20-21 (6th Cir. 2010), the Sixth Circuit Court of appeals concluded that the parents of a deceased individual had no claim based upon a due process violation  resulting from decision of the State of Ohio to retain their deceased son's brain following an autopsy.  The Sixth Circuit based their decision on the determination of the Ohio Supreme Court that they held no property interest in their son's brain.  The Court concluded:

Case 2:07-cv-00864-RTR   Filed 09/20/10   Page 11 of 46   Document 176

Federal law is clear that the states define property rights in their respective jurisdictions. *See Craft v. U.S.* Through C.I.R., 140 F.3d 638, 645 (6th Cir. 1998) (Ryan, J., concurring) ("state property law determines which rights, in the bundle of rights we call 'property,' a person may exercise."). The Ohio Supreme Court explicitly delineated the lack of property rights in this case in *Albrecht* II. That Court held that next of kin have no right to autopsy specimens removed and retained by the coroner, in furtherance of a criminal investigation. Although there is no dispute as to the facts as the Albrechts present them, they had no property interest in their son's brain, thus, they cannot support the first element of a due process clause claim. Their claim fails as a matter of law. "[I]f state actors . . . do not infringe on the life, liberty, or property of the plaintiffs, there can be no due process violation." *Whaley v. County of Tuscola*, 58 F.3d 1111, 1113 (6th Cir. 1995). Here, the Albrechts had no property rights on which the state could infringe. As a result, the district court properly granted judgment on the pleadings in favor of the defendants.

*Albrecht v. Treon,* 2010 U.S. App. LEXIS 17659, 20-21 (6th Cir. 2010)

In this case, the Defendants have made no showing that any property interest of theirs has been implicated by the adoption of risk-contribution in *Thomas*. This is because they cannot. In order for risk contribution to apply, each of the Defendants must be proven to have breached a legal duty to the Plaintiff and/or sold a defective and unreasonably dangerous product. In other words, any property interest asserted by the Defendants is that of a wrong doer seeking to avoid a trial on the merits. The State of Wisconsin has not defined any property interest in the avoidance of an adverse judgment which is entered under Wisconsin law. Monetary damages have been an available remedy for tort injuries since the founding of this country. The right to an award of monetary damages, is not however, a right of the Defendants. An award of monetary damages is a property right of the Plaintiff's recoverable after a civil trial held under state court rules and traditions. In other words, a civil judgment of liability is in effect the creation of a property interest in the Plaintiff for the value of his injuries. Thus, without a property interest at issue, the Defendants have no claim of due process violation.

As the Wisconsin Supreme Court noted in *State v. Esser,* 115 N.W. 2d 505, (Wis. 1962):

> We conclude that the function of sec. 13, art. XIV, Wis. Const., was to provide for the continuity of the common law into the legal system of the state; expressly made subject to legislative change (in as drastic degree within the proper scope of legislative power as the legislature might see fit) but impliedly subject, because of the historical course of the development of the common law, to the process of continuing evolution under the judicial power.

However, assuming, arguendo, that a property interest of the Defendants could be somehow implicated by the adoption of risk-contribution, this Court has held, consistent with clearly established law of the United States Supreme Court and the Circuit Courts of Appeals, that the substantive due process protections of the United States Constitution do not extend to state created property interests unless the party also alleges a fundamental right or that available state remedies are inadequate.

> Under this court's decisions, [the plaintiff's] substantive due process claim for her alleged deprivations of property was correctly dismissed. Even assuming that she possessed a property interest in her employment and that Davel wrongly deprived her of it, we have held that "in cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that available state remedies are inadequate, the plaintiff has not stated a substantive due process claim." Kauth v. Hartford Ins. Co., 852 F.2d 951, 958 (7th Cir. 1988) (citations omitted); see also Doherty v. City of Chicago, 75 F.3d 318, 325-26 (7th Cir. 1996).

*Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997) (affirming E.D. Wis., Hon. Judge Randa presiding); *Draghi v. County of Cook*, 184 F.3d 689, 694 (7th Cir. 1999).

Similarly, in *Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003), the Court held that if a party's substantive due process claim does not implicate a fundamental right and involves only a property interest, that party must show as an initial matter either that state law remedies are inadequate or that an independent constitutional right has been violated. The only constitutionally protected interest asserted by each of the Defendants in connection with their

13

substantive due process defenses are alleged state created property interests that they claim will

unfairly impaired by Wisconsin's risk contribution doctrine.  As the *Lee* Court noted:

> Although property rights are protected by the U.S. Constitution, they are created by applicable state and local law. *See, e.g., Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Specifically, property rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id. Accord Ulichny v. Merton Cmty. Sch. District*, 249 F.3d 686, 700 (7th Cir. 2001).

*Id.*, at 469.


More recently, in *General Auto v. City of Chicago*, 526 F.3d 991, 1000-1001 (7th Cir. 2008), the

Court elaborated:

> Once a landowner obtains such a state-created property right, the due process clause of the Fourteenth Amendment circumscribes, but does not eliminate, the government's ability to deprive him of that interest. As we observed in *Lee v. City of Chicago*, "[S]ubstantive due process is not 'a blanket protection against unjustifiable interferences with property.'" 330 F.3d 456, 461 (7th Cir. 2003) (quoting *Schroeder v. City of Chicago*, 927 F.2d 957, 961 (7th Cir. 1991)). And it does not confer on federal courts a license to act as zoning boards of appeals. *Ctrs., Inc. v. Town of Brookfield Wis.*, 148 F.3d 699, 704 (7th Cir. 1998); *Albiero v. City of Kankakee*, 122 F.3d 417, 420 (7th Cir. 1997). It is instead a modest limitation that prohibits government action only when it is random and irrational. "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee*, 330 F.3d at 467 (citing *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 2271, 138 L.Ed.2d 772 (1997)). A property owner challenging a land-use regulation as a violation of due process is therefore obliged to show that the regulation is arbitrary and unreasonable, bearing no substantial relationship to public health, safety, or welfare. *E.g., Greater Chicago Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1071 (7th Cir. 2005). And because the right infringed upon is an interest in property rather than life or liberty, the property owner must first establish either an independent constitutional violation or the inadequacy of state remedies to

14

redress the deprivation before a court will consider whether the interference with property is arbitrary or irrational. *Lee*, 330 F.3d at 467.

Furthermore, out of minimal respect for state process, federal courts should presume that state procedures will afford an adequate remedy in the absence of unambiguous authority to the contrary. *31 Foster Children v. Bush*, 329 F.3d 1255, 1279 (11th Cir. 2003).

The Defendants have not even attempted to carry their threshold burden of showing the state remedies available to them to be inadequate. Nor could the Defendants carry this burden if they tried because under risk contribution, the defendants have available various exculpatory defenses and rights of contribution pursuant to Wisconsin's comparative negligence law, as well as post trial redress to the established limitations on liability by public policy. Furthermore, upon information and belief, the Defendants have entered into a joint defense agreement by which each have agreed to waive risk contribution. During the jury instruction conference in the *Thomas* trial the following colloquy occurred:

> MR. SPOERK: There would be just one question. **The risk contribution question, if I understand what you're referring to, is the question that asks about the allocation or comparison as between defendants. We have agreed amongst the defendants that that is not an issue that needs to be resolved here.**
> THE COURT: Oh, so I can dump that question on a different basis.
> MR. SPOERK: Correct, Your Honor.
> THE COURT: Okay. So let me make sure I've got that for the record. **Are the defendants all saying that they are not pursuing contribution claims against each other?**
> MR. NILAN: Yes.
> [Each defendant sequentially indicated yes]
> THE COURT: I was asking whether any of the defendants would pursue contribution claims against each other if more than one of them were found to have contributed to the risk; in other words, if found liable under the risk contribution theory. If they're not going to pursue - - and let me just have a follow-up question. Does that mean that any defendants who are found to have contributed to the risk should be jointly and severally liable?
> MR. SPOERK: I think we would agree with respect to amongst the defendants.

