**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ERNEST GIBSON, Minor, by his**
**guardian ad litem, SUSAN M. GRAMLING,**

and

**MILWAUKEE COUNTY DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**

Plaintiffs,

**Case No. 07-C-864**

-vs-

**AMERICAN CYANAMID Co.,**
**ARMSTRONG CONTAINERS, Inc.,**
**E.I. Du PONT de NEMOURS and Co.,**
**MILLENIUM HOLDINGS LLC,**
**NL INDUSTRIES, Inc.,**
**ATLANTIC RICHFIELD Co., and**
**THE SHERWIN WILLIAMS Co.,**

Defendants.

---

**DECISION AND ORDER**

---

On June 15, the Court granted summary judgment for one of the defendants, Atlantic Richfield Company ("ARCO"). The Court held that the imposition of liability under the "risk contribution" rule adopted by the Wisconsin Supreme Court in *Thomas ex rel. Gramling v. Mallett*, 701 N.W.2d 523 (Wis. 2005) would violate ARCO's substantive due process rights. *Gibson v. Am. Cyanamid Co.*, — F. Supp. 2d —, 2010 WL 2465498 (E.D. Wis. June 15, 2010). The remaining defendants now move for summary judgment. As the

Court accurately predicted, the logic of the Court's decision applies with equal force to all of the defendants in this case.

**I.**

The plaintiff, Ernest Gibson ("Gibson"), alleges that in January 1997 his family moved into a residence located at 2904 West Wisconsin Avenue, Milwaukee, Wisconsin. Gibson contends that he sustained an injury caused by ingesting paint containing white lead carbonate pigment at that residence. Gibson's residence was constructed in 1919.

Lead pigments are granular lead compounds that impart color, toughness, and texture to paint. Historically, painters and paint manufacturers prized white lead carbonate pigments for their strength, durability, flexibility, washability, brushability, and bright color. In the early 1900s, some states, including Wisconsin, enacted consumer protection laws requiring paint labels to disclose lead content to prevent consumers from unknowingly buying inferior paint with non-lead pigments. From the early 1900s through the 1960s, federal, state and local governments, including the City of Milwaukee, required the use of lead pigments in their project specifications. Eventually, the residential use of lead paint was banned in various forms by the federal government in 1972 and 1978. Wisconsin banned the use of lead paint in 1980. *Thomas*, 701 N.W.2d at 530.

Gibson brought this action against seven "Industry Defendants:" ARCO, E.I. du Pont de Nemours and Company ("DuPont"), NL Industries, Inc. ("NL"), Armstrong Containers, Inc. ("Armstrong"), American Cyanamid Company ("Cyanamid"), The Sherwin-Williams

Company ("Sherwin-Williams"), and Millenium Holdings LLC ("Millenium").[1] Plaintiff is unable to identify the specific manufacturer, supplier or distributor of the white lead carbonate he allegedly ingested. Moreover, Gibson did not sue every company that manufactured white lead carbonate pigments and sold them in Milwaukee or Wisconsin. Some of the companies that manufactured white lead carbonate pigments are no longer in existence.

DuPont began the manufacture of white lead carbonate pigment in 1917 when it acquired the Harrison Works, a plant located in Philadelphia, Pennsylvania. The Harrison Works plant was the only place that DuPont ever manufactured white lead carbonate pigment. By December 31, 1924, DuPont had discontinued the manufacture of white lead carbonate pigment. DuPont announced that it ceased the manufacture of white lead carbonate pigment in two separate trade journals on three separate occasions in December 1924 and January 1925.

The National Lead Company was organized in a consolidation of various white lead carbonate pigment manufacturers in 1891. National Lead created the Dutch Boy trademark in 1907, and made and sold white lead carbonate pigment for use in paint through its Dutch Boy division. National Lead was a major manufacturer of white lead carbonate for many years, but it was only one of several major manufacturers. In 1971, National Lead changed its name to NL Industries, Inc. ("NL"). NL sold its Dutch Boy division in December 1976.

