# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ERNEST GIBSON,<br><br>           Plaintiff,<br><br>v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>           Defendants. | Case No. 07-cv-00864-LA |
| DEZIREE VALOE, et al.,<br><br>           Plaintiffs,<br><br>v.<br><br>AMERICAN CYANAMID CO., et al.,<br><br>           Defendants. | Case No. 11-cv-00425-LA |

**BRIEF IN SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

I.   The *Gibson* and *Valoe* Plaintiffs allege exposure to WLCs in 1999 and later .................. 1

II.  The Court previously held as a matter of law that manufacturers had no duty to warn in the 1990s and 2000s ........................................................................................ 2

III. The Seventh Circuit has affirmed judgment for Defendants in all of the related cases based on Defendants' lack of any duty to warn ........................................................ 3

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.   As a matter of law, Defendants had no duty to warn ........................................................... 5

    A.   There is no duty to warn if manufacturers had any reason to believe consumers would realize the alleged danger ............................................................ 5

    B.   The same undisputed record that previously compelled judgment for Defendants also precludes liability in *Gibson* and *Valoe* ....................................... 6

    C.   Plaintiffs' alleged exposure to WLCs post-dates additional warnings that the federal government mandated by 1996 ........................................................... 10

II.  Plaintiffs' evidence is irrelevant under the governing legal standard and cannot create a genuine dispute of material fact .............................................................................. 13

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. Am. Cyanamid*,
   527 F. Supp. 3d 982 (E.D. Wis. 2021) ............................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 4

*Antwaun A. v. Heritage Mut. Ins. Co.*,
   596 N.W.2d 456 (Wis. 1999) ............................................................................... 9

*Burton v. Am. Cyanamid*,
   334 F. Supp. 3d 949 (E.D. Wis. 2018) ............................................................... *passim*

*Burton v. E.I. du Pont de Nemours & Co.*,
   994 F.3d 791 (7th Cir. 2021) ............................................................................... *passim*

*Cannon v. Armstrong Containers Inc.*,
   92 F.4th 688 (7th Cir. Feb. 9, 2024) ............................................................. 3, 4, 5, 13

*Logan v. Commercial Union Ins. Co.*,
   96 F.3d 971 (7th Cir. 1996) ................................................................................. 5

*Peace v. Nw. Nat'l Ins. Co.*,
   596 N.W.2d 429 (Wis. 1999) ............................................................................... 9

*Stockton v. Milwaukee County*,
   44 F.4th 605 (7th Cir. 2022) ................................................................................. 5

**STATUTES**

15 U.S.C. § 2686 ......................................................................................................... 8

42 U.S.C. § 4852d ....................................................................................................... 8

**OTHER AUTHORITIES**

61 Fed. Reg. 9064-01 (Mar. 6, 1996) ................................................................... 10, 11

Fed. R. Civ. P. 56 ..................................................................................................... 4, 13

# INTRODUCTION

The Seventh Circuit has directed this Court to address whether Defendants had a duty to warn for purposes of the last two cases remaining in this coordinated litigation, *Gibson* and *Valoe*. This Court has already addressed that question in five related cases and, based on undisputed historical evidence, held that Defendants did not have a duty to warn in the 1990s and 2000s. By that time, decades of federal, state, and local government and industry warnings about lead in paint and household dust had given manufacturers "ample reason" to believe that consumers would realize the danger alleged in these cases—possible exposure to white lead carbonate pigments ("WLCs") from deteriorated residential paint. *Burton v. Am. Cyanamid*, 334 F. Supp. 3d 949, 961 (E.D. Wis. 2018) ("*Burton I*"); *Allen v. Am. Cyanamid*, 527 F. Supp. 3d 982, 997 (E.D. Wis. 2021). As the Seventh Circuit confirmed last month, the legal standard that governs this duty question remains unchanged. The undisputed historical evidence on which this Court relied in previously entering judgment for Defendants likewise remains unchanged. Indeed, before any of the *Gibson* and *Valoe* Plaintiffs allegedly were exposed to WLCs, federal law *required* that *all* landlords leasing pre-1978 residential properties give multiple, explicit lead-paint warnings to tenants like Plaintiffs and their caregivers, including specific warnings about lead dust. By itself, that law precludes liability under Wisconsin's test for duty. As it has in each other case, the Court should grant summary judgment for Defendants on all claims in these cases.