. . . . .

THE COURT: Okay, **So your position is we can dump risk contribution, because if anybody is in for a penny, they're all in for a pound.**

MR. SPOERK: If I understand what you're saying correctly, that's correct.

Affidavit of Peter Earle, Exhibit No. 4 ( *Thomas* trial transcript 10/29/07, pp. 5648-5650.)

If the Defendants have entered into a joint defense agreement whereby they waive the procedures provided to them under state law, the defendants cannot be heard to assert the inadequacy of those procedures. This is especially true when the gravamen of the substantive due process claim is that the risk contribution doctrine *potentially* deprives each defendant of a property interest without allowing them to adjust their respective comparative culpabilities.

The procedural adequacy of the risk contribution doctrine as defined by the Wisconsin Supreme Court must be viewed in the context of Wisconsin tort law. First, the doctrine applies only to white lead carbonate pigment manufacturers who have been proven to have breached a legal duty to the Plaintiff. *Thomas* ¶ 161. Thus, each Defendant must have been found to have been negligent in the first place. Second, each defendant must receive notice of the claim by way of a lawfully served complaint and summons. §801.02 Wis. Stats. Third, each defendant has an opportunity to answer, assert affirmative defenses, join other potentially liable parties, conduct discovery, file motions, present and cross examine witnesses and argue to the jury. §802.02, §802.08, §803.03, Chapter 804, and Chapter 805, Wis. Stats. Fourth, each defendant has available the specific exculpatory defenses defined by the *Thomas* Court:

> Once Thomas makes a prima facie case under either claim, the burden of proof shifts to each defendant to prove by a preponderance of the evidence that it did not produce or market white lead carbonate either during the relevant time period or in the geographical market where the house is located. However, if relevant records do not exist that can substantiate either defense, "we believe that the equities of [white lead carbonate]

16

cases favor placing the consequences on the [Pigment Manufacturers]." *Id.*
at 198. In addition to these specific defenses, and unlike in the DES cases,
the Pigment Manufacturers here may have ample grounds to attack and
eviscerate Thomas's prima facie case, with some of those grounds
including that lead poisoning could stem from any number of substances
(since lead itself is ubiquitous) and that it is difficult to know whether
Thomas's injuries stem from lead poisoning as they are not signature
injuries.

*Thomas* at ¶ 163[3].Fifth, those defendants unable to exculpate themselves may assign relative

fault through comparative negligence:

We believe that comparative negligence is a flexible doctrine which will
permit the jury in DES cases equitably to apportion liability among the
defendants that have been unable to exculpate themselves. In assigning
a percentage of liability to each defendant, the jury may consider factors
which include, but are not limited to, the following: whether the drug
company conducted tests on DES for safety and efficacy in use for
pregnancies; to what degree the company took a role in gaining FDA
approval of DES for use in pregnancies; whether the company had a small
or large market share in the relevant area; whether the company took the
lead or merely followed the lead of others in producing or marketing
DES; whether the company issued warnings about the dangers of DES;
whether the company produced or marketed DES after it knew or should
have known of the possible hazards DES presented to the public; and
whether the company took any affirmative steps to reduce the risk of
injury to the public. This list of factors is not exclusive, and the trial court
may in its discretion permit the jury to consider other factors relevant to
apportioning liability. Although the allocation of liability will present a
difficult task for juries, we conclude that it is the best method to ensure
that liability will be assigned equitably accorded to relative fault.

*Thomas* at ¶164, fn 52; *Collins v. Eli Lilly*, 116 Wis.2d 166, 200 (1984).

Finally, in the event the jury finds liability, each liable defendant has available post trial motions

to negate the liability on the basis of public policy:

The application of public policy factors to preclude recovery for
negligence has a long history in Wisconsin. In *Colla*, we articulated the
six public policy factors that Wisconsin courts use today to limit liability

---

[3] As can be seen from the CCAP record for the *Thomas* jury trial, the defendants did in fact
eviscerate *Thomas'* prima facie case.

in negligence claims: (1) "the injury is too remote from the negligence"; (2) the recovery is "'wholly out of proportion to the culpability of the negligent tort-feasor'"; (3) the harm caused is highly extraordinary given the negligent act; (4) recovery "would place too unreasonable a burden" on the negligent tort-feasor; (5) recovery would be "too likely to open the way to fraudulent claims"; and (6) recovery would enter into "'a field that has no sensible or just stopping point.'" Any one of the six factors, if applicable, could preclude liability.

*Behrendt v. Guld Underwriters Insurance*, 2009 WI 71, ¶29, 318 Wis.2d 622 (2009).

Any federal substantive due process attack on risk contribution must presume an unsuccessful post jury trial public policy challenge to a jury verdict in Ernest Gibson's favor holding the Defendants liable. That means a post trial finding that the injury of Ernest Gibson was *not* too remote from the Defendants' negligence and that the recovery *is not* wholly out of proportion to the culpability of the Defendants as found at trial, and the recovery ordered by the jury did *not* place too unreasonable of a burden on the negligent Defendants. The foregoing structure of Wisconsin tort law provides each Defendant with adequate state remedies for the wrongful or unfair deprivation of any property interest resulting from an adverse jury verdict pursuant to the risk contribution doctrine. As is demonstrated *infra* in the section of this brief addressing procedural due process, every constitutionally mandated requirement of procedural due process is satisfied. In the context of Wisconsin product liability law, the risk contribution doctrine provides each Defendant with adequate process, defenses, and remedies.

## B. *Eastern Enterprises* Does Not Compel a Finding of Unconstitutionality

In the course of granting summary judgment to the Atlantic Richfield Company, this Court applied a multi-factor test to the *Thomas* decision based on its interpretation of *Eastern Enterprises v. Apfel*: "a liability 'might be unconstitutional if it imposes (1) severe (2) retroactive liability on a (3) limited class of parties that (4) could not have anticipated the liability, and the extent of that liability is (5) substantially disproportionate to the parties' experience.'" Order at

18

28-29. Whether the risk contribution doctrine even raises the possibility of a constitutional due process analysis in large part depends on whether *Eastern Enterprises* provides a holding from which such a rule can be derived. For the reasons set forth below, it does not.

As this Court recognized, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who **concurred in the judgments** on the narrowest grounds.''" Order at 25 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal citation omitted and emphasis added)). *See also United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006) ("When a majority of the Supreme Court agrees only on the outcome of a case and not on the **ground for that outcome**, lower-court judges are to follow the narrowest **ground** to which a majority of the Justices would have assented if forced to choose."). Courts and commentators have interpreted this as requiring that lower courts "look[] for the 'narrowest' ground common to the earlier majority and concurring opinions." Saul Levmore, *Ruling Majorities and Reasoning Pluralities*, 3 Theoretical Inquiries L. 87, 96 (2002). *See also King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) ("*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions . . . [T]he narrowest opinion . . . must embody a position implicitly approved by at least five Justices **who support the judgment**.") (emphasis added).