---

[1] Millenium is in Chapter 11 bankruptcy. Pursuant to the automatic stay of proceedings against Millenium, Gibson's claims against Millenium are dismissed without prejudice. The Court previously determined that the Milwaukee County Department of Health and Human Services is properly aligned as a plaintiff, not a defendant. D. 111 at 13; *Gibson*, 2010 WL 2465498 at *6.

Of NL's 48.63 million outstanding shares, almost none are held by shareholders who date back to 1976 when NL sold its Dutch Boy business. Today, NL is a holding company with ownership interests in business that had nothing to do with NL's former lead pigment business.

Armstrong is an entity that allegedly succeeded to the liabilities of the John R. MacGregor Lead Co. and the MacGregor Lead Co. ("MacGregor"). MacGregor manufactured white lead carbonate at a single plant in Chicago, Illinois from 1938 to mid-1971, when it sold the plant. Until mid-1971, MacGregor manufactured and sold lead-based paint for exterior use under the brand name "Scotch Laddie." MacGregor's paint business was limited to the manufacture and sale of "Scotch Laddie" paint for exterior use. White lead carbonate manufactured at MacGregor's Chicago plant was used as lead pigment in MacGregor's Scotch Laddie brand exterior paint.

Cyanamid first manufactured white lead carbonate starting in June 1971 when it purchased white lead manufacturing assets from MacGregor, including MacGregor's manufacturing plant in Chicago. Cyanamid acquired the MacGregor assets to expand its plastics additives business, specifically, to sell lead products to other companies that used the product as a heat stabilizer in making plastics. Cyanamid had no interest in MacGregor's "Scotch Laddie" exterior paint manufacturing business; that business line was excluded from Cyanamid's asset purchase and continued in existence and operation. The asset purchase, however, included Cyanamid's agreement to a "requirements" contract under which Cyanamid would supply to MacGregor white lead carbonate at a specified grade at a

specified price. The requirements contract set a maximum quantity that MacGregor might purchase during each year, but it did not obligate MacGregor to purchase any minimum. Less than two months after MacGregor sold its lead chemicals business to Cyanamid, MacGregor sold its paint business to another Chicago paint company, Elliot Paint & Varnish. The time period in which Scotch Laddie paint might possibly have contained white lead carbonate made by Cyanamid is limited to approximately eighteen months – from the June 1971 asset purchase date until December 1972.

Sherwin-Williams was founded in 1870. Sherwin-Williams focused on selling high-quality "ready-mixed" or "prepared" paint. Sherwin-Williams began manufacturing white lead carbonate pigment in 1910 as part of its vertical integration strategy. Sherwin-Williams used almost all of the white lead carbonate it produced in its own paints. Sherwin-Williams confined its entire white lead carbonate production to a single facility in Chicago, which operated from 1910 until 1947. None of Sherwin-Williams' interior-use wall paint contained white lead carbonate.

## II.

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Gibson does not dispute any of the facts that are relevant to the defendants' motions for summary judgment.

The Court presumes familiarity with its previous orders in this case. *Gibson*, — F. Supp. 2d —, 2010 WL 2465498 (E.D. Wis. June 15, 2010) (granting ARCO's motion for summary judgment); *Gibson v. Am. Cyanamid*, No. 07-C-864, 2010 WL 3062145 (E.D. Wis. Aug. 2, 2010) (denying ARCO's motion for entry of judgment and denying Gibson's motion for reconsideration). As relevant here, ARCO succeeded to the liabilities of a company that manufactured white lead carbonate pigment at a plant in East Chicago, Indiana from 1936 until 1946. The Court found that the "potential imposition of liability [against ARCO] under the risk contribution rule violates the constitutional bar to retroactive liability expressed in" *E. Enters. v. Apfel*, 524 U.S. 498 (1998). *Gibson* at *7. *E. Enters.* was a fragmented opinion, so the Court conducted an extensive analysis of Justice O'Connor's plurality opinion, Justice Kennedy's concurrence, and Justice Breyer's dissent. Even though the plurality (Takings Clause) and the concurrence (Due Process Clause) in *E. Enters.* disagreed on the appropriate constitutional framework to analyze whether retroactive liability passes constitutional muster, the rationale employed in the two opinions is "'strikingly similar.'" *Id.* at *13 (quoting *Swisher Int'l Inc. v. Schafer*, 550 F.3d 1046, 1059 n.12 (11th Cir. 2008), citing *United States Fid. & Guar. Co. v. McKeithen*, 226 F.3d 412, 420 (5th Cir. 2000)). "The bottom line is that five of the justices [in *E. Enters.*] (indeed all nine of the justices) generally agreed upon a substantive standard that should apply to retroactive liability . . ." *Id.*