# BACKGROUND

**I.       The *Gibson* and *Valoe* Plaintiffs allege exposure to WLCs in 1999 and later.**

Each Plaintiff alleges exposure in 1999 or later to WLCs from residential paint in pre-1978 housing that their families rented. Ernest Gibson was born in 1997. Defendants' Statement of Proposed Material Facts ("SPMF") ¶ 1. According to his sworn statement, Gibson asserts he was initially exposed to WLCs in 1999 at a pre-1978 residence that his family leased. SPMF ¶¶ 2-4.

Plaintiffs Detareion Valoe and Deziree Valoe were both born in 2006. SPMF ¶ 5. Both also allege initial exposure to WLCs from paint in pre-1978 residences that their family leased. SPMF ¶¶ 6-8.

## II. The Court previously held as a matter of law that manufacturers had no duty to warn in the 1990s and 2000s.

Each remaining Plaintiff asserts negligence and strict-liability failure-to-warn claims based on alleged exposure to WLCs in pre-1978 residential paint. This Court considered identical claims in prior opinions holding that Defendants—former manufacturers of WLCs—did not have a duty to warn at the time of alleged exposure.

In *Burton I*, the Court applied Wisconsin's objective legal standard for duty to the undisputed historical record and held that manufacturers had no duty in the 1990s and 2000s to warn about the alleged dangers of WLCs:

> To establish the existence of a duty … a plaintiff must show that the manufacturer "(a) knows or has reason to know that the chattel is likely dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition."… This they cannot do: as plaintiffs acknowledge, Sherwin Williams and other paint manufacturers had issued product warnings since at least 1955, … while federal, state and local governments have warned of risks of lead in the homes since the 1970s…. Defendants therefore had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in the paint, and of the various mechanisms by which that lead might be ingested.

334 F. Supp. 3d at 961 (internal citations omitted) (quoting *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 613 N.W.2d 142 (Wis. 2000), and Restatement (Second) of Torts § 388). Accordingly, Defendants did not owe a duty to plaintiffs or their caregivers to warn them of any risk from WLCs, including the dangers of lead dust. *Id.*; *see also Gibson v. Am. Cyanamid Co.*, No. 2:07-cv-00864-LA (E.D. Wis.), ECF No. ("*Gibson* ECF") 482 at 18; *Valoe v. Am. Cyanamid Co.*, No. 2:11-cv-00425-LA (E.D. Wis.), ECF No. ("*Valoe* ECF") 326 at 18.

2

Case 2:07-cv-00864-LA   Filed 03/12/24   Page 5 of 20   Document 520

The Court revisited that question in *Allen v. American Cyanamid*, and again held that "defendants had no duty to warn children or caregivers … during the 1990s and later." 527 F. Supp. 3d 982, 997 (E.D. Wis. 2021). The legal standard and undisputed historical evidence were the same in *Allen* as in *Burton I*, and the Court held that "[t]he same reasoning applies" and again granted summary judgment for Defendants in relevant part. *Id*. By the 1990s, former WLC manufacturers "had ample reason to believe that persons residing in homes with older paint would be aware of the toxicity of the lead compounds possibly in their paint, and of the various mechanisms by which that lead might be ingested," including (as the Court subsequently confirmed in the present cases) lead dust. *Id.*; *see also Gibson* ECF 482 at 18-23 ("I previously determined that the defendants were not required to warn consumers in that period about the dangers of white lead carbonate—*including the dangers of lead dust*" (emphasis added)); *Valoe* ECF 326 at 18-23 (same).