Recently, the Court of Appeals for the Seventh Circuit had occasion to consider the scope of the rule articulated in *Marks* in the context of plurality decisions where "a concurrence that provides the fifth vote necessary to reach a majority does not provide a 'common denominator' for the judgment." *U.S. v. Heron*, 564 F.3d 879, 884-885 (7th Cir. 2009). The *Heron* Court cited, with approval, *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 237 (4th Cir. 2002),

19

noting that case found the *Marks* rule inapplicable "because it found 'no theoretical overlap between the rationales employed by the plurality and Justice Kennedy' in *Eastern Enterprises v. Apfel* [further noting that] "the [*Massanari*] court did not consider Justice Kennedy's reasoning to be a narrower ground or controlling." Significantly, the *Massanari* Court found *Eastern Enterprises* inapplicable to subsequent constitutional challenges to the Coal Act unless the coal company defendant stood in substantially the same position as the coal company defendant in *Eastern Enterprises*. *Id*, at 237-238.

The *Heron* Court also cited with approval *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3rd Cir. 1999), for the proposition that "[i]n cases where the approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court." It is instructive that the *Anker* Court held the *Marks* rule inapplicable to *Eastern Enterprises* in construing the constitutionality of the Coal Act because:

> "Justice Kennedy's substantive due process reasoning is not the 'narrower' ground that we might take to constitute the controlling holding." In such a case, then, the only binding aspect of a splintered decision is its specific result, in *Eastern Enterprises* the Court's "holding the Coal Act unconstitutional as applied to Eastern Enterprises." *Eastern Enterprises* requires a finding that the Coal Act is unconstitutional as applied the Anker, then, only if Anker "stand[s] in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence.

*Anker,* at 171 (citations omitted).

The *Heron* Court also cited *U.S. v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2nd Cir. 2003), for the proposition that "[w]hen it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of

the land because no one standard commands the support of a majority of the Supreme Court."

The *Alcan* Court held:

> With respect to the Supreme Court's analysis in *Eastern Enterprises*, it is difficult to discern a general principle of law that supports appellant's claim that retroactive CERCLA liability is unconstitutional. Because the substantive due process reasoning presented in Justice Kennedy's concurrence is not a logical subset of the plurality's takings analysis, no "common denominator" can be said to exist among the Court's opinions. The only binding aspect of such a splintered decision is its specific result, and so the authority of *Eastern Enterprises* is confined to its holding that the Coal Act is unconstitutional as applied to Eastern Enterprises.

*Alcan* at 189.

Since *Alcan* was a case involving the constitutionality of the retroactive application of CERCLA, and several federal appellate courts had failed to hold the Coal Act unconstitutional as it applied to other coal companies in the wake of *Eastern Enterprises*, it is particularly instructive that the *Alcan* Court observed:

> If the holding of *Eastern Enterprises* is so specific that it does not support a finding that the Coal Act's retroactive liability provision is unconstitutional as applied to coal operators not in the same position as Eastern Enterprises, then it may not be said to stand for the much broader proposition that the application of retroactive CERCLA liability to Alcan runs afoul of the Constitution.

*Id.*

At bottom, it is particularly significant that the Court of Appeals for the Seventh Circuit sought and applied guidance from *Massanari*, *Alcan*, and *Anker* in its most recent analysis of the scope of the rule from *Marks* in the context of a fragmented plurality opinion that lacks a discernable narrowest common ground. *Heron* at 884-885. Each of these three cases specifically held that the rule from *Marks* could not be applied to *Eastern Enterprises* because the splintered opinion lacked a common denominator between the concurrence and the plurality. Thus, on the basis of the authority relied upon by the Seventh Circuit for construing the rule from

*Marks*, the decision in *Eastern Enterprises* is properly constrained to its facts and provides no rule applicable to the constitutionality of Wisconsin's risk contribution doctrine.

In *U.S. v. Gerke Excavating, Inc.*, 464 F.3d 723 (7th Cir. 2006), the Court also applied the rule from *Marks* in concluding the Justice Kennedy's lone concurrence in *Rapanos v. United States*, constituted the narrowest common denominator. The *Gerke* Court did not expand the *Marks* rule to allow the conjuring of a governing rule from the concurrences and dissents of a splintered plurality decision. Nothing in *Gerke* justifies a conclusion that the Court of Appeals for the Seventh Circuit has deviated from the often stated rule that in order for *Marks* to be workable "[t]he narrowest opinion . . . must embody a position implicitly approved by at least five Justices *who support the judgment*." *Heron* at 885 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991).

Even if *Gerke* stood for the proposition that a trial court was free to conjure a governing rule from the dissents and concurrences in cases where a splintered plurality provides no discernable single standard, the concurrence and dissents in the case of *Eastern Enterprises* provide no such assistance. In the context of construing economic legislation, Justice Kennedy's concurrence noted that:

> "[i]f retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them. Both stability of investment and confidence in the constitutional system, then, are secured by due process restrictions against severe retroactive legislation"

*Eastern Enterprises* at 549- 550.

While Justice Kennedy's lone concurrence would have found the Coal Act unconstitutional as applied to Eastern Enterprises, it did not articulate the rule conjured by this Court in response to Atlantic Richfield's motion for summary judgment that "a liability might be unconstitutional if it imposes (1) severe (2) retroactive liability on a (3) limited class of parties that (4) could not have anticipated the liability, and the extent of the liability is (5) substantially disproportionate to the parties experience." Order at 29. The Kennedy concurrence did not list the foregoing five elements and provided no indication that its analysis applied outside the context of economic regulation. Rather, Justice Kennedy articulated the applicability of highly deferential settled due process principles that invalidate economic legislation "only under the most egregious of circumstances" because the liability created bears "no legitimate relation to the interest which the Government asserts in support of the statute." *Eastern Enterprises* at 550. In other words, Justice Kennedy's concurrence went no further than the traditional rational basis test.

Justice Stevens' dissent did not advocate a constitutional standard, thus adding nothing to an inferred rule derived from an expansive *Marks* type of analysis; but more importantly, it wisely cautioned against judicial activism:

> "Rather it seems to me that the plurality and Justice Kennedy have substituted their judgment about what is fair for the better informed judgment of the members of the Coal Commission and Congress. It may well be true that the majority might have been able to fashion a wiser solution to a difficult problem. Nevertheless, as Chief Justice Hughes observed in a dissent joined by Justices Brandeis, Stone, and Cardozo: 'The power committed to Congress to govern interstate commerce does not require that its government should be wise, much less that it should be perfect.'"

*Id.*, at 553 (footnote omitted).

Justice Breyer's dissent strictly confined its analysis to economic regulation and provides no support for an implied rule that might be applicable to federal constitutional supervision of the sovereign state function of judicial development of the common law:

> "The law imposes upon Eastern the burden of showing that the statute, because of its retroactive effect, is fundamentally unfair or unjust. The circumstances I have mentioned convince me that Eastern cannot show a sufficiently reasonable expectation that it would remain free of all future health care cost liability for the workers whom it employed. Eastern has therefore failed to show that the law unfairly upset its *legitimately* settled expectations. Because, in my view, Eastern has not met its burden, I would uphold the "reachback" provision of the Coal Act as constitutional."