Accordingly, pursuant to *E. Enters.* and its predecessors, the Court analyzed whether the risk contribution rule threatens to impose (1) severe (2) retroactive liability on a (3) limited class of parties that (4) could not have anticipated the liability, and whether the extent of that liability is (5) substantially disproportionate to the parties' experience. *Id.* at *14 (citing *E. Enters.* at 528-29). All of these factors were satisfied as applied to ARCO. Stated another way, and perhaps more simply, the risk contribution rule violates due process because it imposes retroactive liability in a manner that is arbitrary and irrational. By "eliminating the traditional causation requirement in tort for those who were injured by white lead carbonate pigment, the risk contribution rule imposes a burden that is unrelated to any injury that was actually caused by ARCO and bears no legitimate relationship to the government's interest in compensating the victims of lead poisoning for their injuries." *Id.* at *16.

As with ARCO, the foregoing factors are satisfied with respect to the remaining defendants. It is unnecessary for the Court to proceed through the entire analysis once again. All of the defendants (or their predecessors-in-interest) stopped manufacturing white lead carbonate pigment years before the risk contribution rule could have been anticipated, if it was even possible to predict such a development prior to the ruling in *Thomas*. All of the defendants face substantial liability through the cumulative effect of multiple lawsuits, including those that are currently pending and those that could potentially be re-filed. And by eliminating the traditional causation requirement in tort, the only potential connection between Gibson and the defendants under the risk contribution theory is that the defendants

(or their predecessors-in-interest) produced or marketed white lead carbonate for use at some point during the relevant and expansive time period: the duration of the houses' existence. *Gibson* at *16 (citing *Thomas*, 701 N.W.2d at 564). Each defendant participated in the marketplace for varying periods of time, and not all of the market participants are even in existence to be brought into this suit, which means that each defendant would be subject to liability for more harm than they actually could have caused. Accordingly, the imposition of liability for injuries caused by white lead carbonate pursuant to the risk contribution rule is disproportionate to the defendants' experience in the marketplace, arbitrary and irrational.[2]

### III.

Gibson's opposition to this new round of summary judgment motions largely rehashes arguments that the Court already considered and rejected. Gibson does raise some new arguments that are worthy of discussion.

First, Gibson argues that the defendants cannot escape liability on substantive due process grounds because they did not allege the deprivation of a substantive constitutional right or that available state remedies are inadequate. "In cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that available state remedies are inadequate, the plaintiff has not stated a substantive due process claim." *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997); *see also Lee v. City of Chicago*, 330 F.3d 456, 467 (7th

---

[2] ARCO's status as a successor to the liabilities of a company that participated in the marketplace was not necessary to the Court's disposition. *Gibson* at *15. The risk contribution rule is unconstitutional when applied to companies that actually participated in the relevant marketplace or merely succeeded to the liabilities of such a company.