### III. The Seventh Circuit has affirmed judgment for Defendants in all of the related cases based on Defendants' lack of any duty to warn.

In two separate appeals arising from this coordinated WLC litigation, the Seventh Circuit held that Defendants were entitled to judgment in full for lack of a duty to warn. In 2021, on appeal from *Burton I*, the Seventh Circuit directed judgment against all three plaintiffs on all claims because "a manufacturer is not liable unless it 'has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition,'" and that standard applies to both negligence and strict-liability failure-to-warn claims. *Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791, 820, 822 (7th Cir. 2021) ("*Burton II*") (quoting *Strasser* and related precedent).

In a second opinion issued last month, the Seventh Circuit affirmed judgment for Defendants on all claims alleged by approximately 150 WLC plaintiffs. *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688 (7th Cir. Feb. 9, 2024). Each of those plaintiffs also alleged

3

negligence and strict-liability failure-to-warn claims, and this Court had held under law-of-the-case principles that Defendants did not have any duty for purposes of those claims as well. *Gibson* ECF 482 at 18-23; *Valoe* ECF 326 at 18-23. On appeal, the Seventh Circuit affirmed, finding "no error" in this Court's analysis. *Cannon*, 92 F.4th at 701-05. The court also reaffirmed its earlier decision in *Burton II*, rejecting Plaintiff's request to overturn that precedent. As the Seventh Circuit held, "the cases we relied on in *Burton II* remain good law…. and nothing since then has called that decision into question." *Id*. at 715. The court also declined to certify any issue to the Supreme Court of Wisconsin, noting that "we [were] far from 'uncertain' about what Wisconsin law has to say about these questions because we answered them at length in *Burton II*." *Id*.[1]

With respect to the *Gibson* and *Valoe* Plaintiffs, the decision in *Cannon* held only that issue preclusion did not bind them to this Court's prior decisions on duty. *Id*. at 713. The appellate court considered whether to address the parties' evidence on duty in the first instance, but declined, noting that "apply[ing] the standard to the facts … is a job in the first instance for the district court." *Id*. at 714. The court thus left "this task to the district court on remand." *Id*.

## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" only if they "might affect the outcome of the suit under the governing law," and a dispute over material facts is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1] As the Seventh Circuit also noted, subsequent to *Burton II*, the Supreme Court of Wisconsin declined to consider any purported error in that decision when it denied a petition filed by the *Valoe* Plaintiffs and others asking the Supreme Court "to take jurisdiction of an original action addressing these same questions." *Cannon*, 92 F.4th at 714; *see also Valoe et al. v. Armstrong Containers, Inc., et al.*, No. 2022AP797-OA, Final Order (Wis. Oct. 11, 2022).

242, 248 (1986). "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996). When the nonmoving party "fails to produce evidence sufficient to establish an element essential to that party's case," the moving party is entitled to judgment as a matter of law. *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022).

## ARGUMENT

I. **As a matter of law, Defendants had no duty to warn.**

    A. **There is no duty to warn if manufacturers had any reason to believe consumers would realize the alleged danger.**

The Seventh Circuit and this Court both repeatedly have held that "a manufacturer is not liable unless it 'has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition.'" *Burton II*, 994 F.3d at 822 (quoting *Strasser*, 613 N.W.2d at 155); *see Burton I*, 334 F. Supp. 3d at 961. That is an objective standard. *Gibson* ECF 450 at 4; *Valoe* ECF 293 at 4. Thus, Defendants "cannot be liable for failing to provide a warning" where a manufacturer had "reason to believe that the dangerous condition of its product would be known to consumers." *Gibson* ECF 482 at 6; *see also id*. at 21, 30-31; *Valoe* ECF 326 at 6, 21, 30-31.