*Id.*, at 568-569 (emphasis added).

The plurality's multi-factor test grounded in the Takings Clause, which this Court has adopted, is at most persuasive authority in cases reviewing economic legislation that is closely analogous to the facts of *Eastern Enterprises*, and therefore it should not be applied in this case. A standard for federal constitutional review of state supreme courts on matters of state law presents significant prudential considerations not present in the case of *Eastern Enterprises*.

Insight into those prudential considerations can be gleaned from the United States Supreme Court issued its decision in *Stop the Beach Renourishment v. Florida Department of Environmental Protection*, ___ U.S. ___ (U.S. 6-17-2010), which held that a decision by the Florida Supreme Court was not a taking of the littoral rights of beach front property owners because it had not been shown that the Florida Supreme Court had in fact redefined property rights in a way that extinguished any such pre-existing right. All seven Justices participating in the decision joined in the majority opinion which held that it had not been shown that the Florida Supreme Court's decision had in fact eliminated a property right previously established under Florida law. *Id.*, at 28. A plurality of four Justices would have fashioned a standard for

constitutional review of state supreme court decisions under the Takings Clause, two Justices would have fashioned a standard for constitutional review under the Substantive Due Process Clause, and most importantly, two Justices declined to declare a constitutional standard under either clause because defining such a rule was unnecessary to the holding since all agreed that there had been no taking.

Justice Breyer's concurrence, which was joined by Justice Ginsberg, declared that the plurality in parts II and III of the decision "unnecessarily address questions of constitutional law that are better left for another day. " *Id.*, Breyer Concurring at 1. Most significantly, Justices Breyer and Ginsberg criticized the plurality for finding it "'irrelevant' that the 'particular state actor' that takes private property (or unconstitutionally redefines state property law) is the judicial branch, rather than the executive or legislative branch." Justice Breyer emphasized that by conjuring such rules in the abstract, the U.S. Supreme Court fails to engage in "the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law." *Id.*, at 2. He added that "the failure of that approach to set forth procedural limitations or cannons of deference would create the distinct possibility that federal judges would play a major role in the shaping of a matter of significant state interest – state property law." *Id.* Surely, the development of the common-law of a state in the context of tortiously mass produced fungible products that cause wide spread injury to entirely innocent victims is a matter of significant state interest entitled similar constitutional deference.

Besides the wise counsel in favor of judicial restraint, the significance of Justice Breyer's concurrence in *Stop the Beach Renourishment*, also is that at least two of the dissenters in *Eastern Enterprises* cannot be counted in support of the rule conjured up by this Court to grant

summary judgment to the Atlantic Richfield Company. Justices Breyer and Ginsberg expressed a prudential commitment to refrain from unnecessary and expansive declarations of constitutional principles. Indeed, the core principle from *Marks* is that where it is necessary to glean a rule from a fragmented plurality opinion, it should be done on the *narrowest* grounds from those Justices *concurring in the judgment*. In *Eastern Enterprise*, Justices Breyer, Ginsberg, Stevens, and Souter all dissented. They did not concur in the judgment. The focus in *Eastern Enterprises* was on the constitutionality of an act of Congress and Justice Breyer penned his dissent in that case with express deference to Congress' discretion to impose retroactive liabilities on employers unless the liability upsets settled expectations in a way that is so unfair and unjust that it undermines a basic objective of the law itself. *Eastern Enterprises*, at 557-58. That Justices Breyer and Ginsberg expressed a preference for reviewing retroactive legislation by Congress under the rubric of the substantive due process clause in *Eastern Enterprises* does not mean that those two Justices would apply the same standard to reviewing the development of the common law by a state court of last resort. Justices Breyer and Ginsberg expressly criticized the plurality in *Stop the Beach* for glossing over the differences between the judicial, executive and legislative branches of government when it comes to fashioning rules for constitutional review.

Given Justices Breyer's and Ginsberg's objections to abstractly conjured constitutional rules that risk interference in matters of state law by federal judges, it is ironic that the dissents by those very Justices would be used expand the fragmented holding of *Eastern Enterprises* and apply it beyond federal economic legislation in a novel way to limit the development of the common law by a state supreme court. The clear objection stated by Justices Breyer and Ginsberg in *Stop the Beach* undermine the validity of the rule adopted by this Court and thus

warrant return to the prudential deference and restraint that is traditionally the hall mark of review of property interests under the limited concept of substantive due process.

### C. Even if *Eastern Enterprises* Provided a Coherent Rule, It Would Not Bar Liability Under Risk Contribution

Each Defendant quotes *Eastern Enterprises v. Apfel*, 524 U.S. 498, 548-49(1998), for the proposition that if retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership and as a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. If such a rule could somehow be conjured from *Eastern Enterprises*, which it can't, it would nevertheless not help the Defendants in the instant case. Sober reading of the law must acknowledge that the transactions at issue in the case at bar have not yet closed. The transactions (or more accurately-torts) started with negligent conduct by each Defendant over the course of 59 years resulting in the accumulation of a virtual cesspool of dangerous neurotoxins in the home of Ernest Gibson during the his most tender and vulnerable years. He was not poisoned until recently and that was the result of the very risk of harm each of the Defendants tortiously contributed to.

The common law of the State of Wisconsin has long recognized the right of individuals to recover in tort for their injuries. The concept that "it is not necessary in order for an act to be negligent that the actor should have reasonably foreseen the particular injury which did result from such act so long as he should have forseen that harm was likely to be caused to someone by reason thereof," has been deeply rooted in Wisconsins legal traditions for more than 100 years. Klassa v. Lepianka, 77 N.W.2d. 397, 401(Wis. 1956) describing Christianson v. Chicago M. & O. R. Co., 69 N.W. 640 (Minn. 1896). Thus, the expansion of the common law to include strict

products liability and risk-contribution does not alter the tortious nature of Defendants' conduct, it merely alters the procedure for finding liability.

It is well within the purview of the Wisconsin Supreme Court to define the elements necessary to impose tort liability based upon the changing needs of society. Historically, tort law, including products liability law, was limited by the public policy of advancing the development of industry over the protection of injured parties. *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng. Rep. 402 (1842) (*cited in Dippel v. Sciano*, 155 N.W. 2d. 55 (1967). Courts protected manufacturers from liability by requiring privity of contract between the manufacturer and ultimate purchaser. *Id.* However, in 1967, the Wisconsin Supreme Court recognized that the old public policy was no longer applicable in the consumer society of the 20th century. The Court in *Dippel* eliminated the privity of contract requirement in negligence and adopted the tort of strict product liability under Section 402A of the Restatement Second of Torts. In breaking with the past, the Court recognized that:

> That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Changes of this character should not be left to the legislature.

*Dippel v. Sciano*, 155 N.W. 2d. 55 (1967) quoting Justice Cardozo as cited in *State v. Esser*, supra, pp. 581, 582.