-8-

Cir. 2003); *Doherty v. City of Chicago*, 75 F.3d 318, 323-26 (7th Cir. 1996). Gibson observes that there are numerous ways for the defendants to escape liability under state law, even though *Thomas* dispensed with the requirement that a plaintiff's injury be connected to a product manufactured by the defendant. For example, the defendants can argue that the other elements of Gibson's *prima facie* case are not satisfied. *Thomas* at 564 (listing elements for negligence and strict liability claims). Defendants could also attempt to escape liability post-verdict on public policy grounds. *See Behrendt v. Guld Underwriters Ins.*, 768 N.W.2d 568, 577 (Wis. 2009) (listing six public policy factors that can preclude liability for negligence).

The cases cited by Gibson all involve plaintiffs bringing claims for *affirmative relief* under the rubric of substantive due process. Here, of course, the defendants are asserting due process as an affirmative defense to liability. The defendants' challenge to the use of the risk contribution rule presumes that even if all of the other elements to establish liability are satisfied (aside from the individual causation requirement cast aside by *Thomas*), the imposition of liability would be unconstitutional. A defendant is not required to exhaust all of his other affirmative defenses, keeping the due process defense in reserve as a last resort. Surely, due process encompasses a party's right to avoid the burdens of trial if such would be a pointless exercise.

Gibson also argues that application of the risk contribution rule would not impose retroactive liability because a tort is not complete until the tortious act or omission results in harm. *Abraham v. General Casualty Co.*, 576 N.W.2d 46, 53 (Wis. 1998). This argument

misconstrues the relevant constitutional framework for analyzing retroactive liability. The focus is on what the defendant could reasonably foresee at the time of the conduct which underlies the attempt to impose liability. The risk contribution rule imposes retroactive liability because it "attaches new legal consequences" to the manufacture and sale of white lead carbonate pigments. *Landgraf v. USI Film Products*, 511 U.S. 244, 270 (1994).

Finally, Gibson insists that the Court erred when it extracted a governing principle from the various opinions in *E. Enters*. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). Even if the Court erred by disregarding the traditional *Marks* approach, the various opinions in *E. Enters.* are, as Gibson concedes, persuasive authority for how to approach the imposition of retroactive liability in the instant case. *Swisher*, 550 F.3d at 1057 n.8. Moreover, as the Court demonstrated, there is substantial overlap between the analyses under the Due Process Clause and the Takings Clause. *Gibson* at **12-14. Therefore, if substantive due process is not the appropriate method of analysis, the Takings Clause stands as an alternative defense to the imposition of retroactive liability by the judicial branch. *Cf. Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, — U.S. —, 130 S. Ct. 2592, 2602 (2010) ("the Takings Clause bars *the State* from taking private property without paying for it, no matter which branch is the instrument of the taking") (emphasis in original).

**IV.**

The Court also found that the imposition of liability pursuant to the risk contribution rule would violate ARCO's due process rights by imposing "damages for the wrongful conduct of others." *Gibson* at *18 (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) and *Philip Morris USA v. Williams*, 549 U.S. 346 (2007)). Once again, the logic of this alternative rationale applies to the remaining defendants in this case. Gibson offers no new arguments to oppose the entry of summary judgment on this basis.

**V.**

Alternatively, Sherwin-Williams argues that it is also entitled to summary judgment because the risk contribution rule violates its procedural due process rights and the dormant commerce clause. U.S. CONST., art. I § 8, cl. 3. It is unnecessary to address these arguments in light of the foregoing disposition. Gibson argues that the Court should impose sanctions under Rule 11 against Sherwin-Williams for the dormant commerce clause argument. Sanctions are not warranted because the argument is not frivolous and Gibson did not comply with the safe harbor provision in any event. Fed. R. Civ. P. 11(c)(2).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. The defendants' motion for leave to file an oversized memorandum [D. 192] is **GRANTED**;

2. The defendants' motions for summary judgment [D. 135, D. 141, D. 145, D. 150, D. 157] are **GRANTED**;

3. Gibson's claims against Millenium Holdings are **DISMISSED** without prejudice; and

4. This matter is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of November, 2010.

                                              **SO ORDERED,**

                                              *s/ Rudolph T. Randa*
                                              **HON. RUDOLPH T. RANDA**
                                              **U.S. District Judge**