This standard is dispositive of all claims. The Seventh Circuit has held that all negligence claims in WLC cases require a defect, and that the same duty standard governs both negligence and strict-liability failure-to-warn claims. *Burton II*, 994 F.3d at 822-23. The *Gibson* and *Valoe* Plaintiffs also have expressly conceded that they do not allege any other type of defect. *See* Br. of Plaintiffs-Appellants, *Cannon v. Armstrong Containers, Inc.*, No. 22-2636 (consol.) (7th Cir.), Dkt. #70 at 13 n.12. Accordingly, if at the time of the alleged exposures, manufacturers had any reason to believe consumers would realize WLCs' allegedly dangerous condition, all negligence and strict-liability claims fail as a matter of law. *Burton II*, 994 F.3d at 820, 823; *see also Cannon*,

92 F.4th at 701-05 (affirming judgment for Defendants on all negligence and strict-liability claims because law of the case established the lack of a duty to warn).

>   B. **The same undisputed record that previously compelled judgment for Defendants also precludes liability in *Gibson* and *Valoe*.**

Under this standard, the Court has twice granted summary judgment in Defendants' favor because they had no duty to warn by the time of any alleged exposure to WLCs in the 1990s and 2000s. *See Allen*, 527 F. Supp. 3d at 997; *Burton I*, 334 F. Supp. 3d at 961. The Court also has twice held—including here in *Gibson* and *Valoe*—that its prior holdings on this point were "undoubtedly correct." *Gibson* ECF 482 at 16, 22; *Valoe* ECF 326 at 16, 22; *see also Gibson* ECF 509 at 14; *Valoe* ECF 356 at 14. The Court held there was no relevant duty based on undisputed historical evidence that, for decades before any alleged exposure, manufacturers "issued product warnings" and "federal, state and local governments have warned of risks of lead in the home," *Burton I*, 334 F. Supp. 3d at 959, 961, "including the dangers of lead dust." *Gibson* ECF 482 at 18, 23; *Valoe* ECF 326 at 18, 23.

That historical evidence was and remains undisputed. As early as 1955, for instance, manufacturers updated an existing voluntary warning for products that contained more than 1% lead to advise: "CONTAINS LEAD OR OTHER COMPOUNDS. HARMFUL IF EATEN. Do not apply on toys, furniture, or interior surfaces which might be chewed by children. Use with adequate ventilation. Avoid breathing vapor, spray mist, or dust if sanded." SPMF ¶ 9; *Burton I*, 334 F. Supp. 3d at 959. Also in the 1950s, the National Paint, Varnish, and Lacquer Association worked with the federal government on public education campaigns, including distributing over 800,000 pamphlets directed at parents and physicians through public health offices and clinics and in mailings to syndicated columnists. SPMF ¶ 10. By the 1960s, the Federal Hazardous Labeling Substances Act mandated the content of warning labels for any lead paint. SPMF ¶ 11.

Congress and federal agencies have continuously regulated and warned of the dangers of residential lead paints ever since. *See* SPMF ¶¶ 12-22, 27-37. In 1973, Congress amended the Lead-Based Paint Poisoning Prevention Act ("LBPPPA") to mandate that the Department of Housing and Urban Development ("HUD") "establish procedures to eliminate … the hazards of lead based paint poisoning" in all pre-1950 housing supported by HUD financial programs, and provide "notification to purchasers and tenants of such housing of the hazards of lead based paint, of the symptoms and treatment of lead based paint poisoning, and of the importance and availability of maintenance and removal techniques for eliminating such hazards." SPMF ¶ 13-14.

In response, HUD mandated that all prospective buyers and tenants of pre-1950 "HUD-associated housing" receive printed pamphlets containing extensive warnings about the risks of residential lead-based paint and the mechanisms of potential ingestion, including "peeling and flaking paint" and "common household dust" from "[l]ead paint which has weathered and fallen to the ground."[2] SPMF ¶¶ 16, 18. HUD was not the only federal agency to do so. Also in the 1970s, and based on regulations banning the sale of certain lead paints as hazardous substances, the Consumer Product Safety Commission ("CPSC") published a fact sheet describing sources of lead exposure, including children "[i]nhaling lead dust during restoration or repair of lead-painted homes" or eating "peeling and chipped leaded paint found on the windowsills, doors, and walls of older homes." SPMF ¶ 15.