Additionally, in Wisconsin a tort is not complete until the tortious act or omission results in harm. *Holifield v. Setco Industries, Inc.*, 42 Wis.2d 750, 756 (1969) ("It is the fact and date of injury that sets in force and operation the factors that create and establish the basis for a claim for damages. It is true, that without an act of negligence, no claim for damages based on negligence

28

can arise. It is likewise true that, without the result of injury, no claim for damages based on negligence can be asserted, or at least successfully asserted. Both the act of negligence and the fact of resultant injury must take place before a cause of action founded in negligence can be said to have accrued."); *Johnson v. Deltadynamics, Inc.*, 813 F.2d 944, 945 (7th Cir. 1987) ("'A tort is not complete til the victim is injured."); *Abraham v. General Casualty Company*, 217 Wis.2d 294, 310 (1998)( "'A tort is not complete til the victim is injured."). It is up to the Wisconsin Supreme Court, not the federal courts, to decide how to deal with the passage of time between the act of negligence and the onset of an injury. In *Holifield* the Court wisely evaluated the competing claims of unfairness when much time transpires between the act of negligence and the injury in the context of product liability:

> "Stress in respondent's briefs and emphasis on oral argument is given to the heavy and continuing responsibility placed upon sellers of defective products by the holding that the statute of limitations does not run until the date of actual injury. It is argued that "to hold a seller of a defective product liable for an indefinite period of time after the sale of such product would do violence to the principles of justice." Appellant concedes the hardships imposed upon a defendant by compelling him to meet a claim involving his actions many years before the date of the resultant injury, but argues " . . . it would be even more undesirable and unjust to bar a plaintiff's remedy before his cause of action existed, . . . which is, according to one case, ". . . infinitely more abhorrent to logic and justice"

*Id.*, at 757-758

So too, the *Thomas* Court balanced the interests in favor of the innocent victims of defective products by refusing to deny them a remedy for an already existing right as defined by the Wisconsin Supreme Court. While Article I, § 9 of the Wisconsin Constitution, has been described as "something of a constitutional enigma," it is has nevertheless been clearly established that it "applies only when a prospective litigant seeks a remedy for an already existing right." *Aicher ex. rel. LaBarge v. Wisconsin Patients Compensation Fund*, 237 Wis.2d

99, 121 (2000). Did Steven Thomas (like Ernest Gibson) have an already existing right that has been violated by the wrongs alleged to have been committed by the lead pigment manufacturers? In *Thomas*, the Wisconsin Supreme Court clearly answered that question yes. The common law in Wisconsin has long recognized that everyone owes everyone a duty of reasonable care and that manufacturers, including manufacturers of fungible products like lead pigment, have a duty to produce and market reasonably safe products. See *Collins*, 116 Wis.2d at 195-97. But for the problem of being unable to identify the precise manufacturer(s) of the lead pigment that actually poisoned him, the Plaintiff would be able to avail himself of the traditional theories of negligence and strict products liability to redress the wrongs he has alleged, regardless of the passage of time.

Article I, § 9, is "above and superior to any inconsistent common-law rule that existed when the constitution was framed, as well as any statute enacted since." *State ex. Rel. Wisckham v. Nygaard*, 159 Wis. 396 (1915). Accordingly, in *Collins* the Court modified the traditional requirement of particularized legal causation between a defendant's conduct and the plaintiff's injury because, in the DES context, it was an insurmountable obstacle to require the innocent plaintiff to prove that a particular drug company manufactured the DES that injured her. Collins, 116 Wis.2d at 182. In effect the *Collins* Court held that the common-law rule of particularized legal causation was "inconsistent" with the requirements of Article I, § 9, because there were many prospective innocent DES plaintiffs and none could identify the particular offending DES manufacturer whose product injured them as a result of the generic or fungible nature of the product, the large number of manufacturers entering and leaving the market, and the loss of pertinent records due the passage of time. *Collins* 116 Wis.2d at 177-183. In *Thomas*, the Wisconsin Supreme Court, in fulfillment of its sovereign law making judicial function decided to

extend the risk contribution doctrine to those white lead carbonate pigment manufacturers who can be proven to have breached a legal duty to a child poisoned by that product. It is not for the federal courts to police the manner in which the Wisconsin Supreme Court balances the competing interest of innocent victims of negligent manufacturers of fungible and otherwise indistinguishable products that cause widespread risk of harm of epidemic proportions, as long as that balancing is done rationally related to legitimate state objectives. Substantive due process does not provide the Defendants with a federal constitutional statute of repose that is pre-emptive of state law.

Furthermore, the Defendants' arguments compel another troubling result. In *Thomas*, the Wisconsin Supreme Court explicitly recognized that lead poisoned children have a constitutionally protected right to a remedy against the former manufacturers of lead pigments under § I, Art. 9 of the Wisconsin Constitution. The result urged by the Defendants in this motion, and adopted by the Court in ARCO's prior Motion for Summary Judgment, effectively and necessarily deprives lead poisoned children of their state constitutionally protected rights. This result is even more concerning when considered in light of the explicit consideration given by the Wisconsin Supreme Court to the competing interests of the manufacturers in a quest to gain immunity for their negligence and the lead poisoned children who will pay the ultimate price for the manufacturer's decades of misconduct.

D. **Defendants Cannot Show the Application of Risk Contribution Liability Was Arbitrary or Irrational**

In *Thomas v. Mallett*, the Wisconsin Supreme Court rationally modified the common law in pursuit of legitimate state interests. It is not for this Court or any other federal court to substitute its judgment over the wisdom of the holding for that of the Wisconsin Supreme Court. In *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1127 (7th Cir. 1995), the

Court held that rational basis review "is not a license for [federal] courts to judge the wisdom, fairness, or logic of legislative choices." The *National Paint & Coatings Ass'n* Court carefully reviewed constitutional substantive due process jurisprudence:

> "Plaintiffs respond that this is all well and good for equal protection analysis [referring to the rational basis test], but they assert (and the district court held) that the ordinance is a violation of substantive due process. Now we have spent some time looking through the Constitution for the Substantive Due Process Clause without finding it. The fourteenth amendment contains an equal protection clause, and a due process clause, but no "due substance" clause. The word that follows "due" is "process." This court has held repeatedly that economic regulation must be evaluated under equal protection principles, and that laws supported by a rational basis are within the power of the elected branches of government. *River Park, Inc. v. Highland Park,* 23 F.3d 164 (7th Cir. 1994); *Saukstelis v. Chicago,* 932 F.2d 1171, 1173-74 (7th Cir. 1991); *Chicago Board of Realtors, Inc. v. Chicago,* 819 F.2d 732,741-42 (7th Cir. 1987). "The doctrine that . . . due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely . . . has long since been discarded." *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).
>
> The doctrine that goes by the name "substantive due process" is not a rival to the established rational basis analysis of economic regulation. It is instead derived from the many constitutional rules that protect personal liberty from unjustified intrusions. The fact that it is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use. *Albright v. Oliver,* ___ U.S. ___, ___ - ___, 114, S.Ct. 807, 812-13, 127 L.Ed.2d 114 (1994) (plurality opinion); *Collins v. Harker Heights,* 503 U.S. 115, ___, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Only laws that affect "fundamental rights" come within the purview of this doctrine. See *Reno v. Flores,* ___ U.S. ___, ___, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993).
>
> One could scan the most wild-eyed radical's list of candidates for the status of "fundamental right" without encountering spray paint. Plaintiffs point to their licenses to do business, but these are property, not "fundamental rights." Many of the cases in the equal protection canon involved licenses, without the Court so much as hinting that a special rule applied.

*Id.*, at 1129.