---

[2] "HUD-associated housing" was defined broadly to include all residential structures either owned by HUD or "financially assisted under any programs administered by the Secretary," including any "grant, loan, advance, housing assistance payments, the proceeds of a HUD-guaranteed loan or a HUD-insured mortgage." SPMF ¶ 17.

These regulations and warning campaigns intensified in the late 1970s and 1980s. The CPSC effectively banned the sale of residential lead paint in 1978. SPMF ¶ 19. Within a few years of that, HUD expanded its earlier mandates to require lead-paint warnings in all "HUD-associated housing" constructed before 1978. SPMF ¶ 20. HUD also required that all public housing authorities certify that tenants had received warnings about lead-paint risks, and required that all "contracts of sale, rental or management of HUD-associated housing" contain provisions to warn prospective buyers and tenants about such hazards. SPMF ¶¶ 21-22.

Congress took additional action in the early 1990s. Amendments to the LBPPPA in 1992 substantially expanded the federal government's ongoing efforts since the 1970s to warn about lead-paint hazards. SPMF ¶ 27. The 1992 law ordered the Environmental Protection Agency ("EPA") to publish a "lead hazard information pamphlet." 15 U.S.C. § 2686. And Congress further directed EPA and HUD to promulgate regulations mandating that all prospective buyers and tenants of pre-1978 housing receive that pamphlet, as well as other specific disclosures, warnings, and records about the risks of residential lead-based paint. SPMF ¶¶ 27-37; *see also* 42 U.S.C. § 4852d; *infra* Section I.C.

Simultaneously with their federal counterparts, Wisconsin state and local governments separately have been overseeing residential lead-paint warning campaigns since the 1970s. *See* SPMF ¶¶ 23-26. Beginning in the early 1970s and continuing through the 1990s, the Milwaukee Health Department ("MHD") ran "The Intensive Childhood Lead Poisoning Prevention Program," which included a variety of educational initiatives—including pamphlets, posters, doorhangers, television, radio, print news media, bus placards, presentations, home visits, and educational programs—to inform parents and homeowners of the risks of lead paint. SPMF ¶ 23. An MHD pamphlet from 1989, for example, warned about "[o]ld paint" as a potential "source of lead

poisoning in our environment" and advised that "[l]ead particles are released when the paint surface cracks, chips or flakes." SPMF ¶ 25. Similarly, since at least 1980, the Wisconsin Department of Health and Social Services has been charged with "[d]evelop[ing] educational programs to communicate to parents, educators and officials of local boards of health the danger of lead-bearing paint poisoning among children." SPMF ¶ 24. And in 1992, the Wisconsin Legislature mandated that all prospective property buyers must receive specific disclosures concerning any "unsafe concentrations of, or unsafe conditions relating to … lead in paint … on the premises." SPMF ¶ 26.

By the 1990s, it was established as a matter of law in Wisconsin that landlords had an affirmative duty to inspect for lead-paint hazards, and that insurers could disclaim coverage for such hazards. *See Antwaun A. v. Heritage Mut. Ins. Co.*, 596 N.W.2d 456 (Wis. 1999); *Peace v. Nw. Nat'l Ins. Co.*, 596 N.W.2d 429 (Wis. 1999). A cornerstone of both rulings was that, "by 1989, the dangers of lead paint in residential housing was so extensively known" it was "common knowledge." *Antwaun*, 596 N.W.2d at 462, 464; *see also Peace*, 596 N.W.2d at 443, 447 (holding that, "by the mid-1980s," "lead paint chips, flakes, and dust" were "widely, if not universally, understood to be dangerous and capable of producing lead poisoning"). This widespread societal awareness of residential lead-paint hazards by 1989 required no "special training or experience," such that Wisconsin landlords and "ordinary property owner[s]" were required to inspect and test for such hazards in their properties, would understand such hazards to be within a standard "pollution exclusion clause," and would "understand their [own] obligation to deal with the problem of lead paint." *Antwaun*, 596 N.W.2d at 464; *Peace*, 596 N.W.2d at 443, 447-48.