Because Defendant's arguments do not relate to fundamental rights, "substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008) (citing *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S. Ct. 2258, 2271, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)). Therefore, in order to properly challenge the Wisconsin Supreme Court's adoption of risk contribution in *Thomas*, the Defendants are "obliged to show that the [doctrine] is arbitrary and unreasonable, bearing no substantial relationship to public health, safety, or welfare." *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000-1001 (7th Cir. 2008); *see also Greater Chicago Combine & Ctr., Inc. v. City of Chicago*, 431 F.3d 1065, 1071 (7th Cir. 2005). Based on the arguments of each of the Defendants, each has failed to meet this obligation.

The Supreme Court recently described the rational basis review as "one of the most deferential formulations of the standard for reviewing legislation in all the Court's precedents." *United States v. Comstock*, 130 S.Ct. 1949, 1966 (2010); *see also Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) ("Both the Supreme Court and this Court have 'emphasized how limited the scope of the substantive due process doctrine is.'"); *In re Chateaugay Corp.*, 53 F.3d 478, 487 (2d Cir. 1995) ("The doctrinal landscape which confronts [Defendant]'s due process challenge encompasses unusually inhospitable legal terrain . . . [T]he Supreme Court has proven reticent to involve itself in decisions about economic policy. We are aware of no post-1935 cases in which the Supreme Court invalidated an economic regulation on substantive due process grounds."). The Supreme Court has suggested that judicial action may implicate substantive due process, but has indicated that greater deference should be afforded judicial action as is given legislation. *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 457 (1993) ("Assuming that

fair procedures were followed, a judgment that is a product of [a jury verdict and affirmation by the state supreme court] is entitled to a strong presumption of validity. Indeed, there are persuasive reasons for suggesting that the presumption should be irrebuttable.")

Under the rational basis standard, state action is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003). Here, the Wisconsin Supreme Court set forth several reasons for adopting the risk-contribution theory, which it believed furthered legitimate state interests. It stated:

> The main policy reasons identified by *Collins* warrant extension of the risk-contribution theory here . . . The Pigment Manufacturers 'contributed to the risk of injury to the public and, consequently, the risk of injury to individual plaintiffs such as' Thomas . . . [T]he record easily establishes the Pigment Manufacturers' culpability for, at a minimum, contributing to creating a risk of injury to the public . . . Second, as compared to Thomas, the Pigment Manufacturers are in a better position to absorb the cost of the injury. They can insure themselves against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business. As we concluded in *Collins*, it is better to have the Pigment Manufacturers or consumers share the cost of the injury rather than place the burden on the innocent plaintiff . . . The procedure is not perfect and could result in drawing in some defendants who are actually innocent, particularly given the significantly larger time span at issue in this particular case. However, *Collins* declared that 'we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law."

*Id.* at ¶ 134-136, 164 (internal citations omitted). Application of the risk-contribution theory in the lead-paint context is rationally related to Wisconsin's legitimate interests in protecting public health, providing a remedy to those who have been injured by lead poisoning from white lead carbonate, consistent with Article I, Section 9 of the Wisconsin Constitution, and forcing the pigment manufacturers to bear the burden of a "public health catastrophe" of their own making.

*United States v. Sperry Corp.*, 493 U.S. 52, 65 (1989) ("It is surely proper for Congress to legislate retrospectively to ensure that the costs of a program are borne by the entire class of persons that Congress rationally believes should bear them.")

The Defendants argue that the *Thomas* court's use of the previously-announced risk-contribution theory imposes unconstitutionally retroactive liability on it, but there is nothing retroactive or unconstitutional about *Thomas's* application of the risk-contribution theory. *Thomas* did not make conduct tortious that was previously not actionable. It remains an element of the plaintiff's burden of proof to establish that each individual defendant pigment manufacturer breached a legal duty to the plaintiff by manufacturing, marketing and selling white lead carbonate pigments. According to well-established principles of common law, the conduct of each Defendant must have been tortious. Under Wisconsin's longstanding law of negligence and strict product liability the conduct of each Defendant was also tortious when it occurred.[4] Moreover, "[j]udicial interpretations 'change the law' from (losing) litigants' perspective, but from the judicial perspective the process of interpretation aims at getting as close as one can to a meaning that predates the litigation." *Mojica v. Gannett Co.*, 7 F.3d 552, 564 (7th Cir. 1993) (Easterbrook, J., concurring). *See also Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 94 (1993) ("Nothing in the Constitution alters the fundamental rule of 'retrospective operation' that has governed '[j]udicial decisions . . . for near a thousand years.'").

As the Wisconsin Supreme Court recognized in *Collins v. Eli Lilly Co.*: "[I]nherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis*, which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common

---

[4] The Defendants were aware of this. In 1939 the NPVLA warned its members that they faced liability if they breached their duty to warn. *Thomas*, at ¶ 48.

law to new situations as the need arose." 342 N.W.2d 37 (Wis. 1984) (quoting *Bielski v. Schulze*, 16 Wis. 2d 1, 11, 114 N.W.2d 105 (1962)). Despite the well established and well recognized concept that the common law may be modified to effect justice depending on the facts of individual cases, the Wisconsin Supreme Court, in *Thomas*, did not change the law, as Defendant would have this Court believe. In its interpretation of the previous holding on risk contribution in *Collins*, the *Thomas* court did not expand the scope of liability under the risk contribution doctrine. The *Thomas* decision was not only consistent with *Collins*, which provided that the risk-contribution theory "could apply in situations which are factually similar to the DES cases" and had been decided fifteen years prior to the manifestation of Gibson's injury, but also gave effect to Article I, Section 9 of the Wisconsin Supreme Court. *Collins, 116 Wis. 2d at 191* (where the *Collins* court sanctioned the expansion of the theory to other similar factual scenarios). Therefore, this Court "need not consider whether [the Wisconsin Supreme] court[] ha[s] worked an impermissible retroactive *change* in the law, violating due process by adopting a new judicial interpretation that was "unexpected and indefensible" by reference to what courts had said before." *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 157 (2d. Cir. 2009). *See Rogers v. Tennessee*, 532 U.S. 451, 461, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001); *see also id.* at 471, 121 S.Ct. 1693 (Scalia, J., dissenting) (noting "the crucial difference between simply applying a law to a new set of circumstances and changing the law that has previously been applied to the very circumstances before the court").

Even if *Thomas* **did** retroactively impose new liability on Defendant—and it did not—such liability would not be per se unconstitutional. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976) ("[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose

a new duty or liability based on past acts."); *Chase Secs. Corp. v. Donaldson*, 325 U.S. 304, 316 (1945) (finding retroactive legislation constitutional and stating, "This is not a case where appellant's conduct would have been different if the present rule had been known and the change foreseen."); *Tonya K. v. Bd. of Educ. of City of Chicago*, 847 F.2d 1243, 1247-48 (7th Cir. 1988) (legislature "may create a remedy years after the fact, although any earlier litigation would have been doomed"). Instead, such liability would have to meet the requirements of due process. As explained above, the Wisconsin Supreme Court's decision in *Thomas* is neither arbitrary nor irrational, and thus does not violate Defendant's substantive due process rights.