In sum, by 1999, the year of the earliest alleged exposure in *Gibson* and *Valoe*, federal and state law had been publishing and requiring residential lead-paint warnings in some form or

fashion for decades, including throughout Wisconsin. This Court has already held that these undisputed facts gave manufacturers "ample reason" to believe by the 1990s that consumers would realize the alleged dangers of WLCs. *Allen*, 527 F. Supp. 3d at 997; *Burton I*, 334 F. Supp. 3d at 961. A fresh look does not permit any other outcome. As it has before, the evidence again compels judgment as a matter of law for Defendants on all claims.

### C. Plaintiffs' alleged exposure to WLCs post-dates additional warnings that the federal government mandated by 1996.

Defendants are separately entitled to summary judgment on all claims, because additional government warnings applicable to these cases provided even more reason to believe that consumers would realize the alleged dangers of WLCs. The Plaintiffs in *Gibson* and *Valoe* allege exposure to WLCs exclusively in 1999 and later while residing in pre-1978 housing that their respective families leased after 1996. SPMF ¶ 2-4, 6-8. All of the exposures alleged here thus post-date additional, comprehensive federal laws requiring specific lead-paint warnings.

In 1996, based on the 1992 Title X legislation and after extensive public notice-and-comment rulemaking, HUD and EPA issued final nationwide mandates requiring all sellers and landlords to provide explicit and detailed lead-paint warnings to all buyers and tenants purchasing, leasing, and renewing the lease of all housing constructed before 1978. SPMF ¶¶ 28-30; 61 Fed. Reg. 9064-01 (Mar. 6, 1996). There were substantial penalties for noncompliance. SPMF ¶ 37. This comprehensive government warning program mandated three main types of disclosures.

*First*, the federal government mandated that all sellers and lessors of pre-1978 housing provide buyers and tenants with the "EPA-approved lead hazard information pamphlet," which federal agencies had been publishing and distributing since 1995. SPMF ¶ 31. This pamphlet warned, *inter alia*, that "[m]any houses and apartments built before 1978 have paint that contains lead," and that "[l]ead from paint, chips, and dust can post serious health hazards if not taken care

of properly." SPMF ¶ 32. It explained that people, especially children, "can get lead in their body if they … [e]at paint chips or soil that contains lead" or "[b]reathe in lead dust," and that "[l]ead from paint chips, which you can see, and lead dust, which you can't always see, can both be serious hazards." *Id.* The pamphlet is replete with additional discussion of, and warnings about, potential hazards from lead-based paint, including in household dust:



11

Case 2:07-cv-00864-LA   Filed 03/12/24   Page 14 of 20   Document 520



SPMF ¶ 32 and Declaration of Jennifer Flannery ("Flannery Decl."), Ex. O (highlighting added).

*Second*, the 1996 mandates separately required all sellers and lessors of pre-1978 housing to "disclose to the purchaser or lessee the presence of any known lead-based paint and/or lead-based paint hazards in the target housing being sold or leased," along with all related details and records. SPMF ¶ 33.

*Third*, the 1996 mandates required that all sales and lease agreements for pre-1978 housing provide notice of the EPA pamphlet and a specific "Lead Warning Statement." SPMF ¶ 34. Lease agreements, for instance, were required to state:

> Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre–1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint

> hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

*Id.* All prospective buyers and lessees of pre-1978 housing were required to expressly affirm receipt of the lead warning statement, and of the required pamphlet and disclosures noted above. SPMF ¶ 35.