II.    **The *Thomas* Court's Application of Risk Contribution Liability Does Not Violate the Takings Clause**

If the analysis of the plurality in *Eastern Enterprises* could somehow be determined to state a binding rule of law despite the fact it has never been supported by more than four Justices, it would nevertheless be on no assistance to the Defendants for the following reasons:

First, the potential liability of each negligent Defendant cannot be deemed severe by presuming that many potential cases not pending before the Court will result in unjustified damages awards. The only case to go to trial under the risk contribution doctrine resulted in a jury verdict for the Defendants. Lead poisoning cases, like all personal injury cases are fact intensive and the prospect for damages vary greatly from case to case. Any judgment that the damages are unconstitutionally severe must be made in the context of the case before the Court. There is simply no basis for this Court to aggregate entirely speculative damages from hypothetical cases. Any damages awarded by a jury in the case of Ernest Gibson after a finding of negligence, would be subject to post trial challenges on the basis of the public policy limitations discussed above. *Behrendt*, 2009 WI 71, at ¶ 19. The only reasonable conclusion at this time about the potential value of Ernest Gibson's case, if he is able to prove negligence and

all of the other elements of his *prima facie* case, and the Defendants are unsuccessful in carrying their burdens of exculpation, contribution and post trial limitations on liability based on the six identified public policies, is that the claims are sufficient to invoke the diversity jurisdiction of the federal courts- in over words - at least $75,000.00. The speculation proposed by the Defendants is akin to suggesting that value of damages in automobile accident caused by defective tires can be determined by the value of another accident caused by the same defective tire. The magnitude of a mass tort cannot be used to constitutionally immunize the wrongdoers. This element demonstrates the problem with importing a rule that might have applicability in the realm of federal economic regulation into the realm of state civil torts. While the realm of federal economic regulation may countenance the concept of "too big to fail," certainly such a concept would be repugnant in the realm of state tort law.

Second, the hypothetical liability is not retroactive because, as demonstrated above, a tort is not complete until the negligence results in an injury. *Holifield*, 42 Wis.2d at 756. Ernest Gibson was injured when he was lead poisoned on June 25, 1999 while living at 2904 West Wisconsin Ave in Milwaukee, Wisconsin. Earle Affidavit, Exhibit No.5. Presuming that some of the lead paint in his apartment was applied when the building was built in 1919, as the Court must; and presuming that some of the lead paint was applied in the 1970's when American Cyanamid and National Lead were still producing lead pigments, as the Court must, and that applications of lead paint must have ceased in 1978 as suggested by the Defendants, it is necessary to infer that 21 years passed between the last application of lead paint and the onset of the injury. The passage of 21 years between the last act of negligence and the onset of an injury does not render a liability retroactive  Nor does the passage of 50 years. This is especially since the tortious conduct was negligent at the time of the conduct. The only reason that Defendants

argue that the potential liability pursuant to risk contribution is retroactive, is that they thought they got away with it due to the passage of time.

Third, risk contribution doctrine does not target a "limited class of entities." Rather, in the context of lead poisoning, it targets those former lead pigment manufacturers who can be proven to have negligently contributed to the creation of a monstrous risk of harm to innocent children. Does substantive due process impose constitutional immunity on surviving wrongdoers when a larger group of tortfeasors is depleted by the passage of time? If the answer were "yes," it would be a perversion of constitutional law to immunize a group of corporations from civil liability for a mass tort that causes a public health epidemic because the wrongdoers numbered too few. This element of the conjured rule also demonstrates the incongruity of transporting an implied holding from the realm of federal statutory economic regulation to the realm of state judicial development of the common-law.

Fourth, how can a negligent tortfeasor have a constitutionally protected "settled expectation" that it can avoid liability? It is one thing to consider the *legitimate* expectations of commercial entities with regard to settled transactions in the realm of statutory economic regulation. But that concept looses coherence when imported into the realm of civil torts. As noted by the *Thomas* Court: "they are essentially arguing that their negligent conduct should be excused because they got away with it for too long." *Thomas* at ¶ 152.

Fifth, the entirely baseless speculation of the Defendants about the potential that a jury verdict may find liability that is disproportionate to any injuries caused by the toxic risk of harm they created should not pre-empt the post trial application of public policy limitations on tort liability. *Behrendt*, 2009 WI 71, at ¶ 29 (listing six public policy limitations). Indeed, the second public policy factor is that "the recovery is 'wholly out of proportion to the culpability of

the negligent tortfeasor.'" *Id.* Again, this element demonstrates the difficulty of applying a rule designed for federal economic regulation to the entirely different context of a state's common law of negligence and strict liability. It also demonstrates the appropriateness of requiring a party to establish the inadequacy of state law remedies before allowing a substantive due process claim based entirely of state created property interests.

III.    **The *Thomas* Court's Application of Risk Contribution Liability Does Not Violate Defendant's Right to Procedural Due Process**

It is important to clarify at the outset of Plaintiff's response to Sherwin-Williams' arguments relating to procedural due process that certain of the issues Sherwin Williams raises are not properly before this Court. In rendering a decision on this motion, this Court cannot substitute its judgment for that of the Wisconsin Supreme Court in *Collins* and *Thomas*. At this stage, it is not proper for this Court to consider whether the Wisconsin Supreme Court's interpretation of the risk contribution doctrine and its applicability to lead paint makers and lead poisoned children is correct. *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 157 (2d. Cir. 2009). *See also Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ("This Court ... repeatedly has held that state courts are the ultimate expositors of state law.") This Court must limit its procedural due process review to the minimum requirement of federal constitutional law. *Ortiz*, 586 F.3d at 157-158. There can simply be no credible claim that herwin Williams was denied notice and an opportunity to be heard, the benchmarks of a procedural due process violation. Harper v. Virginia Dept. Of Taxation, 509 U.S. 86, 100-102 (1993)(The availability of a predeprivation hearing constitutes a procedural safeguard sufficient to satisfy due process). There is simply no basis to hold that in Ernest Gibson's case, Sherwin Williams has been denied procedural due process.

## A. Procedural Due Process - Notice and an Opportunity to be Heard

When a person is facing a deprivation of life, liberty or property, the concept of procedural due process demands that he or she benefits from the elemental requirement of "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Dargis v. Sheahan*, 526 F.3d 981, 989 (7th Cir. 2008) (quoting *Carey v. Piphus*, 435 U.S. 247, 259, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).) The *Mathews* test, also relied on by Sherwin Williams, requires courts to balance "the private interest that will be affected by the official action; [] the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Clancy v. Geithner*, 559 F.3d 595, 600 (7th Cir. 2009) (citing *Mathews*, 424 U.S. at 333.)

Sherwin Williams argues that it is the second factor – the erroneous deprivation of private interest – that is determinative presumably because a jury may find Defendant liable and Sherwin Williams believes that that finding would be a mistake. That presumption is not what the second element demands protection from - "[t]he risk of erroneous deprivation arises from a potential mistake of fact." *Clancy v. Geithner*, 559 F.3d 595, 601 (7th Cir. 2009). That factor presumes that a defendant is not given the opportunity to be heard in order to correct such mistake of fact and to educate the finder of fact on those errors. That is simply not the case here.