Even putting aside the decades of prior government and industry warnings, the 1996 federal mandates alone gave former WLC manufacturers reason to believe consumers would realize any alleged danger from residential lead-based paint. That only reinforces why this Court should, as it has before, hold that Defendants had no duty to warn at the time of the *Gibson* and *Valoe* Plaintiffs' alleged exposures in 1999 and later. In Wisconsin, a manufacturer with any objective "reason to believe that the dangerous condition of its product would be known to consumers **cannot be liable** for failing to provide a warning." *Gibson* ECF 482 at 6 (emphasis added); *Valoe* ECF 326 at 6. Under the Seventh Circuit's binding decisions in *Burton II* and *Cannon*, that compels judgment for Defendants on all claims.

## II. Plaintiffs' evidence is irrelevant under the governing legal standard and cannot create a genuine dispute of material fact.

All of the Plaintiffs in *Gibson* and *Valoe* already have completed discovery on the duty element of their claims. In response to Defendants' 2021 motion for summary judgment on that element, Plaintiffs requested discovery pursuant to Fed. R. Civ. P. 56(d). Noting that duty is subject to an objective standard, this Court expressed skepticism that Plaintiffs' claims could succeed on the merits, but nevertheless granted their request. *See Gibson* ECF 450 (order granting discovery pursuant to Fed. R. Civ. P. 56(d)); *Valoe* ECF 293 (same). Plaintiffs in *Gibson* and *Valoe* then served, conducted, and completed discovery on the issue, and filed their opposition to summary judgment, faulting the Court's prior opinions for not "sufficiently consider[ing] the specific, hidden dangers presented by lead *dust*," and arguing there was a factual dispute

13

concerning "ordinary consumers' lack of knowledge about" that specific danger. *Gibson* ECF 455 at 10, 17; *Valoe* ECF 299 at 10, 17.

Plaintiffs' arguments are both inapposite and unavailing. First, no evidence can rebut the undisputed historical record and negate the many reasons manufacturers had to believe consumers would realize the alleged danger of WLCs. Second, the supposed actual, subjective knowledge of consumers is not the test for a duty to warn. The Seventh Circuit and this Court repeatedly have held that "a manufacturer is not liable unless ***it*** 'has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition.'" *Burton II*, 994 F.3d at 822 (citation omitted and emphasis added); *see also Burton I*, 334 F. Supp. 3d at 961; *Gibson* ECF 482 at 6; *Valoe* ECF 326 at 6. Under the correct standard, the Seventh Circuit directed judgment against the first-wave plaintiffs on both their negligence and strict-liability claims, *id*., and later affirmed this Court's decision to enter judgment against all plaintiffs except the three in *Gibson* and *Valoe* because the requirement of warnings turns on what *manufacturers* objectively had reason to believe about whether consumers would realize the alleged danger in the 1990s and 2000s. *Gibson* ECF 482 at 17; *Valoe* ECF 326 at 17. Plaintiffs cannot create a genuine dispute of material fact with irrelevant evidence about the purported state of *consumer* knowledge.

Moreover, the Court was not confused about the claims in *Burton I* and *Allen*. Both prior decisions expressly considered the "various mechanisms by which … lead might be ingested." *Burton I*, 334 F. Supp. 3d at 961; *Allen*, 527 F. Supp. 3d at 997. "Such mechanisms would include ingestion of lead dust." *Gibson* ECF 482 at 16; *Valoe* ECF 326 at 16. Indeed, industry and government warning campaigns have been warning for decades about not just residential lead-based paint generally, but also the potential for lead exposure through "dust," "common household dust"; "from paint, chips, and dust"; and by "[b]reath[ing] in lead" from deteriorated residential

paint. SPMF ¶¶ 9, 15, 18, 32, 34. The EPA pamphlet that has been required by law to be disseminated to buyers and lessees of pre-1978 residences since at least 1996 includes more than a dozen warnings specific to household dust. *See* SPMF ¶ 32 and Flannery Decl., Ex. O. Irrespective of any other flaw in Plaintiffs' argument, the same undisputed historical record that provided manufacturers with ample reason to believe consumers would realize the alleged danger of exposure to lead-based residential paint also provided ample reason to believe that consumers would realize how that exposure might occur, including through household dust. *Burton I*, 334 F. Supp. 3d at 961; *Allen*, 527 F. Supp. 3d at 997.