Instead of alleging any potential mistake of *fact*, Sherwin Williams essentially argues that there is a likelihood of such erroneous deprivation because the *Thomas* court shifted the burden

of proof of a narrow aspect of causation to Defendants – a burden that Sherwin Williams argues that it cannot meet.[5] First of all, the *Thomas* court did not completely shift the burden of proof away from the Plaintiff and on to the Defendant as suggests in its memorandum. The Court specifically states – "[e]ven under the risk-contribution theory, the plaintiff still retains a burden of establishing causation." *Thomas*, 701 N.W.2d 523, ¶ 156. "The plaintiff's burden is relaxed only with respect to establishing ... the specific type of white lead carbonate Thomas ingested." *Id.* Furthermore, the *Thomas* court required a plaintiff to make a prima facie case on his/her claims *before* the burden shifts to the Defendant. *Id.* at ¶162-163. Commenting on this requirement, the Court explicitly recognized that "the Pigment Manufacturers here may have ample grounds to attack and eviscerate Thomas's prima facie case, with some of those grounds including that lead poisoning could stem from any number of substances (since lead itself is ubiquitous) and that it is difficult to know whether Thomas's injuries stem from lead poisoning as they are not signature injuries." *Id.* at ¶163. Therefore, it is clear that the *Thomas* court carefully considered the burden shift that the *Collins* court set forth and its applicability to lead pigment cases, and determined that risk contribution in this context did not set up an absolute liability paradigm. It is clear the *Thomas* court's decision, after considering the facts and applicable law, was reasonable. As such, this Court should not determine otherwise and should deny Sherwin Williams' motion

### .B.     Irrebutable Presumption

---

[5] Though impermissible in the criminal context, burden shifting appears in the civil context, *see, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as does the use of rebuttable presumptions, *see, e.g., Ruby v. Ohio Cas. Ins. Co.*, 37 Wis. 2d 352, 356 (Wis. 1967) (rebuttable presumption of agency when car is driven by a non-owner). Neither have been found to be unconstitutional.

Sherwin Williams argues that the *Thomas* decision created an irrebuttable presumption of liability which violates due process. At no point in its memorandum does Sherwin Williams point to a moment during this litigation where it has been or will be prevented from offering proof to a jury or from making argument based on evidence to the jury. Instead, Defendant relies on the *Thomas* court's acknowledgment that the common law in general, risk contribution specifically, is imprecise. However, this concept is not disparaged in the law: "Application of common law, which is both imprecise and flexible, aids this purpose [of doing justice] because is [sic] expands incrementally on a case-by-case basis, under the discretion and guidance of the judiciary. Reasoning from case precedent, lawyers and judges can extrapolate and modify the common law to do justice in individual controversies." *In re: Westmoreland Coal Co.*, 213 B.R. 1, *19-20.

The reality is that Sherwin Williams has been provided and will continue to be provided with notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. Each of the facts that Sherwin Williams argues has been presumed in Plaintiff's favor, putting Plaintiff at an unfair disadvantage were carefully considered by the *Thomas* court, balanced according to its interpretation of the common law, and determined to be ripe for consideration by the fact finder at the time of trial. *Thomas*, 701 N.W.2d 523, ¶157. The *Thomas* court's specific invitation to the Defendants to argue its defenses to the jury belies Sherwin Williams' argument herein that it has been and will continue to be deprived of procedural due process rights. *Id.* Because Sherwin Williams has failed to demonstrate that the *Thomas* court's decision to apply the *Collins* risk contribution model to lead pigment claims was unreasonable and failed to present facts not already considered and rejected by the *Thomas* court

that show Sherwin Williams' procedural due process rights have been violated, Sherwin Williams' motion must fail.

## IV. The *Thomas* Court's Application of Risk Contribution Liability Does Not Violate the Commerce Clause

Sherwin William alone argues that the risk contribution doctrine discriminates against interstate commerce in violation of the Commerce Clause to the United States Constitution. In support of this poorly developed argument, Sherwin-Williams devotes two short paragraphs mis-citing two cases. SW Brief, pp. 28-29. Sherwin Williams argues (with a straight face) that by applying the risk contribution doctrine to pigment manufacturers rather than paint companies, the Wisconsin Supreme Court discriminatorily "ensured" that the doctrine applied only to out-of-state companies giving in-state paint companies a competitive advantage while imposing all the liability on out-of-state companies. Since not one fact is cited to support the allegation of discriminatory impact, much less discriminatory intent,, the Sherwin-Williams seeks relief from the Court without any basis in fact whatsoever.

Examination of the two cited cases demonstrates that the defense also lacks any basis in law whatsoever. As such the motion for summary judgment on the basis of the Commerce Clause is in violation of Rule 11 of the Federal Rules of Civil Procedure and Sherwin-Williams should be subject to appropriate sanctions.

Sherwin Williams erroneously cites *Stone ex rel Estate of Stone v. Frontier Airlines, Inc.*, 256 F.Supp.2d 28, 45-46 (D. Mass. 2002), for the proposition that the Commerce Clause restricts state common law tort claims. However, *Stone* instructed that the health and safety of a state's citizens is a "paramount state interest" easily trumping any incidental burden on interstate commerce:

The question here is thus whether a Massachusetts jury verdict in Mrs. Stone's favor — essentially, a verdict imposing a requirement that airlines carry defibrillators — would violate the Commerce Clause by burdening interstate commerce to a degree that clearly exceeds the local benefits of such a regulation. The type of local benefit implicated here — namely, the protection of Massachusetts citizens' health — is significant. Courts have long held that the Commerce Clause does not impair states' authority to establish reasonable regulations for the protection of the health, lives, and safety of the people within their borders.

By contrast, the burden on interstate commerce imposed by such a verdict would not be excessive. It is true that such a verdict would have *some* effect on interstate commerce. But "it is inevitable that a state's law, whether statutory or common law, will have extraterritorial effects. The Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border." . . . .

Reduced to its essence, Frontier's argument is that the dormant Commerce Clause precludes state tort law from regulating any activity that, while having local effects, also effectuates some external consequences. The *reductio ad absurdum* of this reasoning, however, is an evisceration of state tort law because almost every activity a state regulates has some "extraterritorial effects."

*Id.*, at 45-47 (citations omitted).

Sherwin Williams also misconstrues *BMW of North America v. Gore*, 517 U.S. 559 (1996), to stand for the proposition that the Commerce Clause prohibits state torts that discriminate against or impose and undue, disproportionate burden on interstate commerce. Ratherr, *Gore*, held that a state "does not have the power . . . to punish [a defendant] for conduct that was lawful where it occurred [outside the state] and that had no impact on [that state] or its residents." *Id.* Here, the Wisconsin Supreme Court has modified the common law to allow children poisoned by lead in Wisconsin to sue former white lead manufacturers under the risk contribution doctrine for injuries occurring within this state within the applicable statute of limitations. *Gore* is simply inapposite.

Case 2:07-cv-00864-RTR   Filed 09/20/10   Page 45 of 46   Document 176

As part of the remedy for the violation of Rule 11 of the Federal Rules of Civil Procedure, this Court should strike Sherwin-Williams' fifteenth affirmative defense and award attorney's fees to the Plaintiff.

## V.   CONCLUSION

The Plaintiff respectfully requests that the Court deny summary judgment motions of American Cyanamid, Armstrong Containers, E.I. DuPont de Nemours, N.L. Industries, and the Sherwin Williams Company for all of the foregoing reasons.

Dated at Milwaukee, Wisconsin this 22th day of September, 2010.

_____/s/_____
Peter G. Earle, SBN 1012176
Law Office of Peter G. Earle
839 North Jefferson Street, Suite 300
Milwaukee, WI 53202
(414) 276-1076


_____/s/_____
Jonathan Orent, SBN 1062035
MOTLEY RICE, LLC
321 South Main Street
Providence, RI 02903
(401) 457-7700