As is now well-established in this litigation based on undisputed and indisputable historical facts, manufacturers had considerable reasons to believe that consumers would realize the dangers alleged here well before the Plaintiffs in *Gibson* and *Valoe* could have been exposed to WLCs. That compels judgment in full for Defendants on all remaining claims.[3]

## CONCLUSION

For these reasons, the Court should enter judgment in favor of Defendants on all claims in *Gibson* and *Valoe*.

Dated: March 12, 2024                               Respectfully submitted,

/s/ *Sean Morris*                                    /s/ *Jennifer Brinkman Flannery*
Sean Morris                                          Jennifer Brinkman Flannery
ARNOLD & PORTER KAYE SCHOLER LLP                     JONES DAY
777 South Figueroa Street, 44th Floor                1420 Peachtree Street, N.E., Suite 800
Los Angeles, CA 90017-5844                           Atlanta, GA 30309-3053
Telephone: (213) 243-4000                            Telephone: (404) 521-3939
sean.morris@arnoldporter.com                         jbflannery@jonesday.com

---

[3] This motion addresses particular reasons for summary judgment as the most efficient means for resolving this case because they flow directly from the Court's previous conclusions that were reinforced by the Seventh Circuit's recent decision. Should any portion of the cases proceed, however, there are other grounds upon which dismissal would be appropriate. Defendants would raise such issues at the appropriate time, if necessary.

15

Matthew D. Grant
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
matthew.grant@arnoldporter.com

Jonathan L. Stern
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: (202) 942-5000
jonathan.stern@arnoldporter.com

Daniel T. Flaherty
Anthony S. Baish
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Telephone: (414) 273-3500
dflaherty@gklaw.com
tbaish@gklaw.com

***Counsel for Atlantic Richfield Company***

/s/ *Joy C. Fuhr*
Joy C. Fuhr
Christian E. Henneke
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000
jfuhr@mcguirewoods.com
chenneke@mcguirewoods.com

Paul E. Benson (1001457)
MICHAEL BEST & FRIEDRICH LLP
790 North Water Street, Suite 2500
Milwaukee, WI 53202
Telephone: (414) 271-6560
pebenson@michaelbest.com

***Counsel for Defendant EIDP, Inc.***

José A. Isasi, II
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Telephone: (312) 782-3939
jisasi@jonesday.com

Tracy K. Stratford
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Telephone: (216) 586-3939
tkstratford@jonesday.com

Anderson T. Bailey
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
atbailey@jonesday.com

Sara Scullen (Wis. 1030763)
Evan Thomsen (Wis. 1114697)
QUARLES & BRADY LLP
411 E Wisconsin Avenue, Suite 2350
Milwaukee, WI 53202
Telephone: (414) 277-5000
sara.scullen@quarles.com
evan.thomsen@quarles.com

***Counsel for The Sherwin-Williams Company***

/s/ *Robert P. Alpert*
Robert P. Alpert
Jeffrey K. Douglass
Eric A. Larson
MORRIS MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, Georgia 30326
ralpert@mmmlaw.com
jdouglass@mmmlaw.com
elarson@mmmlaw.com

Timothy A. Bascom
BASCOM, BUDISH & CEMAN, S.C.
W193N10975 Kleinmann Drive
Germantown, WI 53022
tbascom@bbclaw.com

***Counsel for Armstrong Containers, Inc.***